FILED ___ ENTERED
LODGED ___ RECEIVED

FEB 24 2003

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES, in its own right and on behalf of the Lummi Indian Nation

Plaintiff,

LUMMI INDIAN NATION

Plaintiff-Intervenor,

v.

STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, et al.,

Defendants.

No. C01-0047Z

ORDER

Plaintiff United States brought this action *in its own right* and on behalf of Plaintiff-Intervenor Lummi Indian Nation (collectively, "Plaintiffs"), seeking a declaration that the Treaty of Point Elliott (the "Treaty"), 12 Stat. 927, impliedly reserved drinkable groundwater under the Lummi Peninsula for the use and benefit of the Lummi Nation. Defendant State of Washington, Department of Ecology ("Ecology") issues permits to Defendant water associations to withdraw groundwater. Defendant Ecology claims that the Treaty of Point Elliott does not impliedly reserve groundwater under the Lummi Peninsula for the use and benefit of the Lummi Nation. Defendants individual fee landowners also assert a right to withdraw groundwater under a claim of right under Washington law. This action seeks to

ORDER -1-

clarify the legal relationship between the parties as to their water rights in the use of the groundwater underlying the Lummi Peninsula.

This matter comes before the Court on Defendant Ecology's motion for summary judgment re reserved groundwater rights, docket no. 216, and Defendant Ecology's motion for partial summary judgment regarding practicably irrigable acreage standard, docket no. 264.

## BACKGROUND

In 1855, the Treaty of Point Elliott reserved the island of Cha-Cho-Sen (now known as the Lummi Peninsula)[1] for the exclusive use of the Lummi Indian Nation. At the time of the Treaty, the Lummi people numbered about 500. Kennedy Decl., docket no. 219, Ex. 5 at 433. The Lummi Tribe lived mostly in the San Juan Islands and Bellingham Bay areas. United States v. Washington, 384 F. Supp. 312, 360-63 (W.D. Wash. 1974).

The Treaty of Point Elliott was one of a number of treaties negotiated by Isaac Stevens, the first governor of Washington Territory. Kennedy Decl., docket no. 219, Ex. 10. The purpose of these treaties was to "extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and non-Indians in the area." Washington, 384 F. Supp. at 355. The Lummi ceded large tracts of land to the United States in exchange for cash, defined reservations, hunting and fishing rights, and other items. 12 Stat. 927. The Treaty does not mention water or water rights, although it reserves to the Lummi their right to fish at their "usual and accustomed places." Id.

There is little information about the historical water use of the Lummi Nation, especially groundwater use at the time of the Treaty. Kennedy Decl., docket no. 219, ¶¶ 3-4. At the time of the Treaty, salmon were the principal source of food for the Lummi Indians,

---

[1] At the time of the Treaty, the Lummi River (in 1855 the Nooksack River was known as the Lummi River) had two mouths, one emptying into Lummi Bay and the other into Bellingham Bay. The island of Cha-Cho-Sen was situated at the point of separation of the mouths. The majority of the flow into the Lummi Bay was later diverted to Bellingham Bay, and the island became what is now known as the Lummi Peninsula. United States' Response, docket no. 287, at 2-3.

ORDER -2-

1   who also relied on shellfish, roots, berries, and various game animals. Id. ¶ 5. Prior to the
2   Treaty, the Lummi may have engaged in a type of incipient agriculture by gathering plant
3   foods. Id. ¶ 6. Their cultivation appears to have been limited to small patches of ground
4   where root vegetables grew naturally, and which they harvested and tended by replanting
5   seeds and small plants. Id. After non-native fur traders introduced potatoes, the Lummi and
6   neighboring tribes cultivated small patches of potatoes. Id. One expert has stated that there
7   is no evidence that the Lummi dug wells or otherwise utilized groundwater at the time of the
8   Treaty for watering these crops. Id. ¶¶ 3-4.

9   Plaintiff United States presents evidence that the historical record indicates the
10  existence of wells on the Lummi Peninsula as early as the latter part of the 1700s. Friday
11  Decl., attached as Ex. 1 to United States' Response, docket no. 287, at 3-5. Defendant
12  Ecology argues that the first wells for individual domestic supply were not drilled until the
13  1940s. Young Decl., docket no. 217, Ex. 2.

