# EXHIBIT 2

1

THE LUMMI RESERVATION: PRIMARY PURPOSE AND TEMPORARY CHARACTER

Kent D. Richards

September 15, 2003

DECY005-10436

# TABLE OF CONTENTS

CONCLUSIONS..............................................3

I.   UNITED STATES INDIAN POLICY TO 1853.........................5

II.  THE POINT ELLIOTT TREATY...................................13

III. THE LUMMI RESERVATION: SURVEY, EXECUTIVE ORDER, ALLOTMENT...25

DECY005-10437

CONCLUSIONS

1.   Jeffersonian agrarianism formed the basis of United States Indian policy in the nineteenth century.  This policy expected tribal members to acquire the skills for agriculture and related mechanical arts, to attend schools and churches, and in all ways prepare to become American citizens.  Government officials strongly supported these tenets until well into the twentieth century.

2.   Under the government's reservation policy, beginning in the 1850s, Indian groups were settled on lands in or near their traditional territories.  There, for a limited time, they received education, training, and subsidies for agricultural equipment and the other necessities of a modern society.  A key feature of this policy was allotment of agricultural land in severalty to tribal members.  At the end of their tuition tribal members would become citizens of the United States.

3.   The Treaty of Point Elliott (1855) reflected United States policy as described above in all respects.  Following the policies and instructions of the federal government, treaty negotiator Isaac Stevens established a reservation for the Lummi and other tribes for their "present use and occupation."  The treaty provided for relocation to a general reservation for western Washington tribes and for allotments of land in severalty to tribal members.

DECY005-10438

4

4.   The intent of the government in the 1855 Point Elliott Treaty was to create the Lummi Reservation as a temporary location for the Lummi and members of other bands and tribes.

5.   The primary purpose of the Lummi Reservation was to create an agricultural community for individuals and families.

6.   The 1873 Executive Order adopted the lines of a government survey of the same year.  This order allowed withdrawal of lands from the public domain in the general area of the temporary Lummi Reservation for the purpose of allotment to individual Indians for agricultural purposes.

7.   In 1883-1884, most of the lands within the 1873 survey were allotted to individuals who over the next few years received patents to their lands.  The purpose of allotment in severalty was to end communal ownership of land and tribal allegiance. Conversely, property ownership constituted a key step toward citizenship.

DECY005-10439

## I. UNITED STATES INDIAN POLICY TO 1853

United States policy toward the nation's native population from the beginning of the nineteenth century until 1934 concentrated on bringing tribal members into the mainstream of American life with all the rights, privileges, and responsibilities of citizens. Concomitant with this aim was eradication (after a necessary transition period) of Indian religious, political, and economic practices.

The Point Elliott Treaty of 1855 (ratified in 1859) represented one small, but integral part of the nation's Indian policy. It provided a temporary reservation for the Lummi people as a safe haven where adults could learn farming, mechanical and household arts and the children attend school.

Americans living in later centuries might find pre-1934 Indian policy paternalistic, but to Thomas Jefferson, and virtually every other nineteenth century policy maker, it seemed an enlightened alternative to the common process of extinction as one group supplanted another throughout the history of organized human societies in all parts of the world.

For Jefferson and most other Americans in the nineteenth century, agrarianism provided a livelihood, but to them it was much more than that; it encapsuled a way of life that strengthened character

DECY005-10440

and induced high moral values.  In Jeffersonian thought the yeoman farmer embodied the character of the new nation: self-reliance, industry, strong moral fiber, and democratic principles.  The process contemplated under the treaties assumedly would allow the Indians to evolve quickly to a plane of civilization that had taken European/Americans several hundred years to achieve.  As President, Jefferson set the tone for the policy of the next 100 plus years.

Historian Francis Paul Prucha has noted that Jefferson had a single formula for all tribes: "[t]he hunter state must be exchanged for an agricultural state; the haphazard life dependent upon the chase must give way to a secure and comfortable existence marked by industry and thrift; private property must replace communal ownership."[1]

In his first annual message in 1801, Jefferson happily informed Congress that the Indians relied ever more on husbandry, and "they are becoming more and more sensible of the superiority of this dependence for clothing and subsistence over the precarious resources of hunting and fishing...."  In a message two years later to the Senate and House, Jefferson noted the nation's need for Indian lands necessitated by the rapid increase in population.  Thus, proper Indian policy should, "encourage them to abandon hunting, to apply to the raising [of] stock, to agriculture, and

---

[1]  Francis Paul Prucha, THE GREAT FATHER (Lincoln: University of Nebraska Press, 1984), 139.

DECY005-10441

domestic manufacture, and thereby prove to themselves that less land and labor will maintain them in this better than in their former mode of living."²

Jefferson's successors without exception continued these policies. President James Monroe informed Congress:

> To civilize them, and even to prevent their extinction, it seems to be indispensable that their independence as communities should cease, and that the control of the United States over them should be complete and undisputed.  The hunter state will then be more easily abandoned, and recourse will be had to the acquisition and culture of land and to other pursuits tending to dissolve the ties which connect them together as a savage community and to give a new character to every individual.³

President John Quincy Adams declared that "[t]he ultimate design was to incorporate in our own institutions that portion of them

---

²  James D. Richardson, comp., A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS (Prepared Under the Direction of the Joint Committee on Printing, of the House and Senate, Pursuant to an Act of the Fifty-Second Congress of the United States, 20 vols., N.Y.: Bureau of National Literature, 1897-1920), Thomas Jefferson, First Annual Message, December 8, 1801, p. 314; Jefferson [To] Gentlemen of the Senate and of the House of Representatives, January 18, 1803, p. 340.

³  Ibid, James Monroe, Second Annual Message, November 16, 1818, 615.

