# EXHIBIT 4

Response to the Report of Dr. Kent Richards

In the Lummi Peninsula Water Rights Case

By Chris Friday

April 2004

# Contents

Summary and Conclusions................................ 1

Part I: Responses to Dr. Richards' "Conclusions"..... 6

Dr. Richards, Conclusion 1........................ 6

Dr. Richards, Conclusion 2........................ 10

Dr. Richards, Conclusion 3........................ 11

Dr. Richards, Conclusion 4........................ 16

Dr. Richards, Conclusion 5........................ 22

Dr. Richards, Conclusion 6........................ 23

Dr. Richards, Conclusion 7........................ 27

Part II: Responses to Dr. Richards' Additional Arguments 29

Part III: Tables Comparing Treaty Language

Table 1: "Special Reservations"................ 44

Table 2: "Present Use and Occupation"........ 46

Table 3: "Comparison of Provisions—Point Elliot..." 48

Table 4: "Comparative Data for Oregon Treaties" 51

The final section of this report offers an examination and discussion of various treaties in relation to the conclusions I have presented herein.

## Part I: Responses to Dr. Richards' "Conclusions"

**Dr. Richards, Conclusion 1**

*Richards:* *"Jeffersonian agrarianism formed the basis of United States Indian policy in the nineteenth century. This policy expected tribal members to acquire the skills for agriculture and related mechanical arts, to attend schools and churches, and in all ways prepare to become American citizens. Government officials strongly supported these tenets until well into the twentieth century"*

In his report, Dr. Richards consistently takes one piece of historical evidence and presents it in broad sweeping terms. This has the impact of placing events, actions, and ideas outside their historical context while allowing Dr. Richards to make arguments that support his conclusions. In fact, Richards' statement contains a number of separate assertions that require further examination.

First, Dr. Richards holds that "Jeffersonian agrarianism," defined by him as the belief that farming and farm life was "a way of life that strengthened character and induced high moral values" (Richards Report, pp. 5-6), was the primary reason and basis for all treaties made by the United States. The historical record is replete with evidence that the United States negotiated treaties for many different reasons, but in the mid-1850s when the Treaty of Point Elliot was negotiated, the primary purpose of treaty negotiation was to extinguish Indian titles to lands. As noted in Friday, "Analysis and

6

Documentation of Lummi History," Commissioner of Indian Affairs George W. Manypenny specifically ordered Governor Stevens in Washington Territory and Joel Palmer in Oregon Territory "to enter at once upon the negotiation... with those tribes in the vicinity of whites, and having... a principal aim the extinguishment of the Indian claims to the lands..." (pp. 43-44, PFRI003-0131-0132, cited from *ARCIA 1855*, 332.) Even earlier in December 1853, Stevens had communicated to Manypenny that the principal problem was that white settlers had claimed lands "before the Indian title is extinguished" (p. 44, PFRI003-0132, cited from Isaac Stevens to George Manypenny, December 6, 1853, Records of the Washington Superintendency of Indian Affairs, 1853-1874, File Microcopies in the National Archives, no. 5, roll 1, National Archives, Washington D.C., 1945). Stevens noted this specifically of the lands near the Lummi when he wrote to Manypenny after a visit to Bellingham Bay in winter 1854. On February 1, 1854, Stevens wrote: "The more information I receive the more strongly I am convinced of the necessity of extinguishing the Indian Titles and granting them reservations..." (p. 45, PFRI003 0133, cited from Isaac I. Stevens to George W. Manypenny, February 1, 1854, Washington Superintendency Microfilm Roll 907, Records of the Bureau of Indian Affairs, Record Group 75, PFRI001 1903). For Stevens, then, the primary objective of the treaties was the extinguishment of Indian title to all lands other than those specifically reserved for Indian use and occupation.

It is the case that provisions in the mid-1850s treaties negotiated by agents of the United States government, such as those in Washington Territory and Oregon Territory, often held provisions to assist in the "civilization" of Indians through the encouragement of farming and industrial training. Article 14 of the Treaty of Point Elliot holds such

7

provisions. (PFRI003 0267) Preparatory to the treaty, Governor Isaac Stevens who was charged with negotiating treaties with Indians in Washington Territory in the mid-1850s, noted: "Farms should be attached to each reservation, under the charge of a farmer competent fully to instruct the Indians in agriculture, and the use of tools..." (*Annual Report of the Commissioner of Indian Affairs 1854* [hereafter cited as *ARCIA*], 247-248, discussed in Friday, "Analysis and Documentation of Lummi History," p. 46, PFRI003 0134). Stevens explained his thinking regarding farming by Indians on Puget Sound, offering in 1854:

> It is obviously necessary that a few reservations of good lands should be set apart as permanent abodes for the tribes. These reservations should be large enough to give each Indian a homestead, and land sufficient to pasture their animals, of which land they should have exclusive occupation. The location and extent of the reserves should be adapted to the peculiar wants and habits of the different tribes. Farms should be attached to each reservation, under the charge of a farmer competent fully to instruct the Indians in agriculture, and the use of tools....
> Another measure has been recommended which, under proper regulations, it is believed, would prove of essential benefit to the Indians, and of great convenience to the citizens. This is the establishment of a system of apprenticeship. Neither the Indians of the coast nor of the interior have any objection to service.... The employment of Indians as farm-servants would be especially useful to them, as at the expiration of their term of service they would carry back with them a sufficient knowledge of agriculture to improve their condition at home (Friday, "Analysis and Documentation of Lummi History," p. 46, PFRI003 0134).

