1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

UNITED STATES, in its own right and on
behalf of the Lummi Indian Nation

              Plaintiff,

LUMMI INDIAN NATION

              Plaintiff-Intervenor,

v.

STATE OF WASHINGTON,
DEPARTMENT OF ECOLOGY, et al.,

              Defendants.

No. C01-0047Z

ORDER

18

## I. INTRODUCTION

19

20

21

22

23

24

25

26

      Plaintiff United States brings this action in its own right and on behalf of Plaintiff-Intervenor Lummi Indian Nation (collectively, "Plaintiffs"), seeking a declaration that the Treaty of Point Elliott impliedly reserved the groundwater under the Lummi Peninsula for the use and benefit of the Lummi Nation.  Defendant State of Washington, Department of Ecology ("Ecology") issues permits to withdraw groundwater on the Lummi Peninsula, and contends that the Treaty of Point Elliott does not impliedly reserve groundwater under the Lummi Peninsula in the amounts claimed by the Lummi Nation ("Lummi" or "the Nation"). Defendant fee landowners and water associations assert a right to withdraw groundwater

1    from the Lummi Peninsula under a claim of right under federal and state law.  This action

2    seeks to clarify the rights of the parties to groundwater under the Lummi Peninsula.

3        On February 18, 2005, the Court heard oral argument on various pending motions.  At

4    the hearing, the Court determined that numerous legal issues should be resolved before trial.

5    The Court ordered the parties to meet, following the hearing, and prepare a list of issues.

6    The parties prepared a list of ten legal issues, with subparts, to be addressed by the Court on

7    summary judgment.  The Court then met informally with the parties to set a briefing schedule

8    for additional cross-motions for summary judgment.  See Minute Entry, docket no. 602.

9        This matter now comes before the Court on cross-motions for summary judgment,

10   docket nos. 718, 723, 726, and 732.  The Court has reviewed the briefs, declarations, and

11   materials submitted by the various represented and pro se parties.  The Court heard oral

12   argument on April 18, 2005, and took the matter under advisement.

13        The Court now being fully informed enters this Order.

## II. BACKGROUND

15        The Lummi Indian Reservation was established in 1855 by the Treaty of Point Elliott

16   (the "Treaty").  12 Stat. 927.  Article II of the Treaty "reserved for the present use and

17   occupation" of the Lummi Nation the land comprising the Reservation and its resources.  Id.

18   at 928.  The Treaty reserved the island of Cha-Cho-Sen (now known as the Lummi

19   Peninsula) for the exclusive use of the Lummi Nation.  At the time of the Treaty, the Lummi

20   people numbered about 500.  See Kennedy Decl., docket no. 219, Ex. 5 at 433.  The Lummi

21   Tribe lived mostly in the San Juan Islands and Bellingham Bay areas.  United States v.

22   Washington, 384 F. Supp. 312, 360-63 (W.D. Wash. 1974).

23        The Treaty of Point Elliott was one of a number of treaties negotiated by Isaac

24   Stevens, the first governor of the Washington Territory.  See Friday Decl., docket no. 733,

25   Ex. 4, at 10 (Response to Richards' Report).  The purpose of these treaties was to

26   "extinguish Indian claims to the land in Washington Territory and provide for peaceful and

compatible coexistence of Indians and non-Indians in the area." <u>Washington</u>, 384 F. Supp. at

355.  The Lummi ceded large tracts of land to the United States in exchange for cash, defined

reservations, hunting and fishing rights, and other rights.  12 Stat. 927.  The Treaty does not

mention water or water rights, although it reserves to the Lummi their right to fish at their

"usual and accustomed places."  <u>Id.</u>

The parties generally agree on the history surrounding the formation of the Lummi

Reservation, and the allotment of lands to individual Indians.  The Lummi Reservation

consists, generally, of two peninsulas.  <u>See</u> Joint Status Report, docket no. 27, at 3.  The

larger peninsula, the Lummi Peninsula, extends into Bellingham Bay, and the smaller

peninsula, the Sandy Point Peninsula, extends into Lummi Bay.  <u>Id.</u>  Both Bellingham Bay

and Lummi Bay are saltwater bodies.  <u>Id.</u>  The portion of the Lummi Reservation involved in

this litigation (the "Case Area") is located entirely within the boundaries of the Lummi

Reservation, and is located on the Lummi Peninsula.  Attached to this Order are maps of the

Lummi Reservation and the Case Area.

The Lummi Indian Reservation was created by Article II of the Treaty of Point Elliott,

signed in 1855 and ratified by the Senate in 1859.  12 Stat. 927.  On November 22, 1873,

President Ulysses S. Grant, pursuant to his authority in the Treaty of Point Elliott, formally

established the boundaries of the Lummi Reservation.  1 Charles J. Kappler, <u>Indian</u>

<u>Affairs: Laws and Treaties</u> 917 (1904); <u>see also</u> <u>United States v. Washington</u>, 969 F.2d 752,

754-55 (1992) (discussing the boundaries set by executive order).  In 1884, nearly all of the

upland area within the Lummi Peninsula was assigned to Indian households.  <u>See</u> U.S.

Motion to Strike, docket no. 503, at 3 (Undisputed facts).  The remaining acreage of the

Lummi Reservation was allotted to individual Indian households by 1914.  <u>Id.</u>  These

assignments, or allotments, of the Lummi Reservation conveyed 12,560.94 acres to 109

1  individual Indians, an average of 115 acres per allottee, and reserved 2 acres for a school.

2  See Duwamish v. United States, 79 Ct. Cl. 530, 552 (1934).[1]  The Case Area comprises just

3  over half of the Lummi Indian Reservation, and is approximately 6,250 acres of mostly

4  forested land.  See Joint Status Report, docket no. 27, at 7-8; Beebe Decl., docket no. 266, at

5  2.  The 1990 census tract which most closely approximates the Case Area indicates

6  populations of 1,256 Indians and 661 non-Indians.  Joint Status Report, docket no. 27, at 8.

7      Some of the allotted lands within the Case Area were eventually sold by the individual

8  Indian allottees to non-Indian purchasers.  U.S. Motion to Strike, docket no. 503, at 3

9  (Undisputed facts).  However, none of the parcels purchased by non-Indians were sold by the

10  Lummi Nation itself, id., and as of 1954 only twelve acres were owned by the Nation.

11  Knapp Decl., docket no. 724, Ex. 4, at 24 (Argel Dep. at pg. 38, ln. 4).  The deeds conveying

12  parcels to non-Indian purchasers made no mention of water rights.  At the time of filing of

13  this litigation in 2001, approximately 4,500 acres of land within the Case Area were owned

14  by the Lummi Nation or its members.  Approximately 1,500 acres of land within the Case

15  Area were owned in fee by non-Indians.

16      The parties agree that one of the primary purposes of the Lummi Reservation was

17  agriculture.  See Treaty, 12 Stat. 927, art. XIII.  However, the portion of the Reservation that

18  is suitable for agriculture is relatively small.  As represented to the Court at oral argument,

19  Defendant Ecology's experts estimate that only seven percent of the Case Area is suitable for

20  agriculture.  The Lummi and United States agree that the portion of the Lummi Reservation

21  suitable for agriculture is limited, and have assumed for purposes of these motions that the

22  State's experts are correct.  See Hamai Decl., docket no. 720, at 2-3; see also Lummi Brief,

23  docket no. 718, at 20.

24  _____

25      [1] Duwamish was brought by various Indian tribes, including the Lummi, against the
United States.  The Tribes alleged that the United States failed to provide annuities, schools, and
26  funds, promised by Treaty, misused funds appropriated by Congress, and improperly reduced
the size of Treaty reservations.  See generally Duwamish, 79 Ct. Cl. 530.

ORDER   -4-

1   The individual Defendants own one or more parcels within the Case Area, and trace

2   title to their land to an Indian owner of land assigned to an Indian family under Article VII of

3   the Treaty of Point Elliott.  U.S. Second Amend. Compl., docket no. 97, at ¶ 7.  The water

4   association Defendants are non-profit corporations organized for the purpose of delivering

5   water to their members, and hold permits issued by the State for the withdrawal and delivery

6   of groundwater on the Lummi Peninsula, within the Case Area.  Id. at ¶ 5.  Ecology regulates

7   the natural resources of the state and has issued permits for the withdrawal of groundwater

8   underlying the Lummi Peninsula.  Id. at ¶ 6.

9   The Treaty of Point Elliott reserved the island of Cha-Cho-Sen (now known as the

10  Lummi Peninsula) and created the Lummi Indian Reservation.  The Treaty did not explicitly

11  reserve water rights for the Indians on the Reservation.  When a Treaty does not mention

12  water rights, the Supreme Court has held that water rights for the Indians are impliedly

13  reserved as part of the Treaty, because land is "valueless" without water.  Winters v. United

14  States, 207 U.S. 564, 576-77 (1908).  This Court has previously held in this litigation that the

15  Winters precedent applies to the Lummi Reservation and the Treaty of Point Elliott.  In

16  addition, the Court held that reserved Winters rights on the Lummi Reservation extend to

17  groundwater, and that the Lummi hold rights to the groundwater under the Lummi Peninsula.