14  Today, the Lummi Nation operates at least eight wells on the Lummi Peninsula, using
15  the water primarily for residential and domestic purposes. Id., Ex. 3. In 1990, the Lummi
16  Nation contracted with the City of Bellingham to purchase water, and a pipeline was
17  constructed to the Lummi Reservation from Bellingham. Bucknell Decl., docket no. 218, Ex.
18  5.

19  Since 1855, much of the land on the Lummi Reservation has been allotted to
20  individual tribal members and sold to non-Indians. Today, several hundred non-Indians own
21  land on the Lummi Peninsula. Young Decl., docket no. 217, Ex. 3. Seven water associations
22  supply water for residential and domestic purposes to numerous homeowners that live on the
23  Lummi Peninsula. United States' Second Am. Compl., docket no. 97, ¶¶ 5, 7. In addition,
24  many non-Indian homeowners withdraw their water from single-family domestic wells
25  drilled on their property. Young Decl., docket no. 217, Ex. 2.
26

The groundwater underlying the Lummi Peninsula is alleged to be the sole source of drinkable water within the Lummi Reservation and is recharged only by precipitation. Lummi Am. Compl., docket no. 96, ¶ 6. The surface water of the Lummi Reservation consists of the Nooksack River, which forms part of the reservation's eastern boundary, and the Lummi River, in the northern portion of the reservation. The Nooksack and Lummi Rivers have become polluted so that their waters are not drinkable without treatment. Freimund Decl., docket no. 282, ¶ 8, Ex. D.

Disputes between Indian and non-Indian landowners on the Lummi Reservation regarding groundwater have a long history. In the 1970s, the United States filed an action against the State and other parties seeking to enjoin further state-authorized withdrawals of water from the aquifer underlying the Lummi Peninsula. United States v. Bel Bay Community & Water Ass'n, Civ. No. 303-71C2 (W.D. Wash. 1978). However, the suit became moot in 1982.[2]

Negotiations between the parties to attempt to resolve the groundwater disputes on the Lummi Reservation commenced in 1995. Deardorff Decl., docket no. 283, ¶ 2.[3] No final agreement was reached. Id. ¶ 5.

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and

---

[2] Before the suit became moot, the Court ruled that the Lummi Nation's federal reserved water right extended to groundwater underlying the Lummi Peninsula. See Ex. 2 to United States' Response, docket no. 287 (Order granting partial summary judgment). However, the Order was subsequently withdrawn and the Court reserved its ruling regarding groundwater until after trial on the merits, but the suit later became moot and no ruling was ultimately made on this issue. See Ex. A to Ecology's Reply, docket no. 292 (Order of September 26, 1978).

[3] Defendant Ecology relies on these negotiations in support of its summary judgment motion regarding groundwater. Bucknell Decl., docket no. 218, Exs. 1-4. The protocols for the negotiations provided that the negotiations were to be confidential, and that no statement or position taken by any party was to be admissible in any court. Deardorff Decl., docket no. 283, Ex. A. Regardless of how the negotiation documents became part of the discovery repository in this case, see Ecology's Reply to Lummi Nation's Response, docket no. 293, at 6, these confidential documents are inadmissible and should not be disclosed to the Court. The Court has not reviewed or relied on these documents.

ORDER -4-

1  the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The
2  moving party bears the initial burden of demonstrating the absence of a genuine issue of
3  material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party
4  has met this burden, the opposing party must show that there is a genuine issue of fact for
5  trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The
6  opposing party must present significant and probative evidence to support its claim or
7  defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.
8  1991). For purposes of the motion, reasonable doubts as to the existence of material facts are
9  resolved against the moving party and inferences are drawn in the light most favorable to the
10 opposing party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

**I.    Ecology's Motion for Summary Judgment Regarding Groundwater**

Defendant Ecology seeks summary judgment regarding groundwater rights on three issues. First, whether the reserved water rights doctrine should be extended to groundwater. Second, whether there was an implied intent to reserve groundwater in the Treaty of Point Elliott when the use of the groundwater arguably was, and is, not necessary to fulfill the purpose of the Lummi Reservation. Third, whether it is inequitable to extend the reserved water rights doctrine to groundwater when it would deprive non-Indian homeowners of their state law rights to withdraw groundwater.