DECY005-10442

which could be converted to the state of civilization."[4]

President Andrew Jackson introduced the concept of removing Eastern tribes to the West. However, the overriding policy remained unchanged. Removed from the pressures of an advancing population, Jackson predicted, tribes and their teachers, both religious and secular, "may proceed unmolested in the interesting experiment of gradually advancing a community of American Indians from barbarism to the habits and enjoyments of civilized life."[5]

President Jackson's Commissioner of Indian Affairs for more than half of his two terms, Elbert Herring (1831-1836), argued that removal allowed Indians the opportunity to acquire the essentials of civilization--Christianity, agriculture, and private property. As Herring's biographer has noted, he warned that Indians "were a doomed race unless they altered their life-styles and accepted white patterns of living."[6]

Herring's successors likewise echoed the Jeffersonian view of proper policy toward the continent's native populations. T. Hartley Crawford (1838-1845) asserted that "common property and

---

[4] Ibid, John Quincy Adams, Fourth Annual Message, December 2, 1828, 981-982.

[5] Ibid, Andrew Jackson, Third Annual Message, December 6, 1831, 1118.

[6] Ronald N. Satz, "Elbert Herring," in Robert M. Kvasnicka & Herman J. Viola, eds., THE COMMISSIONERS OF INDIAN AFFAIRS, 1824-1977 (Lincoln: University of Nebraska Press, 1979) 13-14.

9

civilization cannot co-exist." He warned, "[i]f...the large tracts of land set apart for them shall continue to be joint property, the ordinary motive to industry (and the most powerful one) will be wanting.  A bare subsistence is as much as they can promise themselves."[7]

Rapid settlement of the West in the 1840s prompted a shift in one aspect of the United States government's Indian policy.  The major purposes continued to be peaceful settlement of the continent and incorporation of the native population into the mainstream of American life accomplished through agrarianism, education, and Christianity.  However, it became unfeasible to relocate tribes from one section of the country to another.  Beginning in the early 1850s, the Indian Office crafted a policy that created reservations within or near the traditional homelands of tribes where they could be temporarily separated from the white community while they learned to farm, acquired skills in the mechanical arts, and sent their children to schools.

Under this so-called "reservation policy" some treaties provided for temporary reservations where traditional subsistence practices could continue during a transition period.  After further investigation of suitable locations containing sufficient farm land, the Indians would relocate with the understanding (as

_____

[7] Commissioner of Indian Affairs [CIA], Annual Report, 1838, 425.

provided by treaty) that the land eventually would be allotted to tribal members with excess lands sold to non-Indians settlers.

At the start of the Franklin Pierce administration in March 1853, George W. Manypenny became commissioner of Indian affairs, and (with his second-in-command Charles Mix) became the chief architect of the treaties implementing the reservation policy.   In the same month Washington Territory came into existence with Isaac I. Stevens receiving appointment as governor and superintendent of Indian affairs for the new political entity.

Commissioner of Indian Affairs Manypenny in 1854 negotiated nine treaties with tribes in the area immediately west of the Missouri River.   Central to all the treaties was a provision allowing allotment of lands to families and individuals in farm-sized plots. Any lands left over could be sold to citizens with the proceeds going to the Indians.   This comprised Article 6 of the Omaha Treaty, a document sent by Manypenny to Stevens for his guidance in formulating the Washington treaties.   Subsequently Article 6 was incorporated into the Point Elliott Treaty.

The 1854 Omaha Treaty included acknowledgement by the tribe of its dependence upon the government of United States, agreement to exclude ardent spirits, and the right of citizens to run roads and railways through the reservation. The government agreed to provide payments for a fixed period of time for buildings, farms, fences,

stock, seeds, implements, and other purposes designed "to advance them in civilization." Further, the government committed to build and staff mills and blacksmith shops and to hire a farmer to give assistance and instruction. Again, this all became part of the Point Elliott Treaty.[8]

A second set of treaties also directly influenced those concluded by Isaac Stevens. In September 1853, Oregon Superintendent of Indian Affairs Joel Palmer incorporated the federal government's new Indian policies in treaties negotiated with the Rogue and Cow Creek bands. The Table Rock Treaty with the Rogue created a temporary reserve of about 100 square miles which contained good agricultural land and a variety of roots, game, and fish. Article 2 of this treaty stated:

> It being understood that this described tract of land
> shall be deemed and considered an Indian reserve, until
> a suitable selection shall be made by the direction of the
> President of the United States for their permanent residence
> and buildings erected thereon, and provisions made for their
> removal.[9]

The Cow Creek Treaty contained the same language regarding a

---

[8]   Treaty with the Omaha, March 16, 1854, 10 Stats., 1043.

[9]   Treaty with the Rogue River, 1853, 10 Stats., 1018.

DECY005-10446

temporary location.[10]  Within a few years all western Oregon tribes were consolidated on two reservations.    This provision for temporary reservations with eventual consolidation was also incorporated in the Point Elliott Treaty.

---

/10    Treaty with the Umpqua-Cow Creek Band, 1853, 10 Stats., 1027.

DECY005-10447

## II.   THE POINT ELLIOTT TREATY

Governor Stevens met with tribes on his way west in 1853, assessed the Indian situation in Washington Territory, and informed Commissioner of Indian Affairs Manypenny, "the great end to be looked to is the gradual civilization of the Indians, and their ultimate incorporation with the people of the Territory."[11]

Stevens returned to the nation's capital in 1854 where he conferred a number of times with Manypenny and his top assistant (and later commissioner) Charles Mix.   At that time leaders of the Kansas/Nebraska tribes were in the capital negotiating their treaties (discussed above).

Charles Mix, acting for Manypenny, issued the commissioner's instructions to Governor Stevens to conclude "Articles of Agreement & Convention with the Indian Tribes in Washington Territory" (a region stretching from the divide of the Rocky Mountains to the Pacific Ocean).   Stevens received copies of Palmer's Oregon treaties which had established temporary reservations with the injunction that the Indian Office regarded these treaties "as exhibiting provisions proper on the part of the Government and advantageous to the Indians & will afford you valuable

---

[11]   Isaac I. Stevens to George Manypenny, September 16, 1854, CIA, Annual Report, 1854, 455.