Nonetheless, Dr. Richards' statement that "Jeffersonian agrarianism" was the sole basis for the treaties and his implication that it was consistent in all treaties across the entire treaty-making process in the nineteenth century is overdrawn. For more nearly half a century, scholars have argued that there were several distinct phases of treaty making in U.S. history. (See Felix Cohen, *Handbook of American Indian Law*, esp. pp. 48-66; and Prucha, *Great Father*, for additional details.) While the treaties of the mid-1850s did

8

stress agricultural pursuits as a means to "civilize" Indians, to characterize all the treaties of the late eighteenth and nineteenth centuries as such is misleading.

Second, in that same opening conclusion, Dr. Richards holds that the government used "Jeffersonian agrarianism" in its treaties with Indians so that they would "become American citizens." There are no provisions for citizenship in any of the Steven's treaties negotiated in Washington Territory during 1854 and 1855. Furthermore, U.S. citizenship and tribal affiliation are not mutually exclusive. (See Friday, "Analysis and Documentation of Lummi History," esp. section III, pp. 67-151, PFRI003 0155-0239, for documentation of the relationship between federal programs and Lummi responses, including the continuation of tribal identity and status. See, too, the discussion of citizenship below in relation ship to Dr. Richards, Conclusion 7.)

Third, as a continuation of his arguments regarding "Jeffersonian agrarianism," on page 8 of the report, Dr. Richards suggests that President Andrew Jackson's Removal Policy was an extension of Jefferson's ideas about agrarianism. If this was the case, then no removal would have been necessary for many of the Cherokee who were already thoroughly engaged in agricultural pursuits, including the operation of plantations utilizing slave labor. Dr. Richards neglects to provide the significant dispute between the Executive Office and the Supreme Court regarding the legality of removal as well as the legal standing of federal trust responsibility embodied in the case of *Cherokee Nation v. Georgia* (5 *Peters* 15-20, reproduced in Francis Paul Prucha, ed., *Documents of United States Indian Policy*, 2nd ed. expanded (Lincoln: University of Nebraska Press, 1990), 58-60; and discussed in Jeff Zucker, Kay Hummel, and Bob Hogfass, *Oregon Indians: Culture, History, and Current Affairs* (Portland: The Press of the Oregon Historical

9

Society, 1983), 70-71.)

### Dr. Richards, Conclusion 2

*Richards: "Under the government's reservation policy, beginning in the 1850s, Indian groups were settled in or near their traditional territories. There, for a limited time, they received education, training, and subsidies for agricultural equipment and the other necessities of modern society. A key feature of this policy was allotment of agricultural land in severalty to tribal members. At the end of their tuition tribal members would become citizens of the United States."*

The first sentence that "Indian groups were settled in or near their traditional territories," is correct, but it is at odds with statements Dr. Richards makes in his report that the government intended for Puget Sound Indians to be removed to one large, general reservation for all Indians west of the Cascades. (See pp. 25 [DECY005-10460] and following.)

Isaac Stevens considered and then created provisions for a number of small reservations around the Puget Sound and Washington coast in 1854 and 1855 with the intent of maintaining the self-sufficiency of the various tribes. Stevens's negotiations at Medicine Creek in December 1854 confirmed this. After the treaty had been signed, Stevens and his advisors held "an evening session of the Commission . . . [with] all members being present." According to the notes taken by George Gibbs:

> the treaty was very fully discussed and the provisions necessary to be incorporated in the further treaties to be concluded with Indians upon the Sound and Coast. The question of Reservations was considered and the number proper to be allowed. Messers. Simmons and Gibbs thought that several Reserves would be necessary for remaining Tribes on the Sound on account of their differences in language and dispositions—and because they needed a number of fishing stations. (Friday, "Analysis and Documentation of Lummi History," p. 51, PFRI003 0139, cited from "Records of the Proceedings of the Commission to Hold Treaties with the Indian Tribes of Washington Territory and the Blackfoot Country," [typescript of Medicine Creek council] p. 6, Wells Supplemental Report,

that Indians were thinking strategically about the treaty negotiations and that although principal chiefs knew they were in a "changing social environment," they did not see themselves or their peoples "as a single, benighted, and bested race" (Alexandra Harmon, *Indians in the Making: Ethnic Relations and Indian Identities around Puget Sound* (Seattle: University of Washington Press, 1998), 70 and 109).