18  See Order, docket no. 304, at 8.  However, the Court did not quantify the Lummi's right to

19  groundwater, and did not determine how much groundwater the Lummi were entitled to

20  withdraw.

21  The Lummi Nation and the United States seek to declare the Lummi's superior right

22  to groundwater under the Lummi Peninsula, in the Case Area.  They seek to exclude all uses

23  of groundwater by non-Indians in the Case Area, which the Lummi believe conflict with their

24  tribal rights to groundwater.  The Lummi Nation seeks to prevent the withdrawal of too much

25  groundwater, which they claim would lead to saltwater intrusion in the aquifer, and

26  corruption of the groundwater under the Lummi Peninsula.

ORDER   -5-

1     Under federal law, water rights are reserved only for the primary purpose of an Indian

2   reservation.  Thus, in order to quantify Lummi's rights to groundwater on the Lummi

3   Peninsula, the Court must determine the "primary purpose" of the Lummi Reservation.

4   <u>Winters</u> water rights are implied in federal Indian law, and thus are limited to the primary

5   purposes of the Reservation as determined at the time of the Treaty.  This does not mean the

6   Tribe may not seek additional water rights, in addition to those reserved by Treaty.

7   However, any additional rights acquired by the Tribe will be similar to the rights of other

8   municipal and private water purveyors, and will not have an 1855 Treaty date of priority.

9                              **III. ANALYSIS**

10     Summary judgment is appropriate where there is no genuine issue of material fact and

11   the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

12   moving party bears the initial burden of demonstrating the absence of a genuine issue of

13   material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party

14   has met this burden, the opposing party must show that there is a genuine issue of fact for

15   trial.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The

16   opposing party must present significant and probative evidence to support its claim or

17   defense.  <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir.

18   1991).

19     The meaning of treaty language is ultimately a question of law.  <u>United States v.</u>

20   <u>Washington</u>, 157 F.3d 630, 642-43 (9th Cir. 1998); <u>see also</u> <u>United States v. Idaho</u>, 210 F.3d

21   1067, 1072 (9th Cir. 2000) (District court's interpretation of treaties, statutes, and executive

22   orders are questions of law and are reviewed de novo.).  Treaties with Indian tribes must be

23   interpreted as they would have understood them.  <u>Choctaw Nation v. Oklahoma</u>, 397 U.S.

24   620, 631 (1970); <u>see also</u> <u>Montana v. Blackfeet Tribe of Indians</u>, 471 U.S. 759, 766 (1985)

25   (Treaties with Indian tribes must be "construed liberally in favor of the Indians, with

26   ambiguous provisions interpreted to their benefit.").

ORDER   -6-

1    An implied reservation of water for an Indian reservation must be found where it is

2 necessary to fulfill the purposes of the Reservation. Winters, 207 U.S. at 576. In Winters,

3 the Court considered the Fort Belknap Reservation in Montana, created by Treaty in 1888.

4 Id. Embodied in the Treaty was the policy of the United States to change the Indians'

5 "nomadic" habits and transform them into a "pastoral and civilized people" by placing them

6 on reservations. See id. at 575-76. After the 1888 Treaty and the placement of the Indians,

7 however, homesteaders began settling around the reservation and drawing water for irrigation

8 and stockwatering from the Milk River, the northern boundary of the reservation. Id. at 576.

9 A severe drought occurred, and upstream irrigation left the river nearly dry, with little water

10 for the reservation and other downstream users. The federal government sued on behalf of

11 the Fort Belknap tribes to protect their rights to Milk River water. The lands on the Fort

12 Belknap Reservation were "arid and, without irrigation . . . practically valueless." Id.

13 Because the lands were valueless without water, the Supreme Court found that the 1888

14 Treat necessarily implied a reserved right to water for the Fort Belknap reservation. Id.

15 Because of Winters, implied reservations of water are known in federal Indian law as

16 "Winters" rights.

17    The Courts have also held that Winters rights may be transferred with the sale of

18 Indian land to a non-Indian purchaser. If an Indian allottee owns land on a reservation, but

19 unable to sell the water rights along with that land, the value of the land would be severely

20 impaired. Colville Confederated Tribes v. Walton, 647 F.2d 42, 50 (9th Cir. 1981) ("Walton

21 II"). In the Walton cases, non-Indians purchased lands from Indian allottees on the Colville

22 Reservation, and irrigated and used those lands. The Colville Confederated Tribes brought

23 suit to enjoin the non-Indian Waltons from using "No Name Creek," located entirely within

24 the reservation, but crossing land owed by the defendants Walton. Colville Confederated

25 Tribes v. Walton, 460 F. Supp. 1320, 1323 (E.D. Wash. 1978) ("Walton I"). The district

26 court held that an Indian allottee could convey only a right to water actually put to use. Id. at

1   1329.  The Ninth Circuit reversed, however, holding that such a "restriction on

2   transferability" was an impermissible "diminution of Indian rights," and that an Indian must

3   be able to sell all of his right to share in the reserved waters of the Tribe.  Walton II, 647

4   F.2d at 50.  The Court found "no basis for limiting the transferability" of the appurtenant

5   right to share in reserved waters.  Id.

6          On remand, the district court calculated the respective rights of the Tribe, Walton, and

7   the individual allottees.  The district court found that "Walton exercised reasonable diligence

8   in irrigating a minimum of 104 acres"; however, the district court did not properly consider

9   the diligence of the non-Indian grantees whose interest preceded Walton's.  See Colville

10  Confederated Tribes v. Walton, 752 F.2d 397, 402 (9th Cir. 1985) ("Walton III").  The Ninth

11  Circuit held that it was error not to consider whether Winters rights were maintained through

12  continuous use, by all non-Indian predecessor successors-in-interest.  Id.

13         The following ten issues submitted by the parties relate to reservation status, primary

14  reservation purpose, reserved rights, and the transferability of reserved rights.  The Court will

15  analyze these issues in the sequence discussed by the parties in their briefing.

16  **1.     Reservation Status of the Lummi Peninsula.**

17         The pro se homeowner defendants have asserted that the Lummi Reservation lacks

18  status as an Indian reservation, and is not "Indian Country."  See Motion to Declare Lummi

19  Reservation is not Indian Country, docket no. 519.[2]

20         The Lummi Reservation was created by the Treaty of Point Elliott, and has

21  reservation status.  See Treaty, 12 Stat. 927; see also Washington v. Confederated Tribes of

22  Colville Indian Reservation, 447 U.S. 134, 143 (1980).  The Lummi Reservation is "Indian

23

24         [2] Although this litigation is limited to the quantification of water rights in the Case Area
    (a portion of the Lummi Reservation), the pro se Defendants challenge the status of the entire
25  Lummi Reservation.  In contrast, all other parties, including the individual homeowner
    Defendants and the Defendant water associations, represented by counsel, concede the Lummi
26  Reservation does not lack reservation status.  See Homeowner/Water Association Brief, docket
    no. 723, at 6.

ORDER   -8-

1   Country," as that term is defined by statute.  See Treaty, 12 Stat. 927; see also 18 U.S.C. §

2   1151(a).  "Indian Country" includes "all land within the limits of any Indian reservation

3   under the jurisdiction of the United States Government."  18 U.S.C. § 1151(a).  The Supreme

4   Court has specifically ruled that the assignment process on the Lummi Peninsula did not

5   effect a diminishment of the reservation, and this Court finds that determination to be

6   binding on these proceedings.  See United States v. Celestine, 215 U.S. 278, 285 (1909).

7   **2.   "Temporary" Status of the Lummi Reservation.**

8          Defendant homeowners and water associations have asserted the Lummi Reservation

9   was intended by Treaty to be a "temporary" reservation for the Lummi.  The Court finds as a

10  matter of law that the Lummi Reservation is not temporary.  Article II of the Treaty of Point

11  Elliott reserved land for the "present use and occupation" of the tribes.  Defendants have

12  urged the Court to find that the Lummi Reservation was intended only as a temporary

13  reservation, and that the Treaty held out the possibility of removal to another location.  See

14  Treaty, 12 Stat. at 927-28.  While the Treaty may have held out the possibility of relocation

15  to a different reservation, after 150 years the Reservation is permanent as a matter of law.

16  See, e.g., Blackfeet Tribe, 471 U.S. at 766 (Treaty must be "construed liberally in favor of

17  the Indians, with ambiguous provisions interpreted to their benefit.").

18  **3.     Primary Purpose of the Lummi Reservation.**

19         **A.     Applicable Standard.**

20         The meaning of treaty language is ultimately a question of law.  Washington, 157

21  F.3d at 642-43; Idaho, 210 F.3d at 1072 (interpretation of treaties, statutes, and executive

22  orders are questions of law and are reviewed de novo).  The Treaty of Point Elliott reserved

23  lands for the Lummi Nation, and the historical facts surrounding the Treaty are largely

24  undisputed.