**A.    Extension of Water Rights Doctrine**

The reserved water rights doctrine derives from Winters v. United States, 207 U.S. 564 (1908). In Winters, the United States Supreme Court held that when Congress set aside lands of the Fort Belknap Reservation for the use of the Gros Venture and Assiniboine Tribes, it also impliedly reserved the water of the Milk River because "[t]he lands were arid, and, without irrigation, practically valueless." Id. at 576. The Supreme Court has summarized the reserved water rights doctrine as follows:

> The Court has long held that when the Federal Government withdraws its land
> from the public domain and reserves it for a federal purpose, the Government,

ORDER -5-

> by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. In so doing the United States acquires a reserved right in unappropriated water which vests on the date of the reservation and is superior to the rights of future appropriators.

Cappaert v. United States, 426 U.S. 128, 138 (1976). The Supreme Court elaborated upon the reserved water rights doctrine in Arizona v. California ("Arizona I"), 373 U.S. 546 (1963), in which the Court held that when the federal government withdraws land for an Indian tribe, an adequate supply of water to accomplish the purpose of the reservation is likewise reserved.

Defendant Ecology argues that reserved water rights do not extend to groundwater because groundwater law has traditionally differed from surface water law. Defendant Ecology argues that the implied water rights doctrine should not be extended to groundwater because Washington law uses a different statutory code for the two types of water, because there are hydrologic differences between the two, and because extending the doctrine would detrimentally affect those who have relied on state law appropriations.

In United States v. Cappaert, 508 F.2d 313, 317 (9th Cir. 1974), the Ninth Circuit held that the United States may reserve not only surface water, but also underground water. Cappaert involved the drilling of wells and pumping of groundwater from a pool that was part of the groundwater system. Id. at 315-16. The Ninth Circuit held that the implied reservation of water doctrine applied not only to surface water, but also to underground water. Id. at 317. The United States Supreme Court affirmed the Ninth Circuit and stated that "since the implied-reservation-of-water-rights doctrine is based on the necessity of water for the purpose of the federal reservation, we hold that the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater." Cappaert v. United States, 426 U.S. 128, 143 (1976). However, this Supreme Court language is dicta because the Court ultimately characterized the water in Cappaert as "surface water." Id. at 142. Thus, Cappaert left unresolved the question of whether a reserved right to groundwater exists.

ORDER -6-

The Ninth Circuit has upheld the extension of implied reservation of water rights to groundwater when it is connected to surface water. United States v. Anderson, 736 F.2d 1358, 1361 (9th Cir. 1984); Colville Confederated Tribes v. Walton, 647 F.2d 42, 47 (9th Cir. 1981). However, state courts are split over the interpretation of this line of cases when groundwater is not connected to surface water. Compare *In re* General Adjudication of All Rights to Use Water in the Big Horn River, 753 P.2d 76, 99-100 (Wyo. 1988) (holding that there is no reserved right to groundwater), with *In re* General Adjudication of All Rights to Use Water in Gila River System & Source, 989 P.2d 739, 747 (Ariz. 1999) (holding that reserved rights may include groundwater), and Confederated Salish & Kootenai Tribes of the Flathead Reservation v. Stults, 59 P.3d 1093, 1098-99 (Mont. 2002) (holding that "there is no distinction between surface water and groundwater for purposes of determining what water rights are reserved").