DECY005-10448

14

suggestions."[12]

Mix also provided Stevens with copies of Manypenny's treaty with the Omaha and that with the Ottoes & Missourias which he said would indicate the policy of the Government in regard,

> to the ultimate civilization of the Indian Tribes, the graduation of the annuity payments secured to them, the encouragement of Schools and Missions among them,...and the authority proper to reserve to the President of determining the manner in which annuities of Indians shall be applied for their benefit.

In regard to the last point, Mix noted that policy called for payment of annuities in agricultural implements, stock, and goods necessary to the "comfort & civilization of the tribes."[13]

Finally, Mix admonished Stevens to operate within the general views of the government, and "you will take care in all treaties made to leave no question open out of which difficulties may hereafter arise, or by means of which the Treasury of the United States may be approached."[14]

Back in Olympia, Stevens appointed several men well acquainted with

---

[12] Charles Mix to Stevens, August 30, 1854, National Archives, M21, Letters Sent by the Office of Indian Affairs, R.50.

[13] Ibid.

[14] Ibid.

DECY005-10449

the Territory's tribes to serve as a commission to draft a general outline for all the forthcoming treaty negotiations. Stevens and his advisors read and "fully discussed" the copies of Manypenny's treaties before drafting a plan which would initially locate as many as ten reservations in western Washington, but "generally to admit as few Reservations as possible, with the view of finally concentrating them in one."[15]

After meeting with the bands near Olympia at the end of December 1854 and concluding the Treaty of Medicine Creek, Stevens traveled north to the Snohomish River to treat with the tribes and bands in the area between present Everett and British Columbia. Stevens had met with those living in the Bellingham Bay area early in 1854 to inform them of a treaty council to be conducted at some point in the future. In early January 1855 one of the treaty commissioners, traveled to Bellingham Bay to bring the various tribes to Point Elliott. (He failed to reach the Nooksacks because of ice in the river). The Lummi arrived on January 17.[16]

Before the Point Elliott council began, surveyor George Gibbs (another member of the treaty commission) reconnoitered the region around the Snohomish River to test Governor Stevens' preliminary

[15]   Records of the Proceedings of the Commission to Hold Treaties with the Indian Tribes in Washington Territory and the Blackfoot Country [Records of Proceedings], December 7, 1854, National Archives, M5, Records of the Washington Superintendency of Indian Affairs [WSIA], R.26.

[16] Records of Proceedings, January 9, 17, 1855.

DECY005-10450

conclusion that this might be the best location for the general
reservation contemplated for all Puget Sound tribes.   Gibbs and
Puget Sound Indian Agent Michael Simmons recommended Tulalip Bay
where a township could be set aside, "fitted in all respects for an
agency, having a harbor to which a vessel of ordinary size could
have access, perfectly safe & with abundant good land for farms."[17]

The council convened on January 22.  Stevens told the head men that
he had consulted with the Great Father (using the common parlance
of the day to mean the President and federal government).   The
governor realized that he must speak in general terms to better
convey the basic points in the treaty's articles.   The "Great
Father," Stevens said, would care for his "children" in the present
life and prepare them for the life to come--"a home for the next
world." He made it clear that the government planned "to place you
in homes where you can cultivate the soil."   The Lummi leader
Chowitshoot responded that he raised potatoes and had built a
house, but would move to the agreed location and "do as you say
hereafter."[18]

Discussion at the council on January 22 was limited because, as
Stevens remarked during the proceedings, all the details "had been
fully explained by Col. Simmons, & Mr. Shaw, the Interpreter, in
previous conversations with the Chiefs and head men, and as is

----

[17]   Records of Proceedings, January 12, 13, 16, 1855.

[18]   Records of Proceedings, January 22, 1855.

DECY005-10451

believed were fully understood."  At the council the treaty was read and explained "paragraph by paragraph," and then agreed to and signed by all parties.[19]

The Treaty of Point Elliott (or Treaty with the Dwamish, Suquamish, etc.) lists twenty-two separate groups, but not the Lummi who are subsumed under "other allied and subordinate tribes and bands."  In Article 1, the native people "hereby relinquish and convey to the United States all their right, title, and interest in and to the lands and country occupied by them."  Article 2 "reserved for the present use and occupation of the said tribes and bands the following tracts of land...."  Four areas were set aside including "the island called Chah-choo-sen, situated in the Lummi River at the point of separation of the mouths emptying respectively into Bellingham Bay and the Gulf of Georgia."[20]

No reference to acreage or a legal description of boundaries is contained in the treaty.  There was no need for precision because the reserves were temporary.  Article 3 reserved thirty-six sections at Tulalip Bay "for the purpose of establishing thereon an agricultural and industrial school...and with a view of ultimately drawing thereto and settling thereon all the Indians living west of

---

[19]  Records of Proceedings, January 22, 1855.

[20]  Treaty with the Dwamish, Suquamish, etc., January 22, 1855, 12 Stat., 927.

DECY005-10452

the Cascade Mountains in said Territory."[21]

Upon conclusion of the first treaty council at Medicine Creek,
Stevens had written to Commissioner of Indian Affairs Manypenny
informing him regarding Indian reserves that, "it was proposed to
admit as few reservations as possible with the view of finally
concentrating them in one."  Further, the governor pointed out,

> article 6th gives authority to the President to remove
> these Indians to other reserves or to consolidate them
> with friendly tribes in a single reserve, as also to give
> within the limits of the reserves homesteads on the
> principle of the Omaha Treaty.[22]

Thus, not only were all the reserves (except the central one)
temporary, the President had the right to combine tribes and move
tribes at will.