5. On page 23, Dr. Richards asserts that the timing for the end of the treaty status for Lummi and other signatory tribes to the Treaty of Point Elliot was "likely before the end of the annuity period." He does so without substantiation of that point and conflates the end of annuities with the end of treaty obligations. This assertion runs counter to the published proceedings of the Treaty Council of the Treaty of Point Elliot at which Governor Stevens told the Lummi and other Indians assembled: "I want that you shall not have simply food and drink now but the you may have them forever.... [W]e will," he told the assembled Indians "put our hearts down on paper then we'll sign our names. We will send that paper to the Great Father and if he says it is good it will stand forever...." (See DECY003-00004404 and 00004406.)

6. On page 19, Dr. Richards claims that the provisions for hunting, fishing, and gathering were temporary. Nothing in the treaty language, the treaty commission records, or subsequent historical analysis of the treaties provides any indication that hunting, fishing, and gathering provisions in the Stevens treaties, especially in the Treaty of Point Elliot was "temporary." Dr. Richards cites a 1798 treaty with the Cherokee and an 1831 Treaty with the Menominee, but does not address the specific language or history of the Stevens treaties to make this assertion. At the Point Elliot Treaty Council, which included representatives from the Lummi, Stevens made this clear, explaining to

the assembled crowd:

> I want you as my children to be fed and clothed, and made comfortable and happy . . . . We want to place you in homes where you can cultivate the soil, raising potatoes and other articles of food, and where you may be able to pass in canoes over the waters of the sound to catch fish, and back to the mountains to get roots and berries . . . .
> The Great Father thinks you ought to have homes . . . and he wants you to have a school where your children can learn to read and be made farmers and be taught trades. He is willing that you should catch fish in these waters and get roots and berries back in the mountains. He wishes you all to be virtuous and industrious and become a happy and prosperous community. ("Records of the Proceedings of the Commission to Hold Treaties with the Indian Tribes of Washington Territory and the Blackfoot Country," [typescript of Point Elliot Council] pp. 4 and 7, Wells Supplemental Report, June 1855, Box 24, Northwest Ethnohistory Collection, Western Washington University, Bellingham, Washington. Also see, Friday, "Analysis and Documentation of Lummi History," pp. 52-53 [PFRI 003 0140-0141].)

Nothing in the treaty language or Stevens' speech at Point Elliot give any indication that fishing, hunting, and gathering off reservation would be a temporary privilege. The famous Boldt case (384 Fed. Supp. 353-358) amply confirmed this right retained by Indians of the Puget Sound under the Stevens treaties. (PFRI 002 1415-1417)

7.      On page 20, Dr. Richards provides a lengthy quote by Stevens' son, Hazard, who he claims "was privy to his father's private discussions with both whites and Indians" to add further support to the assertion that hunting, fishing, and gathering rights were intended as temporary. Dr. Richards offers no evaluation of the credibility of Hazard Stevens' claims, no historical context for the publication some forty-six years after the fact of the tract by Hazard Stevens to resuscitate his father's reputation. Furthermore, Dr. Richards is willing to accept the claims of a young teenaged Hazard over Indian voices in the *Duwamish* testimony, some of whom were present with Hazard but who have a very different evaluation of the proceedings. Hazard Stevens (and Dr. Richards) are correct in

the assertion that the Treaty of Point Elliot provides that the President of the United States retained the power to remove Indians to other locations, but it should be noted that no President has done so.

8. On page 21, Dr. Richards cites Francis Paul Prucha, *The Great Father*, p. 17, who argues that reservations were understood by Americans in the 1850s as "a temporary expedient." It is clear that the cultural goal of federal policy and much popular opinion of the mid-nineteenth century were predicated on the idea that Indians must be culturally and socially transformed into modern, "civilized" people. If reservations were necessary in order to protect Indians from modern society—whites who wished to defraud Indians of their lands, to sell them whiskey, and to generally mislead them—then the establishment of reservations was a necessary step to ensure that the cultural transformation could be made. This does not mean, however, that the legal status of reservations created by treaties was necessarily and uniformly "temporary" in each and every case. It appears that Dr. Richards has selectively combed through the evidence to find phrases that support his assertions rather than build a close, careful analysis of the historical context for the Stevens treaties, especially that of the Treaty of Point Elliot.

9. On pages 27 and 28, Dr. Richards refers to the visit to the Lummi Reservation by Felix Brunot, chairman of the Board of Indian Commissioners, citing Brunot's statement that when the "treaty runs out" as evidence of the temporary nature of the treaty. Brunot refers however, to the annuities and not the treaty itself. Dr. Richards also suggests that Lummi desires for surveyed lands can only mean a desire for individual ownership at the exclusion of tribal interests and at the expense of the continued existence of the Lummi Tribe and the Lummi Reservation as distinct entities. Historical evidence demonstrates