25  ///

26  ///

ORDER   -9-

1  Although the parties place different weight on various historical facts, the Court finds that

2  the purposes of the reservation may be determined as a matter of law.[3]

3       The parties generally agree that the purposes of the Reservation may be determined as

4  a matter of law.  Plaintiff United States argues that the unambiguous language in the Treaty

5  allows the Court to determine the purposes of the Lummi Reservation as a matter of law.

6  U.S. Brief, docket no. 732, at 12.  Plaintiff Lummi Nation states that the issue of reservation

7  purpose is "primarily legal."  See Lummi Brief, docket no. 718, at 3.  Defendants similarly

8  urge the Court to resolve the issue of reservation purpose as a matter of law.  See Ecology

9  Brief, docket no. 726, at 5-6; see also Homeowner/Water Association Brief, docket no. 723,

10  at 11-12.

11       Where language in the treaty is unambiguous, such language will control.  However,

12  where language is ambiguous, the ambiguities must be resolved in favor of the Tribe.  See

13  Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208 n.17 (1978).

14      **B.    Theories of The Parties.**

15       The parties each advance a different theory of "primary purpose" for the Lummi

16  Reservation.  The parties' different theories lead to substantially different calculations of

17  impliedly reserved water rights of the Lummi Nation.

18      **(1)   Homeland Purpose (Plaintiffs' Position).**

19       Plaintiffs assert that the Treaty of Point Elliott was intended to provide a "homeland"

20  for the Lummi Nation.  See Walton II, 647 F.2d at 47 ("[T]he general purpose [of an Indian

21  reservation,] to provide a home for the Indians, is a broad one and must be liberally

22  construed."); see also Winters, 207 U.S. at 565 (The purpose of an Indian reservation is to

23  provide the Indians with a "permanent home and abiding place").  Plaintiffs contend that

24

25

26  [3] Although this litigation is limited to the Case Area, in determining the purpose of the Reservation the Court must necessarily look at the purpose of the entire Lummi Reservation, rather than the limited Case Area.

ORDER   -10-

1    because the Treaty's purpose was to provide a homeland, the Court should find sufficient

2    water was reserved to provide for all domestic, agricultural, community, commercial, and

3    industrial purposes.  Plaintiffs urge this result is consistent with a broad "homeland" purpose

4    intended by the federal government, which must be interpreted to further the goal of Indian

5    self-sufficiency.  Plaintiffs rely heavily on In re General Adjudication of All Rights to Use

6    Water in Gila River System & Source, 35 P.3d 68, 76 (Ariz. 2001) ("Gila River V") ("Water

7    use necessary to the establishment of a permanent homeland is a primary . . . purpose.").  In

8    Gila River V, the Arizona Supreme Court considered and rejected the traditional measures of

9    Indian reserved water rights.  Id. at 79.  Drawing a distinction between Indian reservations

10   and other types of federal reservations, the court concluded that a "fact-intensive inquiry . . .

11   on a reservation-by-reservation basis" was appropriate.  Id.  The Arizona Supreme Court

12   acknowledged that it was entering "uncharted territory," but held that consideration of a

13   "myriad of factors"[4] was a superior means of quantifying Indian reserved rights.  Id.

14          Plaintiffs' theory of the case is based on Gila River V.  The effect of Plaintiffs'

15   position would be the quantification of a water right for a broad and almost unlimited range

16   of activities.  The adoption of Plaintiffs' position would necessitate a finding that water was

17   reserved for a myriad of "homeland" purposes at the time the Reservation was created.

18          Plaintiffs ask the Court to reject the Defendants' agricultural theory of primary

19   purpose, and contend that allowing water only for agricultural purposes would unfairly limit

20   the Lummi's water rights.  The parties agree that the amount of land suitable for agriculture

21   is limited, with only approximately seven percent of the total Case Area suitable for

22   agricultural pursuits.  Plaintiffs' "homeland" purpose arguments, if adopted, would

23

24   _____

25          [4] The Court provided a non-exclusive list of factors that might be considered, including
     the tribe's history and traditions, cultural preservation, geography, topography, natural resources,
26   economic base, past water use, the suitability of water requests, and the present and projected
     future population.  Gila River V, 35 P.3d at 79-80.

1    ultimately require a finding that all or substantially all of the groundwater in the Case Area

2    would be subject to Winters rights.

3                        **(2)    Agricultural Purpose (Defendants' Position).**

4            Defendants ask the Court to find the primary purpose of the reservation was

5    agricultural, and that "practicably irrigable acreage"[5] or "PIA" is the primary measure of

6    Lummi's right to Peninsula groundwater.  Defense expert Dr. Richards testified at his

7    deposition that "the purpose [of the Lummi Reservation] was to create an agricultural

8    community," and that "Jeffersonian agrarianism formed the basis of United States' Indian

9    policy."  Young Decl., docket no. 727, at 19 (Richards Dep. at p. 93).  Defendants also point

10   to the report of Dr. Friday, the Plaintiffs' expert on the purpose of the Reservation, who

11   stated in his report that the United States hoped to transform the Lummi from "wild Indians"

12   into "civilized people," by moving the Tribe toward "intensive agricultural practices as the

13   primary means of Indian subsistence and commercial activity."  Id. at 10 (Friday Dep. at p.

14   168).  All parties agree that the Treaty of Point Elliott intended agriculture as a primary

15   purpose of the Lummi Reservation.  However, Defendants contend that agriculture was the

16   sole purpose.

17          Based on agriculture as the primary purpose, the Defendants urge the Court to apply

18   the practically irrigable acreage methodology on the Lummi Reservation, in order to quantify

19   the Lummi's right to the groundwater underlying the peninsula.  E.g., Arizona v. California,

20   373 U.S. 546, 601 (1963) ("Arizona I") ("The only feasible and fair way by which reserved

21   water for the reservations can be measured is irrigable acreage.").  Defendants urge that PIA

22   is the only proper means for assessing the measure of Lummi's right to water in the Case

23

24   _____

         [5] The determination of practicably irrigable acreage involves a two-part analysis.  PIA
25   must be susceptible of sustained irrigation (not only proof of the arability but also of the
     engineering feasibility of irrigating the land) and irrigable at reasonable cost.  General
26   Adjudication of All Rights to Use Water in the Big Horn River System, 753 P.2d 76, 101 (Wyo.
     1988) ("Big Horn I").

1   Area.  Use of PIA to quantify water rights would result in a very limited amount of the

2   available Case Area groundwater being subject to Winters rights.

3   Defendants conceded at oral argument that implied water rights were also reserved for

4   domestic purposes, which includes personal, household, and stockwatering uses.  However,

5   Defendants urge the Court to find that domestic purposes should be included as part of the

6   Lummi's PIA award.  The practical effect of Defendants' position would be the

7   quantification of the Lummi's water rights based solely on the agricultural suitability of land,

8   with no significant additional domestic award.  This would determine the water rights for the

9   Case Area based on irrigable acreage, which accounts for only seven percent of the Lummi

10  Reservation.[6]  The Homeowner Defendants also conceded at oral argument that it would be

11  fair to calculate domestic uses separate from agricultural uses, because of the relatively small

12  portion of the Lummi Peninsula suitable for agriculture.

13  Defendants urge the Court to reject Plaintiffs' "homeland" theory of primary purpose.

14  Defendants argue that Plaintiffs' theory puts no limits on the Nation's water rights.  Ecology

15  argues that a primary reservation purpose to "create a homeland" is an argument that "begs

16  the question" as to primary purpose.  Moreover, all Defendants urge that Plaintiffs' reliance

17  on the Arizona Supreme Court opinion in Gila River V would be manifest error, because

18  Gila River V was decided by the Arizona Supreme Court and is contrary to federal law.

19  ### C.   Primary Purpose Analysis.

20  The primary purpose of a federal reservation defines the scope and extent of impliedly

21  reserved water rights.  United States v. Adair, 723 F.2d 1394, 1408-09 (9th Cir. 1983).

22  There may be more than one primary purpose of a reservation.  Id. at 1410.  However, water

23  is reserved only for the primary purposes of the reservation, and not for secondary purposes.

24

25  _____

26  [6] The parties disagree as to whether seven percent is the exact measure of irrigable acreage on the Lummi Peninsula.  However, the parties agreed at oral argument that the percentage is small, and that irrigable acreage on the Peninsula is "limited."

1   United States v. New Mexico, 438 U.S. 696, 702 (1978); Adair, 723 F.2d at 1409; Walton II,

2   647 F.2d at 47.  Water rights are not implied where they are merely "valuable for a

3   secondary use of the reservation."  Adair, 723 F.2d at 1409 (citing New Mexico, 438 U.S. at

4   702).[7]  The quantity of water reserved under Winters is that amount necessary to fulfill the

5   purposes of the reservation, no more.  Cappaert v. United States, 426 U.S. 128, 141 (1976).