Defendant Ecology argues for the first time in its Reply that the groundwater under the Lummi Peninsula is unconnected to any surface water. Ecology's Reply, docket no. 292, at 3. Ecology relies on the fact that Plaintiffs' complaints do not explicitly assert that the groundwater is connected to surface water. See United States' Second Am. Compl., docket no. 97; Lummi Am. Compl., docket no. 96. The United States argues in its Response that the groundwater and surface water systems are connected. United States' Response, docket no. 287, at 12. The United States cites Dr. Kennedy's example of groundwater surfacing as springs, but Dr. Kennedy is not a qualified expert on this subject as a cultural anthropologist and ethnohistorian. Ex. 3 to United States' Response, docket no. 287; Kennedy Decl., docket no. 219, ¶ 1. From the present record, the Court cannot determine whether the two systems are in hydraulic continuity.[4]

---

[4] In the previous Bel Bay litigation, there was testimony from an engineering geologist submitted by Ecology that other groundwater aquifers and the Nooksack River are "separate from the aquifer underlying the Lummi Peninsula and have little, if any, hydrological connection to it." Ex. E to Freimund Decl., docket no. 282 (Third Affidavit of Duane Wegner, ¶ 4).

ORDER -7-

If the groundwater and surface water systems on the Lummi Peninsula are connected, the Court finds as a matter of law that the reserved water rights doctrine extends to the groundwater. Anderson, 736 F.2d at 1361; Walton, 647 F.2d at 47. For purposes of summary judgment, all inferences are to be made in favor of the nonmoving party. Therefore, the Court DENIES Defendant Ecology's motion for summary judgment on this ground. Assuming for the sake of argument that the groundwater and surface water systems on the Lummi Peninsula are not connected, the Court finds persuasive the Arizona Supreme Court's rationale in Gila River, 989 P.2d 739. The Arizona Supreme Court relied on the language in Cappaert indicating that "the United States can protect its water from subsequent diversion, whether the diversion is of surface or groundwater." Gila River, 989 P.2d at 746 (quoting Cappaert, 426 U.S. at 143). The Arizona Supreme Court stated that because federal reserved rights law did not differentiate between surface and groundwater when addressing the diversion of protected waters, the implication is that federal reserved rights law would not differentiate between surface and groundwater in identifying the water to be protected. Gila River, 989 P.2d at 747; see also FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, at 585-86 (1982) ("Rights [to reserved water] should attach to all water sources – groundwater basins, streams, lakes, and springs . . . ."). Thus, as a matter of law the Court concludes that the reserved water rights doctrine extends to groundwater even if groundwater is not connected to surface water. Accordingly, the Court DENIES Ecology's motion for summary judgment on this ground.

**B.  Implied Intent to Reserve Groundwater Under the Treaty**

An intent to reserve water can be implied only when necessary to fulfill the purpose of a federal reservation. United States v. New Mexico, 438 U.S. 696, 700 (1978); Cappaert, 426 U.S. at 141; United States v. Adair, 723 F.2d 1394, 1408-9 (9th Cir. 1984); Walton, 647 F.2d at 47. Defendant Ecology argues that even if the reserved water rights doctrine extends to groundwater, the doctrine should not apply in this case because the reservation of

ORDER -8-

groundwater was, and is, unnecessary to fulfill the purpose of the Lummi Reservation.[5]

Ecology relies on the use of groundwater by the Lummi at the time of the Treaty of Point Elliott to argue that implied groundwater rights were not necessary to the purpose of the reservation. Ecology argues that at the time of the Treaty, there was abundant surface water available to meet the Lummi Nation's needs from the Lummi River and Nooksack River. Ecology relies on the lack of evidence of Lummi groundwater use at the time of the Treaty to argue that surface water was adequate, relying on the opinion of Dr. Kennedy. Kennedy Decl., docket no. 219, ¶¶ 3-4. Ecology presents evidence that the first documented use of groundwater on the Lummi Peninsula occurred in the 1940s when individual domestic wells were drilled. Young Decl., docket no. 217, Ex. 2.