Several weeks later Stevens reiterated the point, telling
Manypenny, "it is believed that as soon as the central agency shall
be underweigh [sic], all the special reservations can be dispensed
with and the Indians consolidated on the general reservation."[23]

At a later date, the Lummi Tribe endorsed Stevens' representations

---

[21] Ibid. The government retained the right to change the
general reserve to another location if it wished.

[22] Stevens to Manypenny, December 30, 1854, WSIA, R.1.

[23] Stevens to Manypenny, May 11, 1855, WSIA, R.1.

DECY005-10453

regarding temporary reservations. In 1925 the Lummi stipulated in their Sixth Cause of Action to the U.S. Court of Claims that the Tribe understood at the time it signed the Point Elliott Treaty:

> that the reservations reserved in said treaty and designated therein were but temporary resting places for their then present use; that a general reservation was provided for therein to be thereafter selected in Western Washington by the President, upon and to which all the tribes then signing said treaty, and others, would be moved....[24]

At the Point Elliott council Stevens also told the chiefs that the Indians could continue to hunt, fish, and take roots and berries. Article 5 allowed the taking of fish at usual and accustomed places in common with citizens and the privilege of hunting and gathering on open and unclaimed lands.[25]

The fishing, hunting, and gathering article must be placed in the context of United States policy.  Many treaties concluded before 1855 allowed temporary hunting, fishing, or gathering privileges.[26]

---

[24] The Duwamish, Lummi [et.al] v. United States, United States Court of Claims, No. F-275, Claim of the Lummi Tribe of Indians, pp. 17-18.

[25] Ibid.

[26]   Typical versions of these provisions appear in the following Cherokee and Menominee treaties. The 1798 treaty with the Cherokee (7 Stat., 62) provided, "that until settlement shall make it improper, the Cherokee hunters shall be at liberty to hunt and take game upon the lands relinquished and ceded by this treaty." The 1831 Treaty with the Menominee (7 Stat., 342) stated that the tribe, "shall be at liberty to hunt and fish on the lands they have

DECY005-10454

The governor's son Hazard Stevens, who was privy to his father's private discussions with both whites and Indians, detailed the government's intentions:

> At the first the reservations were to be used in
> common, but provision was made for the survey and
> subdivision of the land, and its allotment to the
> Indians in severalty as soon as they should be prepared
> to receive and utilize it.  As it was evidently
> impracticable to make so radical a change in their
> habits suddenly, the Indians were to have the
> privilege of hunting, root-gathering, and pasturing
> stock on vacant land until appropriated by settlers,
> and the right of fishing....The staple argument held
> out was the superior advantages of civilization, and
> the absolute necessity of their adopting the habits
> and mode of life of the white man in order to escape
> extinction.

He noted further that jealousies between tribes necessitated more reservations than Governor Stevens at first intended, "but some of them were established temporarily, with the right reserved in the President to remove the Indians to the larger reservations in the

---

now ceded to the United States, on the east side of Fox river and Green bay, with the same privileges they at present enjoy, until it be surveyed and offered for sale by the President; they conducting themselves peaceably and orderly."  The treaty went on to provide that the Menominee would receive goods for four years, "by which time it is hoped their hunting habits may cease, and their attention be turned to the pursuits of agriculture."

DECY005-10455

future.[27]

Hazard Stevens' assessment was echoed by Commissioner of Indian Affairs Alfred Greenwood who in 1860 reported that in the 1850s it had become the government's policy,

> to locate a tribe within such limits as would not at first, or too suddenly, change the modes and manners of hunter life for purely agricultural, yet, at the same time, compel the members to labor in part for subsistence; and, as they become habituated to labor, gradually to restrict their possessions and finally to divide their reservations in severalty, giving to each a distinct and separate farm, and securing to them the comforts of life from the results of their own industry.[28]

---

[27]   Hazard Stevens, THE LIFE OF ISAAC I. STEVENS (2 vols., Boston: Houghton, Mifflin and Co., 1900), II:43-44, 454.

[28] CIA, Annual Report, 1860, 249-250.  A modern authority on United States Indian policy has characterized the reservation policy:
> So reservations--in most cases small parcels of land "reserved" out of the original holdings of the tribes or bands--developed as an alternative to the extinction of the Indians.  The reservations, however, were thought of as a temporary expedient, for whites dealing officially with the Indians in the 1850s all accepted the idea that the nation within its new continental limits would become the abode of enterprising and prosperous American citizens. They had no notion of a pluralistic society or a divided land occupied in part by European immigrants and their descendants and in part by American Indians adhering to their own customs.
Prucha, THE GREAT FATHER, 317.

DECY005-10456

The Point Elliott Treaty described in some detail this ultimate goal of United States policy.  Article 7 allowed the President at his discretion to "remove them from either or all of the special reservations herein before made to the said general reservation, or such other suitable place within said Territory as he may deem fit...."  Further the President could divide any of the reserved lands or other selected land into parcels assigned to individuals or families "as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas...."[29]  Assigning authority to the President (acting through the secretary of the interior and commissioner of Indian affairs) to select and divide lands was common operating procedure.  Indeed, incorporation of portions of a treaty with a tribe located some 1,700 miles distant into the Point Elliott Treaty (Article 6 of the Omaha Treaty) indicates the extent to which government treaty policy of that time was of one piece.

Complementing Article 7 were Articles 6, 13, and 14 which provided for a school, teachers, a blacksmith, farmer, carpenter, and physician located at the general agency at Tulalip.  Funds to support these employees and additional annuities would be paid over a period of twenty years.  A special appropriation compensated for clearing, fencing, and breaking land when tribes moved to the

---

[29]  Treaty with the Dwamish, Suquamish, etc., January 22, 1855, 12 Stat., 927.

23

reservations.[30]   All of these activities the government deemed
necessary to support an agricultural society.   Although most
families would farm, the farmer needed support services.   Equally
important to government officials were the schools and teachers
indispensable to an enlightened, democratic community.