6       The purpose of the reservation is based on the intent of the federal government at the

7   time it established the reservation.  See Winters, 207 U.S. at 577.  Implied in the

8   establishment of the reservation is an allotment of water necessary to "make the reservation

9   livable."  Arizona v. California, 460 U.S. 605, 616 (1983) ("Arizona II").  The water right

10  vests on the date the reservation is created, not when the water is put to use or at some later

11  time.  Arizona I, 373 U.S. at 600.  The purpose of the reservation may be discerned by

12  reference to the relevant treaty, statute, or executive order.  E.g., Walton II, 647 F.2d at 47

13  ("To identify the purposes for which the Colville Reservation was created, we consider the

14  document and circumstances surrounding its creation, and the history of the Indians for

15  whom it was created.  We also consider [the Indians'] need to maintain themselves under

16  changed circumstances.").  In determining the primary purposes of the Reservation, the Court

17  must liberally construe the Treaty in the Indians' favor.  County of Yakima v. Confederated

18  Bands of the Yakima Indian Reservation, 502 U.S. 251, 269 (1992).

19      **Agricultural.**  The parties agree that water for agricultural use was impliedly reserved

20  for the Tribe as a primary purpose of the Lummi Reservation.  See Treaty, 12 Stat. 927, art.

21  XIII; see also Friday Decl., docket no. 733, Ex. 2, at 4 (Richards Report) ("The primary

22

23      [7] Plaintiffs contend the Court should reject, as a practical matter, any distinction between
    primary and secondary purposes, pursuant to Gila River V, 35 P.3d at 74-75.  The Arizona
24  Supreme Court discussed the primary and secondary purpose distinction normally applied to
    federal reservations, e.g. New Mexico, 438 U.S. at 702, but declined to find that such distinction
    applied to federal Indian reservations.  Gila River V, 35 P.3d at 74.  Reasoning that "the
25  essential purpose of Indian reservations is to provide Native American people with a 'permanent
    home and abiding place,' that is, a 'livable' environment," the Arizona Supreme Court declined
26  to determine the "secondary" purposes of the reservation for which water was not reserved.  Id.

1  purpose of the Lummi Reservation was to create an agricultural community for individuals

2  and families.").  The parties also agree that the portion of the reservation suitable for

3  agriculture is limited.  The extent of the Lummi's reserved water right for agriculture is

4  necessarily a question of fact and will be determined at trial.

5         **Domestic.**  The parties agreed at oral argument that reserved water rights for domestic

6  use were impliedly reserved in the Treaty of Point Elliott.  Water impliedly reserved in

7  sufficient quantities to make the reservation livable necessarily includes water for domestic

8  use.  See Arizona II, 460 U.S. at 616.  The Lummi's reserved water right for domestic use is

9  a question of fact to be determined at trial.

10        **Homeland / Community.**  The parties' broader dispute is whether water was

11 impliedly reserved for the Tribe as part of a "homeland" reservation purpose, as found in

12 Gila River V, 35 P.3d at 76 ("Water use necessary to the establishment of a permanent

13 homeland is a primary . . . purpose.").  Plaintiffs urge the Court to find a homeland purpose

14 in the Treaty of Point Elliot, including impliedly reserved water rights to "support the

15 evolving homeland domestic, municipal and commercial needs of the Nation."  See Lummi

16 Brief, docket no. 718, at 9.  At oral argument, Plaintiffs urged the Court to find an impliedly

17 reserved water right for the Lummi Nation, for present and future consumption, comparable

18 to the surrounding Bellingham community.

19        However, no federal court has ever found an impliedly reserved water right by first

20 looking to the modern day activities of the Indian nation.  But see Gila River V, 35 P.3d at

21 76.  This Court finds that the "homeland purpose" theory adopted in Gila River V is contrary

22 to the "primary purpose" doctrine under federal law.  Ecology correctly argues that the

23 "homeland purpose" theory is "simply a formulation that does away with determining the

24 purpose and begs the question of what water was reserved to make the 'homeland' livable."

25 See Ecology Brief, docket no. 726, at 4.  More importantly, Plaintiffs' "homeland" purpose

26 theory conflicts with clear Ninth Circuit precedent.  Walton II acknowledged that "one

1   purpose for creating this reservation was to provide a homeland for the Indians to maintain

2   their agrarian society."  647 F.2d at 47-48.  However, this language does not constitute a

3   determination of primary purpose for which water was reserved.  Id.  The Court cannot find a

4   "homeland" primary purpose and end its inquiry.  Although compelling in analysis and

5   result, Gila River V is contrary to Ninth Circuit precedent.  Plaintiffs' "homeland" theory of

6   reserved water rights must fail as a matter of law.  The appropriate inquiry under federal law

7   requires a primary purpose determination based on the intent of the federal government at the

8   time the reservation was established.  Winters, 207 U.S. at 577.  These implied Winters

9   rights are necessarily limited in nature.

10      Plaintiffs contend that water was impliedly reserved for important purposes beyond

11  agriculture and domestic use.  This finds some support in the Treaty.  For example, the

12  Treaty mentions a variety of important activities intended for pursuit by the Lummi,

13  including the construction of schools and churches, hunting, fishing, and gathering, as well

14  as the learning and pursuit of trades.  See Treaty, art. V (off-reservation fishing, hunting, and

15  gathering rights preserved); art. XIII (government assistance in moving to and clearing their

16  reservations for homes and farming).  In addition, the Treaty reserved specific lands for a

17  school.  Id., art. III.  However, this land was not on the lands reserved for the Lummi.  Id.

18      In order to support a finding of primary purpose, activities must be more than

19  "important" to the Tribe, see Skokomish Indian Tribe v. United States, 401 F.3d 979, 989-91

20  (9th Cir. 2005) (en banc), and must be determined at the time of the Treaty.  In Skokomish,

21  the Court reviewed the district court's interpretation of treaty language in the Treaty of Point

22  No Point, 12 Stat. 933 (Jan. 26, 1855).  That Treaty ceded the Skokomish Indian Tribe's

23  territory to the United States, but reserved a tract for the Tribe.  The Treaty reserved for the

24  Tribe the right of taking fish at usual and accustomed grounds in common with all citizens of

25  the United States, and the privilege of hunting and gathering on open and unclaimed lands.

26  The Skokomish argued that the City of Tacoma infringed on its Treaty reserved water right

ORDER   -16-

1    by diverting water from the Skokomish River, which impeded its ability to fish.  The district

2    court disagreed, and found that the Tribe was unable to establish fishing as a "primary

3    purpose" of the Reservation.  The Ninth Circuit affirmed.

4                    Demonstrating that the United States intended for the Tribe to continue
                    fishing on the reservation is not the same as showing that fishing was a
5                    primary purpose of the reservation.

6                    Nor does the Treaty language help the Tribe.  The Treaty merely provides
                    that the Tribe shall have "the right of taking fish . . . in common with all
7                    citizens of the United States."  Treaty, art. 4.  This language distinguishes
                    our case from United States v. Adair, 723 F.2d 1394 (9th Cir. 1984), where
8                    we based our finding of implied water rights in part on treaty language
                    "expressly providing that the [plaintiff Indian Tribe] will have exclusive
9                    on-reservation fishing and gathering rights."  See id. at 1409 (emphasis
                    added).  The Treaty language in this case cannot make up for the
10                   inadequacy of the evidence the Tribe has presented.

11   Id., 401 F.3d at 989-90.  The Ninth Circuit applied Winters in the Treaty reservation context,

12   holding again that "federal reservations of public land can *sometimes* carry implied property

13   rights in appurtenant waters."  Id. at 989.  In addition, Skokomish emphasized the narrow

14   grant of Winters rights, and the applicability of New Mexico to Indian reserved water rights.[8]

15   Id. at 988-89.  The Ninth Circuit reasoned that "only that amount of water necessary to fulfill

16   the purpose of the reservation [is reserved], no more," Skokomish, 401 F.3d at 988, and that

17   water rights stemming from a reservation of public land are implied "only where 'without the

18   water the purposes of the reservation would be entirely defeated.'"  Id. (citing New Mexico,

19   438 U.S. at 700).  The Court also restated New Mexico's holding with regard to secondary

20   purposes:

21                   where water is only valuable for a secondary use of the reservation, . . .
                    there arises the contrary inference that [the United States] intended,
22                   consistent with its other views, that the [reservation] would acquire
                    water in the same manner as any other public or private appropriator.

23

24

25   _____

26       [8] New Mexico involved a federal reservation for the Gila National Forest, and the
     question of federally reserved water rights for non-Indian purposes.  438 U.S. at 698.

ORDER  -17-

1   Id. (citing New Mexico, 438 U.S. at 702).  Finding a community purpose beyond agriculture

2   and domestic use would be inconsistent with Skokomish.  The Treaty of Point Elliott does

3   not evidence a primary homeland or community purpose, for which water was reserved at the

4   time of the Treaty.  As such, the Court finds that as a matter of law the Treaty of Point Elliott

5   reserved water for agriculture and domestic use sufficient to fulfill the purposes of the

6   Reservation.  The Treaty did not, however, reserve water for additional community or

7   "homeland" purposes as a primary purpose of the Lummi Reservation.  Id. at 988.