Although Ecology looks to the Lummi Nation's historical use of groundwater at the time of the Treaty, the reserved rights doctrine does not require that a tribe actually use the water in question at the time the reservation was created. In identifying the purpose for which a reservation was created, courts consider a treaty and circumstances surrounding its creation, the history of the Indian tribe for whom the reservation was created, and the Indians' need to maintain themselves under changed circumstances. Walton, 647 F.2d at 47. In the context of an Indian tribe's fishing rights under a treaty, the Ninth Circuit has allowed fishing beyond a tribe's activity at the time of the treaty. United States v. Washington, 157 F.3d 630, 646 (9th Cir. 1998); see also United States v. Washington, 143 F. Supp. 2d 1218, 1222 (W.D. Wash. 2001) ("The tribes' right is not limited by particular species, nor limited to the species that were caught at the time of the treaties preserving the right."). Moreover, a tribe's reserved water rights are not limited by technology available at the time of the treaty.

---

[5] Ecology assumes for the purpose of argument on its motion for summary judgment re groundwater that the purpose of the Lummi Reservation was to provide a home for the Lummi people. Ecology's motion for summary judgment re groundwater, docket no. 216, at 15. The issue of the purpose of the Lummi Reservation is discussed further in Ecology's motion for partial summary judgment regarding practicably irrigable acreage standard, docket no. 264. The Court addresses the purpose of the Lummi Reservation in greater depth in Part II of this Order.

ORDER -9-

1   Arizona I, 373 U.S. 546 (1973); see also Washington, 384 F. Supp. at 402 (permitting a tribe
2   to use "improvements in traditional fishing techniques, methods and gear"). Thus, the Court
3   is not bound by the historical use of groundwater by the Lummi at the time of the Treaty.
4       Even if the Court were to reach the issue of whether the Lummi used groundwater at
5   the time of the Treaty, Plaintiff United States raises genuine questions of material fact
6   regarding this issue. The United States submits the Declaration of Christopher Friday in
7   opposition to Defendant Ecology's submission of the Declaration of Dorothy Kennedy. Dr.
8   Friday has read the full historical record on the subject of the Lummi Nation and states that
9   the historical record includes references to wells. Friday Decl., attached as Ex. 1 to United
10  States' Response, docket no. 287, at 3-4. Dr. Friday refers to a dissertation by Wayne Suttles
11  that mentions a well that "gave brackish water" in the late 1700s. Id., App. 1. Dr. Friday
12  also mentions to P.R. Jeffcott, a local historian who references "Indian springs" on a map he
13  prepared for his 1964 study on the Nooksack Indians. Id., App. 2. Mr. Jeffcott references
14  Archibald Menzies' discussion in 1792 of a well of fresh water used by the Nooksack people
15  for drinking. Id., App. 2, p. 3. Dr. Friday also draws inferences from historical facts such as
16  a 1887-88 Geodetic Survey map that shows Lummi homesites spread widely throughout the
17  Lummi Peninsula, many of which were located away from the surface water sources of the
18  Nooksack and Lummi Rivers. Id., at 6, App. 6. Dr. Friday concludes that it can be inferred
19  that the remote homesites would have relied on groundwater to satisfy water needs. Id., at 6.
20  Dr. Friday also states that the historical record discloses that in 1910, approximately 47
21  Indian homesites on the Lummi Reservation relied on groundwater to satisfy domestic needs.
22  Id., at 7. Dr. Kennedy acknowledges that there are historical references to wells, but
23  interprets these references differently than Dr. Friday to conclude that the lack of evidence of
24  Lummi groundwater use at the time of the Treaty means that surface water sources were
25  adequate. Kennedy Decl., docket no. 219, ¶¶ 3-4.
26      Defendant Ecology has failed to show that the reservation of groundwater under the
    Lummi Peninsula is unnecessary to fulfill the purpose of the Lummi Reservation as a matter
    ORDER -10-

of law. The actual usage of groundwater by the Lummi at the time of the Treaty is not determinative, and there are genuine questions of material fact regarding this issue. Accordingly, the Court DENIES Ecology's motion for summary judgment on this ground.

### C.  Balancing of Equities

Defendant Ecology urges the Court to engage in a balancing of equities in making its decision because there are approximately 500 non-Indian landowners who either live or own land on the Lummi Peninsula. These landowners have relied on groundwater to supply their domestic water needs for many years, and if Plaintiffs prevail, their water supply will be affected.