The commissioner of Indian affairs, secretary of the interior,
United States Senate, and the President all endorsed and confirmed
the Point Elliott Treaty.  No objections arose from those quarters
because the treaty encapsulated the Indian policy of the federal
government.   The primary purpose of the Lummi (and other)
reservations under the Point Elliott Treaty was agriculture.   The
treaty established temporary reservations and allowed subsistence
activities during a transition period when education, Christianity,
and the arts of civilization would work their influence.  At some
point in time (likely before the end of the annuity period), at a
location to be determined, members of the Lummi and other tribes
would receive land in severalty with title in fee.  Indians would
become citizens at which time tribes, reservations, traditional
customs, and a hunter-gatherer economy would all become part of the
past replaced by an agrarian community similar to thousands of
others spread across nineteenth century America.

The vision of the federal government for the future may not have
been the one that some Lummi preferred, but the treaty council

_____

[30] Ibid.

DECY005-10458

24

indicates that the Tribe's leaders endorsed the treaty.  Perceptive chiefs likely agreed with government officials that the rapid changes taking place on Puget Sound left the Indians with no better choice.  The treaties outlined a humane course of action.  The alternative, as voiced by government officials, was "extinction."

DECY005-10459

III. THE LUMMI RESERVATION: SURVEY, EXECUTIVE ORDER, ALLOTMENT

War began in autumn 1855 delaying ratification of all but the first of the Stevens treaties.[31]  The Senate ratified the Point Elliott Treaty in 1859 and made appropriations for annuities for Puget Sound tribes to begin in 1860.  The superintendent of Indian affairs for Oregon and Washington informed the Puget Sound Indian agent that the government intended to collect all the Indians west of the Cascade Mountains at the Tulalip site.  He ordered the agent to make no improvements at the temporary reservations except those necessary to open farm lands.[32]

With no employee closer than sixty-plus miles away from the Lummi River site, the Tulalip agent found in 1862 that little had been planted, but stated that the Indians there possessed good land and had promised to till the soil if a farmer were assigned to assist. This happened that same year with the appointment of C.C. Finkbonner, a resident of the Bellingham Bay area who would serve

---

[31]   The federal government appointed J. Ross Browne as a special agent in 1857 charged with investigating Indian matters in the Pacific Northwest.  He was to advise if the treaties negotiated by Governor Stevens should be ratified; he so recommended.  Browne further stated, "I fully concur with Governor Stevens in the propriety of concentrating the Indians of the Sound at some suitable point at as early a period as practicable."  J. Ross Browne, "Report on the Condition of Indian Reservations in the Territories of Oregon and Washington," November 17, 1857, House Ex. Doc. 39, 35th Cong., 1st sess., 14.

[32]   Edward P. Geary to Michael Simmons, August 31, 1860, National Archives, Microfilm P2011, Puget Sound Agency Records, Roll 1.

DECY005-10460

26

as farmer for more than ten years.[33]

Finkbonner secured oxen and agricultural implements, and most families began to garden and farm on an acre or two. Fishing, hunting, and picking cranberries provided other means of sustenance. By the end of the 1860s, thirty or forty men worked at the local coal mines. This represented a large portion of the adult males in the Tribe, and began a trend in which employment in the mines, woods, mills, and fields throughout the region became a major source of income. Finkbonner reported to the commissioner of Indian affairs that the Lummi Reservation was the pride and boast of visitors who believed the Indians there far advanced in civilization, temperance, and religion.[34]

However, the Lummi had some complaints. Most of the treaty funds gravitated to the main reservation at Tulalip which had the largest population and where the agent resided. In a letter to the commissioner of Indian affairs, Lummi leaders complained in 1869 that they had not received the annuities promised. They stated that they had yielded their lands in good faith and wanted the treaty carried out. In addition they called for a physician and

---

[33] Samuel Howe to C.H. Hale, September 30, 1862, NA, P2011, PSDA, R.1. Finkbonner was related to the Lummi through his wife.

[34] C.C. Finkbonner to Capt. George Hill, September 28, 1869; Finkbonner to CIA, October 17, 1870, NA, M234, Letters Received by the Office of Indian Affairs [LRCIA], R.910, 911.

DECY005-10461

medicine. The chiefs averred that they wanted the Tribe's children to be "amongst the civilized and christian people of America."[35]

In August 1871, Felix Brunot, chairman of the powerful and prestigious board of Indian commissioners, met with the Lummi as part of a tour of Washington and Oregon reservations.[36] Brunot cautioned against drinking and gambling and urged settling down to farming. He warned that they needed to be prepared "when the treaty runs out," meaning at the end of twenty years. Lummi leaders responded with complaints about the quality of annuity goods received, but mostly focused on the issues of boundaries and lands. David Crockett, who signed the 1855 treaty, said, "we want this reservation surveyed, that we may bring the Indians from the outside, and that all may have lands, and know what is theirs." Crockett concluded, "I want my people to be like white men, have cattle and horses, and imitate the good whites." Brunot responded that the right line would be run and "wherever the surveyor makes it we must agree to." In his report Brunot recommended regarding

[35] Lummi Chiefs to CIA, June 26, 1869, M234, LRCIA, R.910.

[36] In April 1869, Congress authorized the President to appoint a board of commissioners serving under his direction who would exercise joint control with the secretary of the interior over Indian appropriations. This authority combined with the prestige of the intellectual, religious, and business leaders appointed made the board a powerful force in Indian affairs. In an 1869 report the board advocated abandonment of the treaty system and abrogation of existing treaties. They called for education in industry, the arts of civilization and Christianity which would elevate Indians to the rights of citizenship. The board called for assignment of land in severalty and discouraging tribal relations. Prucha, GREAT FATHER, 503, 510.