8   **4.      Quantification of Reserved Water Rights in the Case Area.**

9       **Agricultural.**  The parties agree that agriculture was a primary purpose of the Lummi

10  Reservation, and that an agricultural water rights component must be quantified as part of

11  these proceedings.  Under similar circumstances involving an agricultural purpose, the

12  Supreme Court concurred with the Special Master's findings that "the only feasible and fair

13  way by which reserved water for the reservation can be measured is irrigable acreage."

14  Arizona I, 373 U.S. at 600-01.  The Ninth Circuit has also utilized the PIA method to

15  quantify reserved agricultural water rights, holding that "when the . . . reservation was

16  created, sufficient appurtenant water was reserved to permit irrigation of all practicably

17  irrigable acreage on the reservation."  Walton II, 647 F.2d at 48.

18      The parties agree that PIA is the correct method for quantifying reserved agricultural

19  water rights.  The Court will utilize the PIA method for determining agricultural reserved

20  water in the Case Area.  The quantity of PIA reserved water is a factual issue to be

21  determined at trial.  As discussed by the Supreme Court of Wyoming in the first Big Horn

22  Adjudication,

23          "Practicably irrigable acreage" is defined as: those acres susceptible to
            sustained irrigation at reasonable costs. The determination of practicably
24          irrigable acreage (PIA) involves a two-part analysis, i.e., the PIA must be
            susceptible of sustained irrigation, not only proof of the arability but also
25          of the engineering feasibility of irrigating the land, and irrigable at a
            reasonable cost.
26

1   <u>Big Horn I</u>, 753 P.2d at 101.  This inquiry is inherently factual.  The Court's evaluation of

2   practicably irrigable acreage within the Case Area will be based on expert engineering and

3   scientific testimony presented at trial.

4       **Domestic.**  When agricultural water rights are substantial, domestic reserved water

5   rights have been quantified in comparatively small amounts.   <u>Walton II</u> utilized the PIA

6   methodology for determining reserved water rights, without including an additional domestic

7   supply.  <u>Walton II</u>, 647 F.2d at 47-48.  The Big Horn adjudication did not add amounts for

8   domestic supply, finding the domestic award subsumed into the agricultural award.  <u>Big</u>

9   <u>Horn I</u>, 753 P.2d at 96-99.  The Supreme Court in <u>Arizona I</u> added to the PIA quantification

10  a figure of one percent for domestic, stockwatering, and related purposes.  <u>See</u> Young Decl.,

11  docket no. 727, Ex. A, Attach. 21, at 102-03 (Special Master Report of Elbert Tuttle).

12      The Court here is faced with a Reservation of a different nature.  The vast majority of

13  the Case Area will have no quantified agricultural water right on which to base a domestic

14  award.  Because much of the Case Area will not have any agricultural award, it would be

15  inappropriate as a matter of law to base the domestic calculation solely on the agricultural

16  award, as calculated by the PIA method.  Similarly, it would be inappropriate to include the

17  domestic award as a percentage or adjustment to the agricultural award.  Under <u>Winters</u> and

18  its progeny, water is impliedly reserved for the Tribe in sufficient quantities to make the

19  Reservation livable, including those portions of the Reservation that are not suitable for

20  agriculture.  <u>Arizona II</u>, 460 U.S. at 616.  The Court's determination of domestic award must

21  necessarily be independent of the agricultural component, but will consider the amount of the

22  PIA award in ultimately determining the domestic <u>Winters</u> rights in the Case Area.

23      The actual determination of domestic award will be determined at trial.  The

24  calculation will not be based on speculation as to how many Indians will live on the Lummi

25  Peninsula in the future.  <u>See</u>, <u>e.g.</u>, <u>Arizona I</u>, 373 U.S. at 601 ("How many Indians there will

26  be and what their future needs will be can only be guessed.").

1    **5.      Quantification of Rights beyond the Case Area.**

2         The parties dispute whether the Court may quantify water rights in the Case Area (i.e.,

3    the Lummi Peninsula) without quantification of water rights for the remainder of the Lummi

4    Reservation.  Plaintiffs argue that the Court's quantification of the Lummi Nation's water

5    right should be limited to the Lummi Peninsula, because Plaintiffs' Complaint seeks only a

6    determination of reserved water rights in the groundwater under the Lummi Peninsula, and

7    proof will relate only to Case Area needs.  <u>See</u> U.S. Brief, docket no. 732, at 21-23; Lummi

8    Brief, docket no. 718, at 10.

9         Defendant Ecology notes that a land-based calculation, such as PIA, may be applied

10   to the Case Area, without impact to quantification of rights for the remainder of the

11   Reservation, but objects to a Case Area specific calculation.  <u>See</u> Ecology Brief, docket no.

12   726, at 12-13.  The Homeowner/Water Association Defendants object to the quantification of

13   water rights only within the Case Area, as opposed to quantification of the entire

14   Reservation.  <u>See</u> Homeowner/Water Association Brief, docket no. 723, at 17-18.  The

15   quantification of water rights within the Case Area does not require the quantification of

16   water rights for the remainder of the Lummi Reservation.

17   **6.      Water Sources beyond the Lummi Peninsula.**

18        Defendants previously asked the Court to join additional parties, who have property

19   rights on the Lummi Reservation but outside the Case Area, pursuant to Fed. R. Civ. P. 19.

20   <u>See</u> Motions to Dismiss for Failure to Join a Necessary Party, docket nos. 62, 66, 70.

21   Defendants also asked the Court to consider adjacent water sources to which the Lummi

22   Nation might claim a right.  <u>Id.</u>  The Court declined, however, to extend the scope of this

23   litigation to fee landowners elsewhere on the Lummi Reservation, or to expand the Court's

24   consideration beyond the "narrow course charted by the Lummi Nation's complaint."  <u>See</u>

25   Order, docket no. 93, at 4.

26

ORDER   -20-

1    Plaintiffs' Complaint relates only to its claim of a superior right in the groundwater

2    under the Lummi Peninsula (i.e., the Case Area).  Defendants have again raised the question

3    of surface water reserved rights, and contend that consideration of the Lummi's reserved

4    rights to groundwater must include surface waters from which water for the Nation was

5    historically drawn.  The Homeowner/Water Association Defendants argue that consideration

6    of other water sources is necessary to lend perspective to the capacity of the Lummi Aquifer.

7    Defendants also argue that the Lummi River was the primary source of potable water

8    on the Lummi Reservation at the time of its creation, and that it would be improper not to

9    consider sources such as the Lummi River, which existed at the time the Reservation was

10   created and were of substantial value to the Lummi.  In addition, the Homeowner/Water

11   Association Defendants urge consideration of groundwater rights only in comparison with

12   available surface water rights, based on In re General Adjudication of All Rights to Use

13   Water in Gila River System & Source, 989 P.2d 739, 748 (Ariz. 1999) ("Gila River III"),

14   where the Court held that "[a] reserved right to groundwater may only be found where other

15   waters are inadequate to accomplish the purpose of a reservation."  The Court is unaware,

16   however, of any federal precedent that would require adherence to Gila River III, permitting

17   reserved groundwater rights only where surface waters are inadequate to provide for the

18   needs of the Reservation.[9]

19   Plaintiffs concede that other water sources not hydraulically isolated from the Lummi

20   Aquifer would need to be considered by the Court.[10]  However, no scientific evidence points

21   _____

22   [9] The Court ruled previously that "as a matter of law . . . the reserved water rights
     doctrine extends to [Case Area] groundwater even if groundwater is not connected to surface

23   water," finding that federal reserved water rights law would not differentiate between surface
     and groundwater in identifying reserved waters.  See Order, docket no. 304, at 8; see also Felix

24   S. Cohen, Handbook of Federal Indian Law, at 585-86 (1982) ("Rights [to reserved water]
     should attach to all water sources – groundwater basins, streams, lakes, and springs . . .").

25   [10] In prior litigation involving many of the same parties, United States v. Bel Bay

26   Community & Water Ass'n, Civ. No. 303-71C2 (W.D. Wash. 1978), there was testimony from
     an engineering geologist submitted by Ecology that other groundwater aquifers and the

1    to a hydraulic connection between the Lummi Aquifer and adjacent surface or ground waters;

2    as such, Plaintiffs argue the Court should not consider other sources.  Plaintiffs further note

3    that Indian reserved water rights cases have never required the adjudication of rights in

4    multiple sources.  See, e.g., Winters, 207 U.S. at 576;  Walton II, 647 F.2d at 42; United

5    States v. Anderson, 736 F.2d 1358, 1362 (1984).  Defendant Ecology distinguishes this case

6    from others because

7                    this case is not an adjudication of all rights to the use of the Peninsula
                     aquifer.  Rather, this case is an attempt by the Lummi to exclude any use
8                    of the aquifer by non-Lummis.