The Ninth Circuit has stated that "[w]here reserved water rights are properly implied, they arise without regard to equities that may favor competing water users." Colville Confederated Tribes v. Walton, 752 F.2d 397, 405 (9th Cir. 1985) (citing Cappaert, 426 U.S. at 138-39). The Court can engage in a balancing of equities only if all of the interested parties derive their rights from the same reserved source, and all share the same priority date. Walton, 752 F.2d at 405; Joint Bd. of Control of Flathead, Mission & Jocko Irrigation Dists. v. United States, 832 F.2d 1127, 1131 (9th Cir. 1987). The parties have not discussed the issue of the parties' various priority dates in their briefing. Nonetheless, the balancing of the equities is inherently factual and cannot be decided on summary judgment. As Judge McCurn of the Northern District of New York stated in a comparable case:

> [B]ecause the stakes are simply too high, the experts' views too antithetical, and the equities on all sides too important to disregard, . . . the only way to proceed at this juncture is to make every effort to insure that all parties to this litigation have an equal opportunity to present their respective versions of history, and how those versions impact the remaining issues . . . .

Cayuga Indian Nation of New York v. Pataki, 165 F. Supp. 2d 266, 274 (N.D.N.Y. 2001) (quoting his supplemental pretrial order, 2000 WL 654943, at * 4).

Even if the Court were to engage in a balancing of equities, Defendant Ecology has not shown that the equities weigh in its favor. Ecology argues that the proper means of addressing Plaintiffs' complaint regarding the inadequate quality of the surface water of the

ORDER -11-

Nooksack River is by treating the water, not increasing the supply. United States' Second Am. Compl., docket no. 97, ¶ 17; Lummi Am. Compl., docket no. 96, ¶ 6. Ecology states that surface water from the Nooksack River is available to satisfy the Lummi's needs, and can be obtained through the existing pipeline running from the Nooksack River to the City of Bellingham to the Lummi Reservation. Alternatively, Ecology argues that the Lummi may construct a treatment plant and take water directly from the Nooksack River by negotiating with the City of Bellingham.

Plaintiff-Intervenor Lummi Nation raises the issue of the incomplete factual record which precludes the Court from finding that the equities weigh in favor of Defendant Ecology, and takes issue with several of Ecology's factual representations. First, the Lummi Nation claims that the Nooksack River does not provide an adequate supply of water. Ecology has closed substantial portions of the Nooksack River, including the portions closest to the Lummi Indian Reservation, to further appropriation. WAC 173-501-040. Second, state law requires that water right certificates issued by Ecology be subject to existing rights. RCW 90.03.010. These existing rights include those reserved for Indian tribes. Third, the Lummi Nation argues that Ecology has contributed to any inequities because when it concluded in 1980 that there was no groundwater on the Lummi Peninsula left for appropriation by non-Indians, it failed to take significant steps to prohibit non-Indians from developing wells or increasing withdrawals in the area during the past twenty years. Freimund Decl., docket no. 282, Ex. E (Third Wegner Aff.); Ex. F (Ecology's Mem. in Supp. of Mot. to Dismiss, at 8) (stating that Ecology had "no intention of issuing further permits to appropriate ground waters on the Lummi Peninsula").[6] Fourth, the Lummi Nation claims that the Nooksack River is contaminated so that its waters do not meet the standards of the federal Clean Water Act and are not fit to drink. Id. ¶ 8, Ex. D. Finally, the Lummi Nation

---

[6] Ecology explains that this quotation was made in the context of whether Ecology should issue additional permits to appropriate groundwater on the Lummi Peninsula, when all but one of the new non-Lummi wells were exempt from state permitting requirements under RCW 90.44.050. Ecology's Reply to Lummi Response, docket no. 293, at 5.

claims that Ecology misrepresents the availability of a water supply through negotiations with the City of Bellingham, and the costs of such a water supply. Deardorff Decl., docket no. 283, ¶¶ 6, 8.

Because the Court cannot engage in a balancing of equities in determining the issue of reserved water rights at this time, the Court DENIES Defendant Ecology's motion for summary judgment on this ground. Even if the Court were to balance the equities, the incomplete and contested facts would preclude the Court from finding in favor of Ecology on summary judgment as a matter of law.