DECY005-10462

the Lummi, "it is important that the lines be definitely marked,
and also the farms allotted by boundaries to those who cultivate
them."[37]

As the Lummi moved forward along the road toward the agrarian and
American way of life contemplated by the treaty, two issues arose.
First, the consolidation of tribes on fewer reservations.  In 1860,
as noted above, the superintendent of Indian affairs for Oregon and
Washington told the Puget Sound agent that the government intended
to ultimately collect all Indians west of the Cascade Mountains at
Tulalip.  Eight years later the Washington superintendent suggested
moving the Swinomish to Lummi because of the good agricultural land
there.[38]  These proposed actions were consistent with provisions
in the 1855 treaty. (Similar proposals are discussed below).  They
provide an indication that the Lummi Reservation was not only
considered temporary, but not deemed the exclusive preserve of that
Tribe.

The composition of the population on the Lummi Reservation
reflected the government's policy of settling members of various
tribes on the temporary reserves created by the Point Elliott
Treaty.  A special 1880 census (conducted in 1881) revealed that

[37] Minutes of a Council, Held at Lummi Reservation, Washington
Territory, by Commissioner Felix Brunot, August 29-30, 1871; Brunot
to Board of Indian Commissioners, November 20, 1871, CIA, Annual
Report, 1871, 537, 556-559.

[38] Edward P. Geary to Simmons, August 31, 1860, P2011, PSAR,
R.1.  T.J. McKenny to CIA, March 16, 1868, M234, LRCIA, R.910.

DECY005-10463

those living on the Lummi Reservation included individuals who claimed membership in eleven tribes as well as nine individuals who were "whites." Within the seventy-six families on the reservation there were approximately thirty-eight adults who traced their lineage to non-Lummi tribes.[39]

Conversely many members of the Lummi Tribe lived outside the reservation. In 1881, these included as many as sixteen families on San Juan and Orcas Islands.[40] A government census made in 1919 located approximately 198 Lummi living outside the reservation. Most lived in various locations in Washington, but some were resident in British Columbia, Montana, and as far away as France and Panama.[41]

In addition to consolidating the temporary reservation, a second issue was survey of reservation lands prefatory to the assignment of individual allotments. In 1865, the Washington superintendent urged division of reservation lands in severalty as the best way to encourage permanence and help induce the tribes to abandon "the wild mode of life" and to imitate white practices. In 1871,

[39] Records of the Bureau of the Census, RG 29, M1791, Schedule of a Special Census of Indians, 1880, Tulalip Agency, R.2. Lummi Reservation residents claimed lineage as Swinomish, Nooksack, Stokamish, Skagit, Chilliwhac, Cowichan, Stickein, Clallam, Snohomish, and Semiamoo.

[40] Ibid.

[41] NAS, Tulalip Agency, Tribal Census Rolls, 1913-1929, Schedule of Unenrolled Indians of Western Washington, Lummi Tribe, B.473.

DECY005-10464

30

Washington Superintendent of Indian Affairs Robert Milroy noted
that the chairman of the board of Indian commissioners (Brunot) had
recently visited the Puget Sound tribes and found most Indians
anxious to have surveys and land patents.[42]

Lummi Reservation Farmer in Charge C.C. Finkbonner urged survey
into tracts assigned to heads of families with distinct ownership.
In this way, he said, the Lummi would improve more land, acquire
property, and abandon tribal organization.   Finkbonner believed
that patents would forestall removal, and the Lummi would "enjoy
all the rights of their white fellow citizens."[43]

In March 1873 farmer Finkbonner forwarded a petition from the Lummi
which came to him unsolicited.  They feared their lands would be
taken by a railroad projected for the area (this was the era of
land grants to railway companies).  The Lummi wished only to become
citizens and offered to forfeit future annuities (scheduled under
the treaty for six more years).  "All that they now ask from the
[Indian] Department," said Finkbonner, "is to have their lands
surveyed and receive a title to it.  They wish to become citizens
and amenable to civil law."[44]

[42]   William Waterman to Senator J.R. Doolittle, August 31,
1865; Robert Milroy to CIA, September 3, 1872, M234, LRCIA, R.909,
912.

[43]  Finkbonner to E.C. Chirouse, September 1, 1872, P2011,
Tulalip Agency Correspondence, R.2.

[44]   Finkbonner to Chirouse, March 10, 1873, P2011, Tulalip
Agency Correspondence, R.2.

DECY005-10465

The Lummi had good reason to believe those who warned reservation
lands would be taken for other purposes.  Superintendent of Indian
Affairs Robert Milroy pointed out to his superior, the commissioner
of Indian affairs, that no action had been taken to alter the
treaty provision creating the Puget Sound reservations for the
"present use and occupation" of the tribes.  The Lummi and others
lived on lands as "tenants at will" of the United States.  The
remedy existed in the treaties, Milroy noted, as the government
only needed to implement Article 6 of the Omaha Treaty which
detailed the allotment process.  In this way, Milroy believed, the
Indians would be civilized and made into Americans.[45]

Milroy's superiors did not act immediately on his proposal.
However, in 1874, two special commissioners appointed by the
commissioner of Indian affairs were charged with making
recommendations for the location of the western Washington tribes.
After investigation and upon reference to the 1854-1855 treaties,
Commissioners J.D. Lang and F.H. Smith proposed consolidation on
fewer reservations.  For those under the Point Elliott Treaty,
"[i]t is believed that their best interests would be promoted by
placing them upon a single reservation...."  However, the
commissioners noted that the Tulalip lands set aside in the Treaty
had proven less fertile than originally believed and recommended
that the single reservation be at the Lummi site which would be
extended five miles north, "and that the Indians now located upon

_____

[45] Milroy to CIA, September 3, 1872, M234, LRCIA, R.912.