9    Ecology Brief, docket no. 726, at 14.  This distinction, however, is without a difference.

10   This case is an adjudication of rights in a water source, and the senior user is entitled to their

11   rights without deference to the rights of junior users.  Defendants fail to explain why other

12   sources available to the Lummi must be considered, where the Lummi seek to assert their

13   senior right with its 1855 priority date, solely in the Case Area.

14          The Homeowner/Water Association Defendants argue that the Court must consider

15   adjacent water sources and potential uses by Lummi because the Case Area groundwater

16   represents a tiny fraction of available water.  Defendants argue that if the Fort Belknap

17   Reservation in Winters had been located on the shores of a large lake, the Supreme Court

18   would have considered those sources in evaluating whether to curtail non-Indian withdrawals

19   from the Milk River.  See Homeowner/Water Association Brief, docket no. 723, at 20-21.

20   This argument fails, however, because Winters involved other water sources that the

21   Supreme Court specifically did not consider when evaluating withdrawals from the Milk

22   River.  Winters, 207 U.S. at 576 ("there are springs and streams on the reservation flowing

23   about 2,900 inches of water . . .").

24   _____

25   Nooksack River are "separate from the aquifer underlying the Lummi Peninsula and have little,
     if any, hydrological connection to it."   See Freimund Decl., docket no. 282, Ex. E (Third
26   Affidavit of Duane Wegner, ¶ 4).  The Bel Bay litigation was settled prior to trial and the issues
     presented in the current litigation were not resolved.

1    Defendants also suggest that <u>Walton II</u> supports their position.  In evaluating the rights

2    of the various claimants to No Name Creek, the <u>Walton II</u> Court refused to find a reserved

3    water right for allotment 526.  <u>Walton II</u>, 647 F.2d at 49.  Instead, the Court found that

4    supply was available from Omak Creek.  <u>Id.</u>  However, at oral argument, counsel for Lummi

5    drew the Court's attention to the key difference between allotment 526 in the <u>Walton</u>

6    litigation and the Lummi Peninsula, illustrated by the map of allotments included in the

7    <u>Walton I</u> appendix.  <u>See Walton I</u>, 460 F. Supp. at 1336.  Allotment 526 is not traversed by

8    No Name Creek, but is physically traversed by Omak Creek.  <u>See id.</u>  As such, the Court did

9    not award water rights for allotment 526.  The Court's holding in <u>Walton II</u> does not support

10   Defendants' position that the Court must consider additional sources outside the Case Area.

11   Lastly, Ecology argues that consideration of other water sources, including the

12   Nooksack River, maximizes the Lummi Nation's practicably irrigable acreage.  Ecology's

13   experts considered available water sources in evaluating the practicably irrigable acreage for

14   the Lummi Reservation.  <u>See</u> Young Decl., docket no. 728, at 27 (Table 1 – Exhibit A,

15   Attachment 18).[11]  Defendants' argument here has merit.  Consideration of all available

16   sources maximizes the determination of the Lummi's reserved water right for agriculture.

17   <u>Id.</u>; <u>see also</u> Young Decl., docket no. 727, at 41 (Taylor Dep. at 69-70).  Dr. Mesghinna, the

18   Plaintiffs' expert on groundwater and reserved rights, stated in his deposition that for

19   purposes of practicably irrigable acreage, it is customary to include all sources of water.

20   Young Decl., docket no. 728, at 24 (Mesghinna Dep. at 79).  Clearly, the Court must

21   consider all available sources when evaluating the practicably irrigable acreage within the

22   Case Area.  As Defendant Ecology suggests:

23

24   ────────────

25   [11] The feasability report prepared by Ecology's experts concludes that the maximum
     number of acres that can be served by surface water and groundwater is 453, with an "applied
     irrigation requirement" of 744 acre-feet.  Conversely, the maximum number of acres that can

26   be served by groundwater alone is 211, with an "applied irrigation requirement" of 346 acre-
     feet.  Young Decl., docket no. 728, at 27 (Table 1 – Exhibit A, Attachment 18).

1
2

even if the Court excludes evidence of other water sources for some purposes, it should not exclude that evidence for the purpose of showing Ecology's PIA calculations.

3 Ecology Brief, docket no. 726, at 18.

4    Evidence of other surface and groundwater sources available to the Lummi will

5 not be considered as part of these proceedings, except as those sources relate to the

6 calculation of the Lummi's PIA reserved water right.  PIA is necessarily based on

7 engineering calculations for service, which are dependent (at least in part) on source

8 location.  It would be error to exclude consideration of a particular source when

9 determining PIA, where consideration of that source would have the effect of

10 maximizing the Lummi's PIA reserved water right.

11 **7.    Water Uses beyond the Lummi Peninsula Case Area.**

12    The parties agree that the implied reservation of water for the Lummi Peninsula

13 aquifer should be quantified based only on Case Area usage, and should not include uses

14 beyond the Lummi Peninsula.  See U.S. Brief, docket no. 732, at 23; Lummi Brief, docket

15 no. 718, at 11; Ecology Brief, docket no. 726, at 18-20; see also Homeowner/Water

16 Association Brief, docket no. 723, at 23.  The Court agrees.

17 **8.    Lummi's Use of Reserved Water.**

18    Once the water rights of the Lummi have been quantified, the water may be used for

19 any purpose, including domestic, commercial, and industrial purposes.  See Arizona v.

20 California, 439 U.S. 419, 422 (1979); see also Walton II, 647 F.2d at 49 ("permitting the

21 Indians to determine how to use reserved water is consistent with the general purpose for the

22 creation of an Indian reservation providing a homeland for the survival and growth of the

23 Indians and their way of life.").  As a matter of law the Lummi may use their Treaty-reserved

24 water for any purpose.

25

26

1    **9.      Transfer of Water Rights.**

2         **A.      What are the attributes of treaty reserved water rights for consumptive
3              uses?  Are these rights held communally or by individual Lummi member
             assignees and their successors?**

4         **B.      When land was assigned on the Reservation, was a water right also
             conveyed with the land? If so, what is the nature of the water right
5             conveyed to the assignee?**

6         Federal Indian reserved water rights are impliedly reserved with the creation of an

7    Indian reservation.  Winters, 207 U.S. at 577.  Federal Indian reserved rights, or "Winters

8    rights," are presently perfected, vested rights.  The rights vest on the day the reservation is

9    created whether the Indians put the water to use or not.  Arizona I, 373 U.S. at 600.  Water is

10   reserved only for the primary purposes of the reservation, not for secondary purposes.  New

11   Mexico, 438 U.S. at 702; Adair, 723 F.2d at 1409.

12        The parties dispute whether individual Indians "owned" a proportionate share of tribal

13   waters, or merely had the opportunity to "participate" in the tribal waters.  The Court finds,

14   as a matter of law, pursuant to Adair and Preston, that each individual Lummi Indian owned

15   a proportionate share of the agricultural and domestic tribal waters which became

16   appurtenant to their land at the time of allotment.  See United States v. Adair, 478 F. Supp.

17   336, 348 (D. Or. 1979) (citing United States v. Preston, 352 F.2d 352, 358 (9th Cir. 1965)).

18   Thereafter, each individual Lummi allottee was entitled to "sell his right to reserved water."

19   Walton II, 647 F.2d at 50.  Such appurtenant water rights, and the ability of each Indian

20   allottee to transfer his right to reserved water, is inconsistent with Plaintiff Lummi's assertion

21   that these rights were held communally.  Rather, the rights were appurtenant to allotted

22   lands, and were freely transferrable by individual Indian allottees.

23        **Agricultural.**  An Indian living on a tribal reservation owns a proportionate share of

24   the tribal waters "the minute the reservation is created, and his rights become appurtenant to

25   his land the minute he acquires his allotment."  Adair, 478 F. Supp. at 348 (citing Preston,

26   352 F.2d at 358).  The extent of an Indian allottee's right is based on the number of irrigable

ORDER   -25-

1   acres he owns.  If the allottee owns ten percent of the irrigable acreage in the watershed, he

2   is entitled to ten percent of the water reserved for irrigation (i.e., a "ratable share").  Walton

3   II, 647 F.2d at 51.  Water rights for purposes of irrigation are affected by the allotment of

4   reservation lands and the passage of title out of Indian hands.  See Walton III, 752 F.2d at

5   400.  The Ninth Circuit has repeatedly held that "[a]n Indian allottee may sell his right to

6   reserved water."  See, e.g., Walton II, 647 F.2d at 50.

7        **Domestic.**  Plaintiffs attempt to distinguish the transferability of domestic reserved

8   rights.  See Lummi Brief, docket no. 718, at 30-31.  Plaintiffs argue that the Lummi's water

9   needs for its members do not diminish with the sale of allotted lands, and that the "sale of

10  land has no automatic or direct effect on the need for water."  Id. at 31.  Plaintiffs concede,

11  however, that non-Lummi owners who satisfy the Walton diligent use standard are entitled to

12  a share of the Lummi's reserved right, sufficient to support their domestic use.  Id. at 31.