## II. Ecology's Motion for Summary Judgment Regarding PIA Standard

Because the Court denies Defendant Ecology's motion for summary judgment regarding groundwater rights, the Court now reaches the issues raised in Defendant Ecology's motion for partial summary judgment regarding practicably irrigable acreage standard, docket no. 264. Ecology argues that the Court should use the practicably irrigable acreage ("PIA") standard to quantify the amount of reserved water rights.

The Winters case merely addressed the *existence* of an implied reservation of water when a reservation is created, not the *amount* of water reserved. The implied reservation of water rights doctrine reserves "only that amount of water necessary to fulfill the purpose of the reservation." Cappaert, 426 U.S. at 141; see Arizona I, 373 U.S. 546. Water is reserved only for a primary purpose of a reservation, not for a secondary purpose. New Mexico, 438 U.S. at 702; Walton, 624 F.2d at 47. A reservation may have multiple purposes that entitle a tribe to reserved water rights. See, e.g., Adair, 723 U.S. at 1410; Walton, 647 F.2d at 47-48.

### A. The PIA Standard

The PIA standard is a method for calculating the amount of water reserved based on the water needed to irrigate the irrigable portions of the reserved land. Arizona I, 373 U.S. at 596. The PIA standard requires a showing that: (1) crops can be grown on the land, and (2)

ORDER -13-

the irrigation is economically feasible.[7] Arizona v. California ("Arizona II"), 460 U.S. 605 (1983) (adopting a Special Master's PIA analysis that required economic feasability). The PIA standard is "a measure which would allow a *fixed* present determination of future needs for water." Arizona II, 460 U.S. at 622-23. Courts have applied the PIA standard when a reservation has been determined to have an agricultural purpose. See, e.g., Arizona I, 373 U.S. at 600-1; Adair, 723 F.2d at 1410, 1415; Walton, 647 F.2d at 47-48; Big Horn, 753 P.2d at 96-99. An award of water under the PIA standard need not be used for agriculture and related uses, but can be used for any lawful purpose. Anderson, 736 F.2d at 1365.

### B. Purpose of the Treaty of Point Elliott

To identify the purpose for which a reservation was created, the Court considers "the document and circumstances surrounding its creation, and the history of the Indians for whom it was created," as well as the Indians' need to maintain themselves under changed conditions. Walton, 642 F.2d at 47. Indian treaties "are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).

The purpose of the Treaty of Point Elliott was to "extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and non-Indians in the area." Washington, 384 F. Supp. at 355. Ecology argues that agriculture was the primary and exclusive purpose of the Lummi Reservation.[8] Ecology relies on federal policy regarding Indian reservations and allotments at the time of the Treaty of Point Elliott.

---

[7] Defendant Ecology has submitted evidence that the calculation of the PIA involves several steps. Beeby Decl., docket no. 266, ¶ 4. The Court makes no ruling at this time regarding the specific steps required in a PIA analysis.

[8] Plaintiff United States mentions that Ecology's position regarding the agricultural purpose of the Treaty is contrary from the position it argued in the previous Bel Bay litigation. See App. 1 to United States' Response, docket no. 300 (Ecology's Mem. in Supp. of Mot. to Dismiss) (stating that "it is doubtful whether agriculture was a 'primary purpose' of the Lummi Reservation. . . . Accordingly, there may have been no water reserved for that purpose."). Because the Bel Bay litigation became moot, the Court never considered Ecology's argument.

ORDER -14-

See generally, CONFERENCE OF WESTERN ATTORNEYS GENERAL, AMERICAN INDIAN LAW DESK BOOK, at 17 (2d ed. 1998) (discussing reservation and allotment policy); COHEN, supra, at 121-25 (same). Ecology specifically points to language in the Treaty establishing an "agricultural and industrial school." 12 Stat. 927, Art. III, XIV. Ecology also references provisions of the Treaty that provided money to enable the tribes "to clear, fence, and breakup a sufficient quantity of land for cultivation." Id., Art. XIII.