DECY005-10466

the Tulalip, Muckleshoot, Port Madison, and Swinomish reservations
be removed and consolidated at this point."[46]

Even this new reservation was seen as a stopgap measure until the
Indians completed the assimilation process already underway. Lang
and Smith predicted, "within a very brief period of years...the
absorption of all the Indians in this portion of the Territory, in
the general mass of community, and in releasing the Government from
any further obligation to provide for their care as a separate
people."[47]

Father Eugene C. Chirouse, agent for all the tribes under the Point
Elliott Treaty, added his support to the proposal of Lang and
Smith. He also advised the commissioner of Indian affairs that the
various suggestions for consolidation of the temporary reservations
had prompted the tribes under his charge to pose several questions:

> Will our Father at Washington [D.C.] force us to leave our
> present homes and when?
>
> Is it advisable for us to continue making improvements if we
> are not to have the benefit?
>
> Could we not have two Reservations instead of one?

---

[46] J.D. Lang and F.H. Smith to Commissioner of Indian Affairs,
November 20, 1874, CIA, Annual Report, 1874, 78.   As another
alternative, the commissioner of Indian affairs proposed moving all
of the tribes in the region to the Yakima Valley.  Commissioner of
Indian Affairs, Annual Report, 1876, vii-viii.

[47] Lang and Smith to CIA, November 20, 1874, CIA, Annual
Report, 1874, 79.

DECY005-10467

33

Would the Government allow us to be free, and as we were
before there was any Treaty made?

If we leave our homes and improvements, will the Government
remunerate us and furnish us with as good or better ones?

Will the Government allow us to make our own choice in the
place of location?

How long will the Government still give us assistance on the
new Reservation?

Shall we not be removed anymore?[48]

These questions indicate that the tribes under the Tulalip Agency,
including the Lummi, believed the federal government, following the
terms of the Point Elliott Treaty, possessed the right to move them
to a new location, and that that removal appeared imminent.

In addition to official reports and recommendations regarding the
temporary reservations, local citizens, well aware of the treaty
provisions, told the Lummi, in the words of the official in charge
of the Lummi Reservation, "that in a few more years, their
annuities will cease, and their treaties expire, when they will be
removed, and their reservation will be occupied by the whites."[49]

Given the above expressed concerns by Lummi and government

---

[48] E.C. Chirouse to CIA, November 25, 28, 1874, M234, LRCIA,
R.913.

[49] C.C. Finkbonner to E.C. Chirouse, September 1, 1872,
National Archives, Microfilm P2011, Tulalip Agency Correspondence,
Roll 2.

DECY005-10468

representatives, it appears they were in agreement on the need for surveys and allotment in severalty.  Such actions would provide land to individuals and safeguard their title.

Washington superintendent Robert Milroy urged interior surveys of reservations at the same time as the external boundary surveys in order to speed the allotment process.  Congress appropriated funds to Milroy for this purpose in 1873.  The commissioner of Indian affairs instructed the Washington superintendent to use the monies as he thought best on as many reservations as possible for surveys "for agricultural purposes."  In August, the surveyor general for Washington Territory contracted with surveyors to locate the exterior boundaries of the Puyallup, Skokomish, Tulalip, and Lummi Reservations and to divide the interior lands into forty acre tracts.[50]

The lands within the Lummi Reservation had been surveyed in 1859 as part of the government's general land survey with no reference to this area as a reservation, although the Point Elliott Treaty had been ratified three months before the work began.  Late in 1859, Indian agent Michael Simmons made the Lummi Reservation boundaries conform to the section lines of the government survey.  An advisor to Governor Stevens during the treaty negotiations, Simmons knew

---

[50]   Milroy to CIA, May 8, 1873; Secretary of the Interior to Commissioner of the General Land Office, July 12, 1873, M234, LRCIA, R.912.  CIA to Milroy, April 19, May 28, 1873, M21, LSCIA, R.112. NAS, RG 49, Bureau of Land Management, Indian Reservations, Contracts, 1871-1874, Box 16.

DECY005-10469

the Point Elliott Treaty contained only a general description of the reservation's boundaries.   Eight years later, reservation farmer Finkbonner referenced Simmons' action but remained uncertain as to the area encompassed by the Lummi Reservation estimating it at between 15,000 and 20,000 acres.[51]   In 1873, Washington superintendent Milroy noted that Simmons had excluded 1,370 acres on the island that supposedly contained the reservation and included 2,200 acres not part of the island.[52]

Because the 1855 treaties for many western Washington tribes described the lands set aside in only general terms, the 1873 surveys required official action by the federal government to legally withdraw the land from the public domain.   Accordingly, President U.S. Grant signed an Executive Order applying to the Lummi lands on November 22, 1873, one week after completion of the survey.   The Order stated that the lands were set apart for the "Dwamish and other allied tribes of Indians."[53]

The 1873 Executive Order was by its very nature temporary as its purpose was to withdraw land from the public domain prefatory to allotting it to members of the Lummi and other tribes.   This in

---

[51] Simmons to Geary, December 13, 1859, WSIA, R.9.  Finkbonner to A.R. Elder, July, 1867, CIA, Annual Report, 1867, 57-60.

[52] Milroy to CIA, March 10, 1873, M234, LRCIA, R.912.

[53] Executive Order, November 22, 1873.   The Lummi Executive Order was one of several issued for western Washington reservations in 1873-1874.

DECY005-10470

turn was prefatory to those individuals receiving patents and
assuming their place in society as equal citizens of the United
States.