13       Walton II and Walton III compel a finding that the Winters doctrine of water rights

14  applies to reserved water for domestic purposes, transferred with the sale of land to a non-

15  Indian.[12]  Where allotted Indian lands will not have an agricultural component because they

16  are not practicably irrigable, the only reserved water right will be domestic.  That right must

17  be transferrable by the Indian allottee in order to prevent the termination or diminution of the

18  Indian allottee's rights.  The Ninth Circuit reviewed this rule in Walton II, and its discussion

19  compels the result here:

20               The general rule is that termination or diminution of Indian rights requires
                 express legislation or a clear inference of Congressional intent gleaned
21               from the surrounding circumstances and legislative history.  Upon careful

22  _____

23       [12] Claims to federal reserved Winters rights by a non-Indian successor to an Indian
     allottee have been referred to as "Walton claims," and the parties in this litigation have referred
24   to Winters rights transferred to non-Indians as "Walton rights."  See, e.g., In re General
     Adjudication of All Rights to Use Water in Big Horn River System, 48 P.3d 1040, 1042 (Wyo.
25   2002) ("Big Horn VI") ("The appellants own lands within the Big Horn River System and claim
     federal reserved water rights as a result of their acquiring properties from Indian allottees. These
26   claims are known as 'Walton' claims based on the federal court cases which first identified
     them.").

ORDER   -26-

1    consideration, we conclude this principle supports the proposition that an
2    Indian allottee may sell his right to reserved water.

3  647 F.2d at 50 (internal citations omitted).  The Court finds that as a matter of law Walton II

4  applies to domestic reserved water rights, as well as agricultural reserved water rights.  An

Indian allottee may sell his right to domestic or agricultural reserved water.  Id.

5
6       **C.      Did a water right transfer to a non-Lummi member merely by the
               conveyance of land?  If so, what is the nature of that right?**

7       The purpose of a Winters reserved water right is to make reservation land livable and

8  valuable.  Walton II, 647 F.2d at 49-50.  An Indian allottee must be able to transfer the right

9  to federal reserved water when allotted land is sold in order to fulfill the purpose of a

10  Winters right.  Id.  When held by a non-Indian such rights are subject to loss through non-

11  use.  The Court in Walton II described the transfer and possibility of loss as follows:

12              [T]he Indian allottee does not lose by non-use the right to a share of
               reserved water. This characteristic is not applicable to the right acquired
13              by a non-Indian purchaser. The non-Indian successor acquires a right to
               water being appropriated by the Indian allottee at the time title passes. The
14              non-Indian also acquires a right, with a date-of-reservation priority date,
               to water that he or she appropriates with reasonable diligence after the
15              passage of title. If the full measure of the Indian's reserved water right is
               not acquired by this means and maintained by continued use, it is lost to
16              the non-Indian successor.

17  Walton II, 647 F.2d at 51.  A non-Indian successor to a Winters right must exercise diligence

18  to perfect his or her inchoate right to the Indian allottee's water right.  Walton III, 752 F.2d at

19  402.  Once perfected, the water right must be maintained by continuous use or it is lost.  Id.

20  This rule is referred to in the Ninth Circuit as "use it or lose it."  Anderson, 736 F.2d at 1362.

21  The non-Indian successor's share of reserved water is limited to the amount appropriated

22  "with reasonable diligence after the passage of title" from the original Indian allottees (or

23  their heirs), and "maintained by continued use" by each subsequent successor.  Id. (citing

24  Walton II, 647 F.2d at 51).

25       Consistent with Walton II, the Ninth Circuit affirmed the "use it or lose it" rule in

26  Anderson:

ORDER   -27-

The second restriction may be simply expressed as: use it or lose it. Pursuant to this restriction, a non-Indian successor acquires a right to that quantity of water being utilized at the time title passes, plus that amount of water which the successor puts to beneficial use with reasonable diligence following the transfer of title. Where "the full measure of the Indian's reserved water right is not acquired by this means and maintained through continued use, it is lost to the non-Indian successor." Consequently, on reacquisition the Tribe reacquires only those rights which have not been lost through nonuse and those rights will have an original, date-of-the-reservation priority.

736 F.2d at 1362. A "non-Indian successor acquires a [perfected] right to water being appropriated by the Indian allottee *at the time title passes*," Walton II, 647 F.2d at 51 (emphasis added), and an inchoate right to the reserved water rights of the allottee that are not being appropriated by the Indian allottee at the time title passes. Walton III, 752 F.2d at 402.

### D. What facts are required for a finding that a non-Lummi member has exercised due diligence?

Issues pertaining to federal reserved rights are controlled by federal law. E.g., Adair, 723 F.2d at 1401, n.3. However, the Ninth Circuit has looked to state law when determining whether a non-Indian successor to tribal lands has exercised due diligence in perfecting an inchoate right to reserved waters within a reasonable time. See Walton III, 752 F.2d at 402-04 (citing In re Waters of Doan Creek, 125 Wash. 14, 25 (1923) (limiting water right to acres put into irrigation within first years of appropriation)). Walton III allowed Walton to irrigate the 30 acres put into irrigation by his predecessors, but found that a delay of 23 years was not appropriation within a reasonable time, for the remaining acreage. Id.

The parties generally agree that under Walton III the Court may look to Washington law for guidance in determining whether a non-Lummi has exercised due diligence to perfect a Winters right transferred with the sale of allotted lands. E.g. Lummi Brief, docket no. 718, at 32 ("Washington law provides guidance for a determination of reasonable diligence and suggests that a successor must put water to use within fifteen years of the parcel leaving Indian ownership."); see also Walton III, 752 F.2d at 400 (holding the Court "may look to

1    state law for guidance" where federal law is not fully developed).  Plaintiff United States

2    suggests that under the prior appropriation system in Washington, rights are relinquished if

3    not used for a period of five years.  See Wash. Rev. Code § 90.14.130.  Plaintiff Lummi and

4    Defendant Ecology both cite Ecology v. Abbott, 103 Wash. 2d 686, 696 (1985), where the

5    Washington Supreme Court held that fifteen years was adequate notice of a change in the

6    law that required that a permit to appropriate water be sought under the state's 1917 water

7    code.  The Lummi suggest that the Court adopt a maximum period of 15 years for diligent

8    use.  See Lummi Brief, docket no. 718, at 33.  Ecology suggests that individual

9    circumstances may excuse non-use of a perfected water right and avoid relinquishment, but

10   joins Lummi in suggesting a presumptive period of 15 years.

11        Washington law provides guidance for evaluating whether Winters rights were put to

12   use with reasonable diligence by non-Indian successors.  As urged by the parties, 15 years is

13   a reasonable time for water rights to be put to use by a non-Lummi.  See Abbott, 103 Wash.

14   2d 696.  Individual circumstances may excuse the non-use of a Winters right, based on the

15   facts proven at trial.  However, a presumptive period of 15 years will be applied to the

16   Winters rights transferred to non-Lummi successors.

17        **E.    Did a water right transfer with the land to a non-Lummi member if the
               right was not perfected within a reasonable time?**

18

19        A non-Indian successor to an Indian allottee acquires an inchoate right to reserved

20   waters at the time title passes.  Walton II, 647 F.2d at 51.  The Ninth Circuit has described

     the transfer of rights as follows:

21

22              The non-Indian successor acquires a right to water being appropriated
                by the Indian allottee at the time title passes. The non-Indian also
23              acquires a right, with a date-of-reservation priority date, to water that he
                or she appropriates with reasonable diligence after the passage of title. If
24              the full measure of the Indian's reserved water right is not acquired by
                this means and maintained by continued use, it is lost to the non-Indian
                successor.

25

26

1   Walton II, 647 F.2d at 51; see also Walton III, 752 F.2d at 401-02.  The parties dispute

2   whether any right passed with the land to a non-Lummi member, if the Winters right was not

3   perfected by the non-Lummi within a reasonable time.  The Court finds that as a matter of

4   law an inchoate right transferred to a non-Lummi successor-in-interest, even if that inchoate

5   right was not perfected within a reasonable time.  Walton II, 647 F.2d at 51.

6      **F.**     **If a "Winters" right transferred to a non-Indian is not perfected, what happens to the unused water?**

7

8      **G.**     **If a "Winters" right transferred to a non-Indian was perfected but subsequently lost due to non-use, what happens to the lost water?**

9      **H.**     **When the Lummi Nation acquires land within the Reservation that has been in non-Indian ownership, what impact does this have on the water rights of the Nation and its members?**

10

11   If an inchoate right to federal reserved water is not perfected within a reasonable time,

12   the right is lost to the non-Indian successor in interest.  Walton II, 647 F.2d at 51.  Similarly,

13   if a perfected right is not maintained by continuous use, the right is lost to the land purchaser.

14   See Anderson, 736 F.2d at 1362 ("use it or lose it").

15      The Ninth Circuit has applied the Walton test for lost federal reserved water rights in

16   the context of reacquired Tribal lands.  That analysis is applicable to the water rights at issue

17   in this case.