Plaintiffs argue that agriculture was not the sole purpose of the Lummi Reservation. Plaintiff-Intervenor Lummi Nation argues that the Treaty on its face included activities other than agriculture, such as fishing, carpentry, blacksmithing, education, and medical care. 12 Stat. 927, Art. V, XIV. In addition, the Lummi Nation refers to the Treaty's express language allowing individual tribal families to be located on allotments as "a permanent home." Id., Art. VII. The Lummi Nation also points out that this Court previously stated that the United States' intent in negotiating the Treaty of Point Elliott was "to make at least non-coastal tribes agriculturists, although not to restrict them to that." Washington, 384 F. Supp. at 355. Plaintiffs also argue that because the general purpose of an Indian reservation is to provide a homeland for the Indians, the creation of the Lummi Reservation necessarily reserved an amount of water adequate to satisfy the domestic needs of the tribe.

The Court finds that the Treaty on its face refers to a variety of activities, including agriculture. The Court acknowledges that Plaintiffs' argument that the general purpose of an Indian reservation is to provide a homeland has some appeal. However, the present record is not sufficiently developed as to the factors other than the Treaty itself that the Court considers when determining the purpose of a reservation. No parties have disclosed expert testimony regarding the purpose of the Lummi Reservation. Therefore, the Court cannot determine the purpose of the Lummi Reservation in connection with the summary judgment motion before the Court.

### C. Quantification of Water Rights for the Lummi Reservation

Because the Court cannot determine the purpose of the Lummi Reservation at this

ORDER -15-

time, the Court consequently cannot determine whether the PIA standard would apply. The Court recognizes that the PIA standard may apply if agriculture is later found to be a primary purpose of the Lummi Reservation. The Court notes that in some cases, the PIA standard has been found to provide a sufficient amount of water for a tribe's agricultural as well as municipal, domestic, and commercial purposes. Big Horn, 753 P.2d at 99; see Arizona I, 373 U.S. at 598; Special Master Report of Simon Rifkind in Arizona I, at 265-66 (December 5, 1960) (quoted in Walton, 647 F.2d at 48).

Plaintiffs claim that using the PIA standard in the Lummi Nation's situation could result in an insufficient amount of water to meet the Lummi Nation's domestic and basic community needs. Quantifying the amount of reserved water rights is necessarily a factual inquiry for each reservation. The present record does not show whether the PIA standard would provide an amount of water "necessary to fulfill the purpose of the reservation." Cappaert, 426 U.S. at 141. Accordingly, the Court DENIES Defendant Ecology's motion for partial summary judgment regarding practicably irrigable acreage standard.

## CONCLUSION

For the forgoing reasons, the Court DENIES Defendant Ecology's motion for summary judgment re reserved groundwater rights, docket no. 216, and DENIES Defendant Ecology's motion for partial summary judgment regarding practicably irrigable acreage standard, docket no. 264. The Court concludes as follows:

1. The doctrine of implied reservation of water rights applies as a matter of law to surface water as well as groundwater on the Lummi Peninsula pursuant to the Treaty of Point Elliott, to the extent needed to accomplish the purpose of the Lummi Indian Reservation.

2. The Court is not bound by the Lummi Nation's actual groundwater usage at the time of the Treaty in determining the amount of water necessary to fulfill the purpose of the Lummi Reservation. There are genuine issues of material fact regarding the Lummi Nation's historical use of groundwater at the time of the Treaty.

ORDER -16-

3. The balancing of equities is inherently factual and cannot be decided in connection with a motion for summary judgment. Even if the Court were to engage in such an inquiry, there are genuine issues of material fact that would preclude summary judgment.

4. Based on the present record, the Court cannot determine the purpose of the Lummi Reservation. The determination of the applicability of the practicably irrigable acreage standard must await a full consideration of all the evidence concerning the purpose of the reservation. This cannot be determined at this preliminary stage on the motion for partial summary judgment.

IT IS SO ORDERED.

DATED this 21st day of February, 2003.

_____
THOMAS S. ZILLY
UNITED STATES DISTRICT JUDGE