Five years after the Lummi Executive Order, the commissioner of
Indian affairs asserted, "[t]he occupants of reservations created
by executive order, or the direction of the Secretary [of the
Interior], are mere tenants at will, and possess no permanent right
to the lands upon which they are temporarily permitted to remain."
The commissioner's annual report in 1880 added, in the "progressive
age in which we live,...all true friends of the Indian" favored
individual land titles to convey a sense of ownership and the value
of labor, to promote "disintegration of tribal relations" and to
prepare "for the duties of a citizen."[54]

Six months after the 1873 survey and Executive Order,
superintendent Milroy noted that on the several reservations
surveyed, including Lummi, the families of adult males had selected
lands and were waiting for the government to issue certificates
confirming their choices.  This action (or the issue of patents)
did not take place immediately because officials in Washington,
D.C., were still contemplating consolidation or removal of the

_____

[54]   CIA, Annual Report, 1878, 486.  CIA, Annual Report, 1880,
95.

DECY005-10471

37

tribes in western Washington (see discussion above).[55]

In March 1879, Tulalip Agent John O'Keane forwarded letters "from the five different chiefs residing at this agency." Chief Charley Jules, addressing "our dear Fathers at Washington," said that white men were always saying that the government would "move us to some strange place." Another leader advised the President, "You made good laws for us Indians, and I will accept that law." Voicing the common assumption of the time that the treaties would end after twenty years, a chief asked, "[w]hen our Treaty is at an end, I would like to know how you will treat us, and what you will do for us."[56]

Charley Jules agreed with government agents who noted how difficult it became for people to work hard to improve lands and homes under uncertain conditions relative to land title. But, despite qualms regarding government intentions and plans for the Lummi, agents and Indian department inspectors consistently reported during the 1870s and 1880s that the Lummi possessed better agricultural land and did more with it than most tribes in the region. One inspector reported that the Lummi reservation contained 12,311 acres of which seven-eights was flat. The 226 inhabitants produced 2,000 pounds

---

[55]   Milroy to CIA, May 29, 1874, M234, LRCIA, R.913.

[56]   John O'Keane to Commissioner of Indian Affairs, March 10, 1879; Charley Jules, et.al. to Our dear Fathers at Washington, March 10, 1879, National Archives, Seattle, Record Group 75, Tulalip Agency, Letters Sent to CIA, Box 24.

DECY005-10472

allotment.  It was an old idea expressed with new urgency.  This way of thinking, which had long since been applied to Washington Territory and many other areas, culminated in the General Allotment Act, or Dawes Act, of 1887 which in general outline mirrored the allotment provisions in Article 6 of the Omaha Treaty that had been incorporated in the Point Elliott Treaty.  This national emphasis on allotment during the decade of the 1880s spurred action on the Lummi Reservation.

In 1883, H.R. Stewart resurveyed the interior lines of the reservation and seventy-three allotments were made.  Stewart found that most of the Lummi had from one to thirty acres under cultivation, and in general he made the allotments conform to existing holdings.  Based on family size, most secured between 120 and 170 acres although single individuals received lesser amounts. In all about seven-eights of the reservation was allotted at that time.  The allotted portion corresponded closely to estimates of the acreage valuable for agricultural or timber land.[59]

In April 1884, Tulalip Agent Patrick Buckley forwarded the schedule of Lummi allotments to the commissioner of Indian affairs.  He urged, "that you give them your earliest attention as the Indians

---

[59]   Field Notes of the Resurvey of the Lummi Indian Reservation, 1883, Center for Pacific Northwest Studies, Northwest Ethnohistory Collection, Box 6.  One piece of unfinished allotment business remained.  In 1906 the small portion of the reservation not allotted in 1883-1884 was assigned.  William McCluskey to Charles Buchanan, May 17, 1906, Tulalip Agency, LR, Lummi, Box 99; Tulalip Agency, Allotment Records, Box 334.

DECY005-10474

are very desirous of receiving their patents." Buckley reported
the Lummi energetically clearing, fencing, and planting as,

> the receiving of their lands in severalty has caused
> them to take more interest and work more faithfully,
> and when they receive their patents for the lands which
> they have located on, it will be another incentive and
> they will be more contented and work to a better advantage,
> for then each one will know that any work done or
> improvements made is for himself and that he cannot be
> deprived of the benefits arising therefrom.[60]

By 1887, most of the patents had been issued. The commissioner of
Indian affairs in that same year informed the Tulalip Agency that
all allotted Indians were citizens of the United States subject to
the law, both criminal and civil. Congressional legislation in
1891 allowed Indians to lease lands to non-Indians; after 1906,
Indians judged by the Indian Office as competent to manage their
financial affairs had trust patents replaced by fee patents.[61]

After Lummi allotment in the mid-1880s, white settlers pressed for
opening to sale the few hundred acres of reservation lands
remaining. Indian Inspector Frank Armstrong advised against it
because, he noted, no land remained other than that necessary to

---

[60]  Patrick Buckley to CIA, April 16, May 2, 1884, Tulalip
Agency, Letters Sent to CIA, Box 24.

[61]  CIA to W.H. Talbott, March 1, 1887, Tulalip Agency, Letters
Received from CIA, 1876-1909, Box 6.

DECY005-10475

complete allotments to the Lummi.   After a final round of allotments in the first decade of the twentieth century, Lummi Farmer in Charge William McCluskey reported that nearly all lands had been allotted in severalty.   The 1917 annual report for the Lummi noted that 12,501 acres were allotted to individuals and that no acres remained unallotted or under the control of the Lummi Tribe.[62]

The ultimate outcome of Isaac Stevens' 1850s treaties was the allotment of land to individual members of the western Washington tribes either within the areas set aside for temporary reservations, on additional lands reserved under executive order, or on public domain lands.   For members of the Lummi Tribe, allotments were made by authority of the Point Elliott Treaty, under the Indian Homestead Act (1875), or by the General Allotment Act of 1887.

---

[62] Frank Armstrong to Secretary of the Interior, July 8, 1887, M1070, Reports of Inspections, R.53.   William McCluskey to Charles Buchanan, July 31, 1906, Tulalip Agency, Annual Reports, Box 311. Tulalip Agency, Annual Reports, Lummi, 1917 Statistical Report, 54, Box 313.

DECY005-10476