18      The Ninth Circuit has restricted its rule concerning the transfer of reserved
        [water] rights appurtenant to allotted lands.  The first restriction is that "the

19      non-Indian successor's right to water is 'limited by the number of irrigable
        acres [of former reservation lands that] he owns.'"  Adair at 1417 (citing

20      Walton, 647 F.2d at 51).  The second restriction may be simply expressed
        as: use it or lose it.  Walton, 647 F.2d at 51.  Pursuant to this restriction,

21      a non-Indian successor acquires a right to that quantity of water being
        utilized at the time title passes, plus that amount of water which the

22      successor puts to beneficial use with reasonable diligence following the
        transfer of title.  Where "the full measure of the Indian's reserved water

23      right is not acquired by this means and maintained through continued use,
        it is lost to the non-Indian successor."  Id.  ***Consequently, on reacquisition***

24      ***the Tribe reacquires only those rights which have not been lost through***
        ***nonuse and those rights will have an original, date-of-the-reservation***

25      ***priority.***

26

1    Anderson, 736 F.2d at 1362 (emphasis added).  Anderson clearly held that Winters rights are

2    lost to the tribe on reacquisition, where they have not been maintained by the non-Indian

3    successor.  Plaintiffs urge the Court to find a different result for unperfected Winters rights,

4    lost to the non-Indian successor by failure to perfect within a reasonable time.  Walton III

5    characterized the loss of unused ratable share:

6                We held also [in Walton II] that a ratable share of this water reserved for
             irrigation passed to Indian allottees.  This ratable share could in turn be
7             conveyed to a non-Indian purchaser.  However, the non-Indian purchaser's
             share is subject to loss if not put to use.

8
9    752 F.2d at 400.  The "use it or lose it" rule in the Ninth Circuit does not distinguish between

10   unperfected Winters rights and rights perfected at transfer, which are lost through nonuse.

11   Plaintiffs argue that Anderson draws this distinction with its emphasis on Winters rights

12   "appurtenant to allotted lands."  736 F.2d at 1362.  The Lummi argue that the rule in

13   Anderson does not apply to lost unperfected rights, because that "water becomes appurtenant

14   to land only when it is put to actual beneficial use on that land."  See Lummi Brief, docket

15   no. 718, at 35.

16       However, an Indian allottee's share of tribal waters "become appurtenant to his land

17   the minute he acquires his allotment."  Adair, 478 F. Supp. at 348 (quoting Preston, 352 F.2d

18   at 358); accord Walton II, 647 F.2d at 48 ("sufficient appurtenant water was reserved to

19   permit irrigation of all practicably irrigable acreage on the reservation.").  Thus, when the

20   Tribe reacquires land on the reservation from a non-Lummi, it reacquires only those rights

21   which have not been lost through nonuse, whether perfected or unperfected at the time of the

22   original transfer to the non-Lummi successor.  Anderson, 736 F.2d at 1362.

23   ///

24   ///

25   ///

26   ///

ORDER   -31-

1    **10.    Burden of Proof.**

2        **A.    Who bears the burden of proof as to what "Winters" rights, transferred to a non-Indian, were perfected?**

3

4        **B.    Who bears the burden of proof as to what "Winters" rights, transferred to a non-Indian, were perfected but then lost, due to non-use?**

5        The rights of non-Indian purchasers have been addressed in this circuit, but the courts

6    have not squarely addressed burden of proof.  Walton II remanded to the district court the

7    question of Walton's share of reserved waters, directing the court to proceed as follows:

8            The district court's holding that Walton has no right to share in water
             reserved when the Colville reservation was created is reversed. *On remand,*
9            *it will need to determine the number of irrigable acres Walton owns, and*
             *the amount of water he appropriated with reasonable diligence in order to*
10           *determine the extent of his right to share in reserved water.*

11   Walton II, 647 F.2d at 51 (emphasis added).  The Court did not state whether the burden of

12   proof was on defendants Walton, or on the plaintiff Tribes.  In Walton III, 752 F.2d 397,

13   which followed, the Court similarly did not address the burden of proof.

14       Defendants argue that "[t]he party alleging the existence of a water right has the

15   burden of proof and must prove it unequivocally."  United States v. Ahtanum Irrigation Dist.,

16   124 F. Supp. 818, 827 (E.D. Wash. 1953) (citing Wiel, Water Rights in the Western States §

17   636 (3d ed. 1911)).  Plaintiffs urge the Court to rely on two state court opinions, which allow

18   Winters rights, transferred to a non-Indian, with a Treaty priority date "for the [practicably

19   irrigable acreage] [the non-Indian successors-in-interest] *can show* were irrigated by their

20   Indian predecessors or put under irrigation within a reasonable time thereafter."  See Big

21   Horn I, 753 P.2d at 113-14 (emphasis added); see also Big Horn VI, 48 P.3d at 1042

22   ("Walton claimants *must demonstrate* their lands were irrigated by their Indian allottee

23   predecessors or the first non-Indian successors irrigated the lands within a reasonable time

24   after they were conveyed.") (emphasis added).

25       The rule from Ahtanum is consistent with the Walton cases only to the extent that a

26   claimant must prove his rights.  124 F. Supp. at 827.  The Court rejects the standard of proof

ORDER   -32-

announced by <u>Ahtanum</u>, when it stated that "the party alleging the existence of a water right . . . must prove it *unequivocally*." <u>Id.</u> (emphasis added).  This language articulates a standard of proof that is inconsistent with <u>Walton III</u>:

> There may be periods about which the evidence concerning the acreage actually irrigated is sketchy or conflicting.  However, *absolute certainty is an impossibility* when we are dealing with witnesses' attempts to remember events of 30 to 40 years ago.

<u>Walton III</u>, 752 F.3d at 403 (emphasis added).  Evidence of the events in this case will be "sketchy or conflicting," as well.  This case will deal with witnesses' attempts to recall events of more than 40 years ago.

Walton III impliedly rejects the "must prove it unequivocally" standard of <u>Ahtanum</u>, and this Court explicitly declines to follow <u>Ahtanum</u>.  The Court is obligated to reconcile the evidence, even when "sketchy or conflicting," and the appropriate means for evaluating the evidence in this case is by a preponderance of the evidence.  The Court finds that the party alleging the existence of a water right has the burden of proof and must prove it by a preponderance of the evidence.

**C.    Who bears the burden of proof as to what water rights are held by the Lummi Nation and its members?**

For the reasons discussed in the previous section, the United States and the Lummi Nation have the burden of proving what federal Indian reserved water rights are held by the Lummi Nation and its members.

**D.    Does federal law or other law apply to the burden of proof?**

Federal law applies with regard to burden of proof.  <u>See</u>, <u>e.g.</u>, <u>Walton III</u>, 752 F.2d at 400 ("[Tribal] reserved water rights are federal water rights and are not dependent upon state law or state procedures.").

# IV.  CONCLUSION

For the reasons set forth in this Order, and as specifically set forth in this Order, the Court rules as follows:

ORDER   -33-

1.  The Lummi Reservation does not lack Reservation status.  The Lummi Reservation is "Indian Country."

2.  The Lummi Reservation is not temporary.

3.  Reservation purpose is established at the time the reservation is created.  The Treaty of Point Elliott did not include a broad "homeland" purpose.  The primary purpose of the Lummi Reservation is limited to agriculture and domestic purposes.

4.  Agricultural and domestic water rights will be quantified at trial.

5.  The Court will not quantify water rights for those areas outside the Case Area.

6.  The Court will exclude evidence of water sources outside the Case Area, except as those sources relate to a determination of the practicably irrigable acreage within the Case Area.

7.  The Court will only consider the implied reservation of water within the Case Area.

8.  Once quantified, the Tribe may use its implied reservation of water for any purpose.

9.  Treaty reserved water rights were transferable to non-Indian successors-in-interest.  The Court will look to state law in evaluating due diligence as it relates to perfection of a water right.  Under Washington law, a non-Lummi exercises due diligence if water is put to use within 15 years.  <u>Winters</u> rights lost under the "use it or lose it" rule are lost to the tribe, whether perfected or inchoate at the time of loss.

10.  The party alleging the existence of a water right has the burden of proof and must prove it by a preponderance of the evidence.  Federal law applies with regard to the burden of proof.

///

ORDER   -34-

The Clerk is directed to schedule a status conference within 20 days of this Order to schedule a trial date.

IT IS SO ORDERED.

DATED this 20th day of May, 2005.


Thomas S. Zilly
United States District Judge

Map 1.
**Lummi Reservation Base Map**

Hydrology
Transportation
Shoreline

Product of Lummi Nation Geographic Information Services, 1996.

ORDER   -36-



Lummi Peninsula Case Area Boundary

Case Area Boundary
Source: AESI

USGS Quads:
Lummi Bay (1994)
Ferndale (1994)
Lummi Island (1994)
Eliza Island (1995)

NORTHWEST ECONOMIC ASSOCIATES

June 2001

ORDER   -37-