1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES, in its own right and on behalf of the Lummi Indian Nation | |
| Plaintiff, | No. C01-0047Z |
| LUMMI INDIAN NATION | AMENDED ORDER |
| Plaintiff-Intervenor, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY, et al., | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff United States brings this action in its own right and on behalf of Plaintiff-Intervenor Lummi Indian Nation (collectively, "Plaintiffs"), seeking a declaration that the Treaty of Point Elliott impliedly reserved the groundwater under the Lummi Peninsula for the use and benefit of the Lummi Nation. Defendant State of Washington, Department of Ecology ("Ecology") issues permits to withdraw groundwater on the Lummi Peninsula, and contends that the Treaty of Point Elliott does not impliedly reserve groundwater under the Lummi Peninsula in the amounts claimed by the Lummi Nation ("Lummi" or "the Nation"). Defendant fee landowners and water associations assert a right to withdraw groundwater

1 from the Lummi Peninsula under a claim of right under federal and state law.  This action

2 seeks to clarify the rights of the parties to groundwater under the Lummi Peninsula.

3      On February 18, 2005, the Court heard oral argument on various pending motions.  At

4 the hearing, the Court determined that numerous legal issues should be resolved before trial.

5 The Court ordered the parties to meet, following the hearing, and prepare a list of issues.

6 The parties prepared a list of ten legal issues, with subparts, to be addressed by the Court on

7 summary judgment.  The Court then met informally with the parties to set a briefing schedule

8 for additional cross-motions for summary judgment.  See Minute Entry, docket no. 602.

9      This matter now comes before the Court on cross-motions for summary judgment,

10 docket nos. 718, 723, 726, and 732.  The Court has reviewed the briefs, declarations, and

11 materials submitted by the various represented and pro se parties.  The Court heard oral

12 argument on April 18, 2005, and took the matter under advisement.  The Court being fully

13 advised issued an Order dated May 20, 2005, docket no. 779.

14      Plaintiff Lummi Nation now seeks reconsideration of those aspects of the Court's

15 Order of May 20, 2005, which referenced Skokomish Indian Tribe v. United States, 401 F.3d

16 979, 989-90 (9th Cir. March 9, 2005) (en banc), amended, ___ F.3d ___, 2005 U.S. App.

17 LEXIS 10160 (June 3, 2005), on the ground that the sections referenced in the Order have

18 been withdrawn.  See Lummi Motion for Reconsideration, docket no. 780.  Plaintiff United

19 States also moves to reconsider and/or clarify, docket no. 781.  The State of Washington,

20 Department of Ecology, also moves the Court to revise its prior Order in light of the

21 Skokomish revised Order.  See Ecology Response, docket no. 789.  The Defendant

22 Homeowners and Water Associations also contend the Court should amend its Order in light

23 of the Skokomish decision.  See Homeowner & Water Association Response, docket no. 786.

24 The Court has also reviewed the Pro Se Response, docket no. 787.

25 ///

26 ///

ORDER  -2-

1   The Court GRANTS the Motions to Reconsider, dockets no. 780 and 781.  The Court

2   now being fully advised amends and clarifies its prior Order, in light of the Skokomish

3   decision.

4   ## II. BACKGROUND

5   The Lummi Indian Reservation was established in 1855 by the Treaty of Point Elliott

6   (the "Treaty").  12 Stat. 927.  Article II of the Treaty "reserved for the present use and

7   occupation" of the Lummi Nation the land comprising the Reservation and its resources.  Id.

8   at 928.  The Treaty reserved the island of Cha-Cho-Sen (now known as the Lummi

9   Peninsula) for the exclusive use of the Lummi Nation.  At the time of the Treaty, the Lummi

10  people numbered about 500.  See Kennedy Decl., docket no. 219, Ex. 5 at 433.  The Lummi

11  Tribe lived mostly in the San Juan Islands and Bellingham Bay areas.  United States v.

12  Washington, 384 F. Supp. 312, 360-63 (W.D. Wash. 1974).

13  The Treaty of Point Elliott was one of a number of treaties negotiated by Isaac

14  Stevens, the first governor of the Washington Territory.  See Friday Decl., docket no. 733,

15  Ex. 4, at 10 (Response to Richards' Report).  The purpose of these treaties was to

16  "extinguish Indian claims to the land in Washington Territory and provide for peaceful and

17  compatible coexistence of Indians and non-Indians in the area."  Washington, 384 F. Supp. at

18  355.  The Lummi ceded large tracts of land to the United States in exchange for cash, defined

19  reservations, hunting and fishing rights, and other rights.  12 Stat. 927.  The Treaty does not

20  mention water or water rights, although it reserves to the Lummi their right to fish at their

21  "usual and accustomed places."  Id.

22  The parties generally agree on the history surrounding the formation of the Lummi

23  Reservation, and the allotment of lands to individual Indians.  The Lummi Reservation

24  consists, generally, of two peninsulas.  See Joint Status Report, docket no. 27, at 3.  The

25  larger peninsula, the Lummi Peninsula, extends into Bellingham Bay, and the smaller

26  peninsula, the Sandy Point Peninsula, extends into Lummi Bay.  Id.  Both Bellingham Bay

1    and Lummi Bay are saltwater bodies.  Id.  The portion of the Lummi Reservation involved in

2    this litigation (the "Case Area") is located entirely within the boundaries of the Lummi

3    Reservation, and is located on the Lummi Peninsula.  Attached to this Order are maps of the

4    Lummi Reservation and the Case Area.

5         The Lummi Indian Reservation was created by Article II of the Treaty of Point Elliott,

6    signed in 1855 and ratified by the Senate in 1859.  12 Stat. 927.  On November 22, 1873,

7    President Ulysses S. Grant, pursuant to his authority in the Treaty of Point Elliott, formally

8    established the boundaries of the Lummi Reservation.  1 Charles J. Kappler, Indian

9    Affairs: Laws and Treaties 917 (1904); see also United States v. Washington, 969 F.2d 752,

10   754-55 (1992) (discussing the boundaries set by executive order).  In 1884, nearly all of the

11   upland area within the Lummi Peninsula was assigned to Indian households.  See U.S.

12   Motion to Strike, docket no. 503, at 3 (Undisputed facts).  The remaining acreage of the

13   Lummi Reservation was allotted to individual Indian households by 1914.  Id.  These

14   assignments, or allotments, of the Lummi Reservation conveyed 12,560.94 acres to 109

15   individual Indians, an average of 115 acres per allottee, and reserved 2 acres for a school.

16   See Duwamish v. United States, 79 Ct. Cl. 530, 552 (1934).[1]  The Case Area comprises just

17   over half of the Lummi Indian Reservation, and is approximately 6,250 acres of mostly

18   forested land.  See Joint Status Report, docket no. 27, at 7-8; Beebe Decl., docket no. 266, at

19   2.  The 1990 census tract which most closely approximates the Case Area indicates

20   populations of 1,256 Indians and 661 non-Indians.  Joint Status Report, docket no. 27, at 8.

21        Some of the allotted lands within the Case Area were eventually sold by the individual

22   Indian allottees to non-Indian purchasers.  U.S. Motion to Strike, docket no. 503, at 3

23   (Undisputed facts).  However, none of the parcels purchased by non-Indians were sold by the

24

---

25   [1] Duwamish was brought by various Indian tribes, including the Lummi, against the
     United States.  The Tribes alleged that the United States failed to provide annuities, schools, and
26   funds, promised by Treaty, misused funds appropriated by Congress, and improperly reduced
     the size of Treaty reservations.  See generally Duwamish, 79 Ct. Cl. 530.

ORDER   -4-

1    Lummi Nation itself, <u>id.</u>, and as of 1954 only twelve acres were owned by the Nation.

2    Knapp Decl., docket no. 724, Ex. 4, at 24 (Argel Dep. at pg. 38, ln. 4).  The deeds conveying

3    parcels to non-Indian purchasers made no mention of water rights.  At the time of filing of

4    this litigation in 2001, approximately 4,500 acres of land within the Case Area were owned

5    by the Lummi Nation or its members.  Approximately 1,500 acres of land within the Case

6    Area were owned in fee by non-Indians.

7       The parties agree that one of the primary purposes of the Lummi Reservation was

8    agriculture.  <u>See</u> Treaty, 12 Stat. 927, art. XIII.  However, the portion of the Reservation that

9    is suitable for agriculture is relatively small.  As represented to the Court at oral argument,

10    Defendant Ecology's experts estimate that only seven percent of the Case Area is suitable for

11    agriculture.  The Lummi and United States agree that the portion of the Lummi Reservation

12    suitable for agriculture is limited, and have assumed for purposes of these motions that the

13    State's experts are correct.  <u>See</u> Hamai Decl., docket no. 720, at 2-3; <u>see</u> <u>also</u> Lummi Brief,

14    docket no. 718, at 20.

15       The individual Defendants own one or more parcels within the Case Area, and trace

16    title to their land to an Indian owner of land assigned to an Indian family under Article VII of

17    the Treaty of Point Elliott.  U.S. Second Amend. Compl., docket no. 97, at ¶ 7.  The water

18    association Defendants are non-profit corporations organized for the purpose of delivering

19    water to their members, and hold permits issued by the State for the withdrawal and delivery

20    of groundwater on the Lummi Peninsula, within the Case Area.  <u>Id.</u> at ¶ 5.  Ecology regulates

21    the natural resources of the state and has issued permits for the withdrawal of groundwater

22    underlying the Lummi Peninsula.  <u>Id.</u> at ¶ 6.

23       The Treaty of Point Elliott reserved the island of Cha-Cho-Sen (now known as the

24    Lummi Peninsula) and created the Lummi Indian Reservation.  The Treaty did not explicitly

25    reserve water rights for the Indians on the Reservation.  When a Treaty does not mention

26    water rights, the Supreme Court has held that water rights for the Indians are impliedly

reserved as part of the Treaty, because land is "valueless" without water.  <u>Winters v. United States</u>, 207 U.S. 564, 576-77 (1908).  This Court has previously held in this litigation that the <u>Winters</u> precedent applies to the Lummi Reservation and the Treaty of Point Elliott.  In addition, the Court held that reserved <u>Winters</u> rights on the Lummi Reservation extend to groundwater, and that the Lummi hold rights to the groundwater under the Lummi Peninsula.  <u>See</u> Order, docket no. 304, at 8.  However, the Court did not quantify the Lummi's right to groundwater, and did not determine how much groundwater the Lummi were entitled to withdraw.

The Lummi Nation and the United States seek to declare the Lummi's superior right to groundwater under the Lummi Peninsula, in the Case Area.  They seek to exclude all uses of groundwater by non-Indians in the Case Area, which the Lummi believe conflict with their tribal rights to groundwater.  The Lummi Nation seeks to prevent the withdrawal of too much groundwater, which they claim would lead to saltwater intrusion in the aquifer, and corruption of the groundwater under the Lummi Peninsula.

Under federal law, water rights are reserved only for the primary purpose of an Indian reservation.  Thus, in order to quantify Lummi's rights to groundwater on the Lummi Peninsula, the Court must determine the "primary purpose" of the Lummi Reservation.  <u>Winters</u> water rights are implied in federal Indian law, and thus are limited to the primary purposes of the Reservation as determined at the time of the Treaty.  This does not mean the Tribe may not seek additional water rights, in addition to those reserved by Treaty.  However, any additional rights acquired by the Tribe will be similar to the rights of other municipal and private water purveyors, and will not have an 1855 Treaty date of priority.

# III. ANALYSIS

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party

has met this burden, the opposing party must show that there is a genuine issue of fact for

trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The

opposing party must present significant and probative evidence to support its claim or

defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.

1991).

The meaning of treaty language is ultimately a question of law.  United States v.

Washington, 157 F.3d 630, 642-43 (9th Cir. 1998); see also United States v. Idaho, 210 F.3d

1067, 1072 (9th Cir. 2000) (District court's interpretation of treaties, statutes, and executive

orders are questions of law and are reviewed de novo.).  Treaties with Indian tribes must be

interpreted as they would have understood them.  Choctaw Nation v. Oklahoma, 397 U.S.

620, 631 (1970); see also Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)

(Treaties with Indian tribes must be "construed liberally in favor of the Indians, with

ambiguous provisions interpreted to their benefit.").

An implied reservation of water for an Indian reservation must be found where it is

necessary to fulfill the purposes of the Reservation.  Winters, 207 U.S. at 576.  In Winters,

the Court considered the Fort Belknap Reservation in Montana, created by Treaty in 1888.

Id.  Embodied in the Treaty was the policy of the United States to change the Indians'

"nomadic" habits and transform them into a "pastoral and civilized people" by placing them

on reservations.  See id. at 575-76.  After the 1888 Treaty and the placement of the Indians,

however, homesteaders began settling around the reservation and drawing water for irrigation

and stockwatering from the Milk River, the northern boundary of the reservation.  Id. at 576.

A severe drought occurred, and upstream irrigation left the river nearly dry, with little water

for the reservation and other downstream users.  The federal government sued on behalf of

the Fort Belknap tribes to protect their rights to Milk River water.  The lands on the Fort

Belknap Reservation were "arid and, without irrigation . . . practically valueless."  Id.

ORDER  -7-

1    Because the lands were valueless without water, the Supreme Court found that the 1888

2    Treaty necessarily implied a reserved right to water for the Fort Belknap reservation.  Id.

3    Because of Winters, implied reservations of water are known in federal Indian law as

4    "Winters" rights.

5         The Courts have also held that Winters rights may be transferred with the sale of

6    Indian land to a non-Indian purchaser.  If an Indian allottee owns land on a reservation, but is

7    unable to sell the water rights along with that land, the value of the land would be severely

8    impaired.  Colville Confederated Tribes v. Walton, 647 F.2d 42, 50 (9th Cir. 1981) ("Walton

9    II").  In the Walton cases, non-Indians purchased lands from Indian allottees on the Colville

10   Reservation, and irrigated and used those lands.  The Colville Confederated Tribes brought

11   suit to enjoin the non-Indian Waltons from using "No Name Creek," located entirely within

12   the reservation, but crossing land owed by the defendants Walton.  Colville Confederated

13   Tribes v. Walton, 460 F. Supp. 1320, 1323 (E.D. Wash. 1978) ("Walton I").  The district

14   court held that an Indian allottee could convey only a right to water actually put to use.  Id. at

15   1329.  The Ninth Circuit reversed, however, holding that such a "restriction on

16   transferability" was an impermissible "diminution of Indian rights," and that an Indian must

17   be able to sell all of his right to share in the reserved waters of the Tribe.  Walton II, 647

18   F.2d at 50.  The Court found "no basis for limiting the transferability" of the appurtenant

19   right to share in reserved waters.  Id.

20        On remand, the district court calculated the respective rights of the Tribe, Walton, and

21   the individual allottees.  The district court found that "Walton exercised reasonable diligence

22   in irrigating a minimum of 104 acres"; however, the district court did not properly consider

23   the diligence of the non-Indian grantees whose interest preceded Walton's.  See Colville

24   Confederated Tribes v. Walton, 752 F.2d 397, 402 (9th Cir. 1985) ("Walton III").  The Ninth

25   Circuit held that it was error not to consider whether Winters rights were maintained through

26   continuous use, by all non-Indian predecessor successors-in-interest.  Id.

ORDER   -8-

The following ten issues submitted by the parties relate to reservation status, primary reservation purpose, reserved rights, and the transferability of reserved rights.  The Court will analyze these issues in the sequence discussed by the parties in their briefing.

**1.      Reservation Status of the Lummi Peninsula.**

The pro se homeowner defendants have asserted that the Lummi Reservation lacks status as an Indian reservation, and is not "Indian Country."  <u>See</u> Motion to Declare Lummi Reservation is not Indian Country, docket no. 519.[2]

The Lummi Reservation was created by the Treaty of Point Elliott, and has reservation status.  <u>See</u> Treaty, 12 Stat. 927; <u>see also</u> <u>Washington v. Confederated Tribes of Colville Indian Reservation</u>, 447 U.S. 134, 143 (1980).  The Lummi Reservation is "Indian Country," as that term is defined by statute.  <u>See</u> Treaty, 12 Stat. 927; <u>see</u> <u>also</u> 18 U.S.C. § 1151(a).  "Indian Country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."  18 U.S.C. § 1151(a).  The Supreme Court has specifically ruled that the assignment process on the Lummi Peninsula did not effect a diminishment of the reservation, and this Court finds that determination to be binding on these proceedings.  <u>See</u> <u>United States v. Celestine</u>, 215 U.S. 278, 285 (1909).

**2.      "Temporary" Status of the Lummi Reservation.**

Defendant homeowners and water associations have asserted the Lummi Reservation was intended by Treaty to be a "temporary" reservation for the Lummi.  The Court finds as a matter of law that the Lummi Reservation is not temporary.  Article II of the Treaty of Point Elliott reserved land for the "present use and occupation" of the tribes.  Defendants have urged the Court to find that the Lummi Reservation was intended only as a temporary

---

[2] Although this litigation is limited to the quantification of water rights in the Case Area (a portion of the Lummi Reservation), the pro se Defendants challenge the status of the entire Lummi Reservation.  In contrast, all other parties, including the individual homeowner Defendants and the Defendant water associations, represented by counsel, concede the Lummi Reservation does not lack reservation status.  <u>See</u> Homeowner/Water Association Brief, docket no. 723, at 6.

1    reservation, and that the Treaty held out the possibility of removal to another location.  See

2    Treaty, 12 Stat. at 927-28.  While the Treaty may have held out the possibility of relocation

3    to a different reservation, after 150 years the Reservation is permanent as a matter of law.

4    See, e.g., Blackfeet Tribe, 471 U.S. at 766 (Treaty must be "construed liberally in favor of

5    the Indians, with ambiguous provisions interpreted to their benefit.").

6    **3.       Primary Purpose of the Lummi Reservation.**

7         **A.       Applicable Standard.**

8         The meaning of treaty language is ultimately a question of law.  Washington, 157

9    F.3d at 642-43; Idaho, 210 F.3d at 1072 (interpretation of treaties, statutes, and executive

10   orders are questions of law and are reviewed de novo).  The Treaty of Point Elliott reserved

11   lands for the Lummi Nation, and the historical facts surrounding the Treaty are largely

12   undisputed. Although the parties place different weight on various historical facts, the Court

13   finds that the purposes of the reservation may be determined as a matter of law.[3]

14        The parties generally agree that the purposes of the Reservation may be determined as

15   a matter of law.  Plaintiff United States argues that the unambiguous language in the Treaty

16   allows the Court to determine the purposes of the Lummi Reservation as a matter of law.

17   U.S. Brief, docket no. 732, at 12.  Plaintiff Lummi Nation states that the issue of reservation

18   purpose is "primarily legal."  See Lummi Brief, docket no. 718, at 3.  Defendants similarly

19   urge the Court to resolve the issue of reservation purpose as a matter of law.  See Ecology

20   Brief, docket no. 726, at 5-6; see also Homeowner/Water Association Brief, docket no. 723,

21   at 11-12.

22   ///

23   ///

24

25   _____

26        [3] Although this litigation is limited to the Case Area, in determining the purpose of the Reservation the Court must necessarily look at the purpose of the entire Lummi Reservation, rather than the limited Case Area.

ORDER   -10-

1    Where language in the treaty is unambiguous, such language will control.  However,

2    where language is ambiguous, the ambiguities must be resolved in favor of the Tribe.  See

3    Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 208 n.17 (1978).

4    **B.    Theories of The Parties.**

5    The parties each advance a different theory of "primary purpose" for the Lummi

6    Reservation.  The parties' different theories lead to substantially different calculations of

7    impliedly reserved water rights of the Lummi Nation.

8    **(1)    Homeland Purpose (Plaintiffs' Position).**

9    Plaintiffs assert that the Treaty of Point Elliott was intended to provide a "homeland"

10   for the Lummi Nation.  See Walton II, 647 F.2d at 47 ("[T]he general purpose [of an Indian

11   reservation,] to provide a home for the Indians, is a broad one and must be liberally

12   construed."); see also Winters, 207 U.S. at 565 (The purpose of an Indian reservation is to

13   provide the Indians with a "permanent home and abiding place").  Plaintiffs contend that

14   because the Treaty's purpose was to provide a homeland, the Court should find sufficient

15   water was reserved to provide for all domestic, agricultural, community, commercial, and

16   industrial purposes.  Plaintiffs urge this result is consistent with a broad "homeland" purpose

17   intended by the federal government, which must be interpreted to further the goal of Indian

18   self-sufficiency.  Plaintiffs rely heavily on In re General Adjudication of All Rights to Use

19   Water in Gila River System & Source, 35 P.3d 68, 76 (Ariz. 2001) ("Gila River V") ("Water

20   use necessary to the establishment of a permanent homeland is a primary . . . purpose.").  In

21   Gila River V, the Arizona Supreme Court considered and rejected the traditional measures of

22   Indian reserved water rights.  Id. at 79.  Drawing a distinction between Indian reservations

23   and other types of federal reservations, the court concluded that a "fact-intensive inquiry . . .

24   on a reservation-by-reservation basis" was appropriate.  Id.  The Arizona Supreme Court

25   ///

26   ///

1    acknowledged that it was entering "uncharted territory," but held that consideration of a

2    "myriad of factors"[4] was a superior means of quantifying Indian reserved rights.  Id.

3        Plaintiffs' theory of the case is based on Gila River V.  The effect of Plaintiffs'

4    position would be the quantification of a water right for a broad and almost unlimited range

5    of activities.  The adoption of Plaintiffs' position would necessitate a finding that water was

6    reserved for a myriad of "homeland" purposes at the time the Reservation was created.

7        Plaintiffs ask the Court to reject the Defendants' agricultural theory of primary

8    purpose, and contend that allowing water only for agricultural purposes would unfairly limit

9    the Lummi's water rights.  The parties agree that the amount of land suitable for agriculture

10   is limited, with only approximately seven percent of the total Case Area suitable for

11   agricultural pursuits.  Plaintiffs' "homeland" purpose arguments, if adopted, would

12   ultimately require a finding that all or substantially all of the groundwater in the Case Area

13   would be subject to Winters rights.

14                    **(2)    Agricultural Purpose (Defendants' Position).**

15       Defendants ask the Court to find the primary purpose of the reservation was

16   agricultural, and that "practicably irrigable acreage"[5] or "PIA" is the primary measure of

17   Lummi's right to Peninsula groundwater.  Defense expert Dr. Richards testified at his

18   deposition that "the purpose [of the Lummi Reservation] was to create an agricultural

19   community," and that "Jeffersonian agrarianism formed the basis of United States' Indian

20

21   _____

22       [4] The Court provided a non-exclusive list of factors that might be considered, including
     the tribe's history and traditions, cultural preservation, geography, topography, natural resources,
     economic base, past water use, the suitability of water requests, and the present and projected
23   future population.  Gila River V, 35 P.3d at 79-80.

24

25       [5] The determination of practicably irrigable acreage involves a two-part analysis.  PIA
     must be susceptible of sustained irrigation (not only proof of the arability but also of the
     engineering feasibility of irrigating the land) and irrigable at reasonable cost.  General
26   Adjudication of All Rights to Use Water in the Big Horn River System, 753 P.2d 76, 101 (Wyo.
     1988) ("Big Horn I").

1   policy." Young Decl., docket no. 727, at 19 (Richards Dep. at p. 93). Defendants also point

2   to the report of Dr. Friday, the Plaintiffs' expert on the purpose of the Reservation, who

3   stated in his report that the United States hoped to transform the Lummi from "wild Indians"

4   into "civilized people," by moving the Tribe toward "intensive agricultural practices as the

5   primary means of Indian subsistence and commercial activity." Id. at 10 (Friday Dep. at p.

6   168). All parties agree that the Treaty of Point Elliott intended agriculture as a primary

7   purpose of the Lummi Reservation. However, Defendants contend that agriculture was the

8   sole purpose.

9        Based on agriculture as the primary purpose, the Defendants urge the Court to apply

10  the practically irrigable acreage methodology on the Lummi Reservation, in order to quantify

11  the Lummi's right to the groundwater underlying the peninsula. E.g., Arizona v. California,

12  373 U.S. 546, 601 (1963) ("Arizona I") ("The only feasible and fair way by which reserved

13  water for the reservations can be measured is irrigable acreage."). Defendants urge that PIA

14  is the only proper means for assessing the measure of Lummi's right to water in the Case

15  Area. Use of PIA to quantify water rights would result in a very limited amount of the

16  available Case Area groundwater being subject to Winters rights.

17       Defendants conceded at oral argument that implied water rights were also reserved for

18  domestic purposes, which includes personal, household, and stockwatering uses. However,

19  Defendants urge the Court to find that domestic purposes should be included as part of the

20  Lummi's PIA award. The practical effect of Defendants' position would be the

21  quantification of the Lummi's water rights based solely on the agricultural suitability of land,

22  with no significant additional domestic award. This would determine the water rights for the

23  Case Area based on irrigable acreage, which accounts for only seven percent of the Lummi

24  Reservation.[6] The Homeowner Defendants also conceded at oral argument that it would be

25

26       [6] The parties disagree as to whether seven percent is the exact measure of irrigable
    acreage on the Lummi Peninsula. However, the parties agreed at oral argument that the

1   fair to calculate domestic uses separate from agricultural uses, because of the relatively small

2   portion of the Lummi Peninsula suitable for agriculture.

3       Defendants urge the Court to reject Plaintiffs' "homeland" theory of primary purpose.

4   Defendants argue that Plaintiffs' theory puts no limits on the Nation's water rights. Ecology

5   argues that a primary reservation purpose to "create a homeland" is an argument that "begs

6   the question" as to primary purpose. Moreover, all Defendants urge that Plaintiffs' reliance

7   on the Arizona Supreme Court opinion in Gila River V would be manifest error, because

8   Gila River V was decided by the Arizona Supreme Court and is contrary to federal law.

9       **C.    Primary Purpose Analysis.**

10      The primary purpose of a federal reservation defines the scope and extent of impliedly

11  reserved water rights. United States v. Adair, 723 F.2d 1394, 1408-09 (9th Cir. 1983).

12  There may be more than one primary purpose of a reservation. Id. at 1410. However, water

13  is reserved only for the primary purposes of the reservation, and not for secondary purposes.

14  United States v. New Mexico, 438 U.S. 696, 702 (1978); Adair, 723 F.2d at 1409; Walton II,

15  647 F.2d at 47. Water rights are not implied where they are merely "valuable for a

16  secondary use of the reservation." Adair, 723 F.2d at 1409 (citing New Mexico, 438 U.S. at

17  702).[7]  The quantity of water reserved under Winters is that amount necessary to fulfill the

18  purposes of the reservation, no more. Cappaert v. United States, 426 U.S. 128, 141 (1976).

19      The purpose of the reservation is based on the intent of the federal government at the

20  time it established the reservation. See Winters, 207 U.S. at 577. Implied in the

21  _____

22  percentage is small, and that irrigable acreage on the Peninsula is "limited."

23      [7] Plaintiffs contend the Court should reject, as a practical matter, any distinction between
    primary and secondary purposes, pursuant to Gila River V, 35 P.3d at 74-75. The Arizona
24  Supreme Court discussed the primary and secondary purpose distinction normally applied to
    federal reservations, e.g. New Mexico, 438 U.S. at 702, but declined to find that such distinction
25  applied to federal Indian reservations. Gila River V, 35 P.3d at 74. Reasoning that "the
    essential purpose of Indian reservations is to provide Native American people with a 'permanent
26  home and abiding place,' that is, a 'livable' environment," the Arizona Supreme Court declined
    to determine the "secondary" purposes of the reservation for which water was not reserved. Id.

1    establishment of the reservation is an allotment of water necessary to "make the reservation

2    livable." Arizona v. California, 460 U.S. 605, 616 (1983) ("Arizona II").  The water right

3    vests on the date the reservation is created, not when the water is put to use or at some later

4    time. Arizona I, 373 U.S. at 600.  The purpose of the reservation may be discerned by

5    reference to the relevant treaty, statute, or executive order. E.g., Walton II, 647 F.2d at 47

6    ("To identify the purposes for which the Colville Reservation was created, we consider the

7    document and circumstances surrounding its creation, and the history of the Indians for

8    whom it was created.  We also consider [the Indians'] need to maintain themselves under

9    changed circumstances.").  In determining the primary purposes of the Reservation, the Court

10   must liberally construe the Treaty in the Indians' favor. County of Yakima v. Confederated

11   Bands of the Yakima Indian Reservation, 502 U.S. 251, 269 (1992).  In contrast, where water

12   is only valuable for a secondary use of the reservation, there arises

13
            the contrary inference that [the United States] intended, consistent with its
            other views, that the [reservation] would acquire water in the same manner
14          as any other public or private appropriator.

15   New Mexico, 438 U.S. at 702.

16        **Agricultural.**  The parties agree that water for agricultural use was impliedly reserved

17   for the Tribe as a primary purpose of the Lummi Reservation. See Treaty, 12 Stat. 927, art.

18   XIII; see also Friday Decl., docket no. 733, Ex. 2, at 4 (Richards Report) ("The primary

19   purpose of the Lummi Reservation was to create an agricultural community for individuals

20   and families.").  The parties also agree that the portion of the reservation suitable for

21   agriculture is limited.  The extent of the Lummi's reserved water right for agriculture is

22   necessarily a question of fact and will be determined at trial.

23        **Domestic.**  The parties agreed at oral argument that reserved water rights for domestic

24   use were impliedly reserved in the Treaty of Point Elliott.  Water impliedly reserved in

25   sufficient quantities to make the reservation livable necessarily includes water for domestic

26

1    use.  See Arizona II, 460 U.S. at 616.  The Lummi's reserved water right for domestic use is

2    a question of fact to be determined at trial.

3         **Homeland / Community.**  The parties' broader dispute is whether water was

4    impliedly reserved for the Tribe as part of a "homeland" reservation purpose, as found in

5    Gila River V, 35 P.3d at 76 ("Water use necessary to the establishment of a permanent

6    homeland is a primary . . . purpose.").  Plaintiffs urge the Court to find a homeland purpose

7    in the Treaty of Point Elliot, including impliedly reserved water rights to "support the

8    evolving homeland domestic, municipal and commercial needs of the Nation."  See Lummi

9    Brief, docket no. 718, at 9.  At oral argument, Plaintiffs urged the Court to find an impliedly

10   reserved water right for the Lummi Nation, for present and future consumption, comparable

11   to the surrounding Bellingham community.

12        However, no federal court has ever found an impliedly reserved water right by first

13   looking to the modern day activities of the Indian nation.  But see Gila River V, 35 P.3d at

14   76.  This Court finds that the "homeland purpose" theory adopted in Gila River V is contrary

15   to the "primary purpose" doctrine under federal law.  Ecology correctly argues that the

16   "homeland purpose" theory is "simply a formulation that does away with determining the

17   purpose and begs the question of what water was reserved to make the 'homeland' livable."

18   See Ecology Brief, docket no. 726, at 4.  More importantly, Plaintiffs' "homeland" purpose

19   theory conflicts with clear Ninth Circuit precedent.  Walton II acknowledged that "one

20   purpose for creating this reservation was to provide a homeland for the Indians to maintain

21   their agrarian society."  647 F.2d at 47-48.  However, this language does not constitute a

22   determination of primary purpose for which water was reserved.  Id.  The Court cannot find a

23   "homeland" primary purpose and end its inquiry.  Although compelling in analysis and

24   result, Gila River V is contrary to Ninth Circuit precedent.  Plaintiffs' "homeland" theory of

25   reserved water rights must fail as a matter of law.  The appropriate inquiry under federal law

26   requires a primary purpose determination based on the intent of the federal government at the

ORDER   -16-

1   time the reservation was established.  <u>Winters</u>, 207 U.S. at 577.  These implied <u>Winters</u>

2   rights are necessarily limited in nature.

3         Plaintiffs contend that water was impliedly reserved for important purposes beyond

4   agriculture and domestic use.  This finds some support in the Treaty.  For example, the

5   Treaty mentions a variety of important activities intended for pursuit by the Lummi,

6   including the construction of schools and churches, hunting, fishing, and gathering, as well

7   as the learning and pursuit of trades.  <u>See</u> Treaty, art. V (off-reservation fishing, hunting, and

8   gathering rights preserved); art. XIII (government assistance in moving to and clearing their

9   reservations for homes and farming).  In addition, the Treaty reserved specific lands for a

10  school.  <u>Id.</u>, art. III.  However, this land was <u>not</u> on the lands reserved for the Lummi.  <u>Id.</u>

11        In order to support a finding of primary purpose, activities must be more than

12  "valuable for a secondary use," as determined at the time of the Treaty.  <u>See</u> <u>New Mexico</u>,

13  438 U.S. at 702; <u>see</u> <u>also</u> <u>Adair</u>, 723 F.2d at 1408-09 ("Water rights may be implied only

14  'where water is necessary to fulfill <u>the very purposes</u> for which a federal reservation was

15  created,' and not where it is merely 'valuable for a secondary use of the reservation.'")

16  (citing <u>New Mexico</u>, 438 U.S. at 702) (emphasis added); <u>Arizona I</u>, 373 U.S. at 600 (Water

17  is reserved for reservation purposes at the time the reservation is created).  Only the amount

18  of water necessary to fulfill the purpose of the reservation is reserved, no more.  <u>See</u>

19  <u>Cappaert</u>, 426 U.S. at 141.

20        Because water rights stemming from a reservation of public land are implied only

21  where "without the water the purposes of the reservation would be entirely defeated," <u>New</u>

22  <u>Mexico</u>, 438 U.S. at 700, the Court finds no community purpose beyond agriculture and

23  domestic use.  The Treaty of Point Elliott does not evidence a primary homeland or

24  community purpose, for which water was reserved at the time of the Treaty.  As such, the

25  Court finds that as a matter of law the Treaty of Point Elliott reserved water for agriculture

26  and domestic use sufficient to fulfill the purposes of the Reservation.  The Treaty did not,

however, reserve water for additional community or "homeland" purposes as a primary

purpose of the Lummi Reservation.  Id. at 988.

**4.      Quantification of Reserved Water Rights in the Case Area.**

**Agricultural.**  The parties agree that agriculture was a primary purpose of the Lummi

Reservation, and that an agricultural water rights component must be quantified as part of

these proceedings.  Under similar circumstances involving an agricultural purpose, the

Supreme Court concurred with the Special Master's findings that "the only feasible and fair

way by which reserved water for the reservation can be measured is irrigable acreage."

Arizona I, 373 U.S. at 600-01.  The Ninth Circuit has also utilized the PIA method to

quantify reserved agricultural water rights, holding that "when the . . . reservation was

created, sufficient appurtenant water was reserved to permit irrigation of all practicably

irrigable acreage on the reservation."  Walton II, 647 F.2d at 48.

The parties agree that PIA is the correct method for quantifying reserved agricultural

water rights.  The Court will utilize the PIA method for determining agricultural reserved

water in the Case Area.  The quantity of PIA reserved water is a factual issue to be

determined at trial.  As discussed by the Supreme Court of Wyoming in the first Big Horn

Adjudication,

> "Practicably irrigable acreage" is defined as: those acres susceptible to
> sustained irrigation at reasonable costs. The determination of practicably
> irrigable acreage (PIA) involves a two-part analysis, i.e., the PIA must be
> susceptible of sustained irrigation, not only proof of the arability but also
> of the engineering feasibility of irrigating the land, and irrigable at a
> reasonable cost.

Big Horn I, 753 P.2d at 101.  This inquiry is inherently factual.  The Court's evaluation of

practicably irrigable acreage within the Case Area will be based on expert engineering and

scientific testimony presented at trial.

**Domestic.**  When agricultural water rights are substantial, domestic reserved water

rights have been quantified in comparatively small amounts.   Walton II utilized the PIA

methodology for determining reserved water rights, without including an additional domestic supply.  Walton II, 647 F.2d at 47-48.  The Big Horn adjudication did not add amounts for domestic supply, finding the domestic award subsumed into the agricultural award.  Big Horn I, 753 P.2d at 96-99.  The Supreme Court in Arizona I added to the PIA quantification a figure of one percent for domestic, stockwatering, and related purposes.  See Young Decl., docket no. 727, Ex. A, Attach. 21, at 102-03 (Special Master Report of Elbert Tuttle).

The Court here is faced with a Reservation of a different nature.  The vast majority of the Case Area will have no quantified agricultural water right on which to base a domestic award.  Because much of the Case Area will not have any agricultural award, it would be inappropriate as a matter of law to base the domestic calculation solely on the agricultural award, as calculated by the PIA method.  Similarly, it would be inappropriate to include the domestic award as a percentage or adjustment to the agricultural award.  Under Winters and its progeny, water is impliedly reserved for the Tribe in sufficient quantities to make the Reservation livable, including those portions of the Reservation that are not suitable for agriculture.  Arizona II, 460 U.S. at 616.  The Court's determination of domestic award must necessarily be independent of the agricultural component, but will consider the amount of the PIA award in ultimately determining the domestic Winters rights in the Case Area.

The actual determination of domestic award will be determined at trial.  The calculation will not be based on speculation as to how many Indians will live on the Lummi Peninsula in the future.  See, e.g., Arizona I, 373 U.S. at 601 ("How many Indians there will be and what their future needs will be can only be guessed.").  The Court DENIES the United States' Motion to Reconsider this issue.  However, the Court clarifies that although Dr. Greene will be permitted to testify, the parties may object to any testimony under the Rules of Evidence if the testimony is (1) not relevant, or (2) the answer would result in speculation.

///

ORDER  -19-

1    **5.      Quantification of Rights beyond the Case Area.**

2         The parties dispute whether the Court may quantify water rights in the Case Area (i.e.,

3    the Lummi Peninsula) without quantification of water rights for the remainder of the Lummi

4    Reservation.  Plaintiffs argue that the Court's quantification of the Lummi Nation's water

5    right should be limited to the Lummi Peninsula, because Plaintiffs' Complaint seeks only a

6    determination of reserved water rights in the groundwater under the Lummi Peninsula, and

7    proof will relate only to Case Area needs.  <u>See</u> U.S. Brief, docket no. 732, at 21-23; Lummi

8    Brief, docket no. 718, at 10.

9         Defendant Ecology notes that a land-based calculation, such as PIA, may be applied

10   to the Case Area, without impact to quantification of rights for the remainder of the

11   Reservation, but objects to a Case Area specific calculation.  <u>See</u> Ecology Brief, docket no.

12   726, at 12-13.  The Homeowner/Water Association Defendants object to the quantification of

13   water rights only within the Case Area, as opposed to quantification of the entire

14   Reservation.  <u>See</u> Homeowner/Water Association Brief, docket no. 723, at 17-18.  The

15   quantification of water rights within the Case Area does not require the quantification of

16   water rights for the remainder of the Lummi Reservation.

17   **6.      Water Sources beyond the Lummi Peninsula.**

18        Defendants previously asked the Court to join additional parties, who have property

19   rights on the Lummi Reservation but outside the Case Area, pursuant to Fed. R. Civ. P. 19.

20   <u>See</u> Motions to Dismiss for Failure to Join a Necessary Party, docket nos. 62, 66, 70.

21   Defendants also asked the Court to consider adjacent water sources to which the Lummi

22   Nation might claim a right.  <u>Id.</u>  The Court declined, however, to extend the scope of this

23   litigation to fee landowners elsewhere on the Lummi Reservation, or to expand the Court's

24   consideration beyond the "narrow course charted by the Lummi Nation's complaint."  <u>See</u>

25   Order, docket no. 93, at 4.

26

1    Plaintiffs' Complaint relates only to its claim of a superior right in the groundwater

2  under the Lummi Peninsula (i.e., the Case Area).  Defendants have again raised the question

3  of surface water reserved rights, and contend that consideration of the Lummi's reserved

4  rights to groundwater must include surface waters from which water for the Nation was

5  historically drawn.  The Homeowner/Water Association Defendants argue that consideration

6  of other water sources is necessary to lend perspective to the capacity of the Lummi Aquifer.

7    Defendants also argue that the Lummi River was the primary source of potable water

8  on the Lummi Reservation at the time of its creation, and that it would be improper not to

9  consider sources such as the Lummi River, which existed at the time the Reservation was

10  created and were of substantial value to the Lummi.  In addition, the Homeowner/Water

11  Association Defendants urge consideration of groundwater rights only in comparison with

12  available surface water rights, based on In re General Adjudication of All Rights to Use

13  Water in Gila River System & Source, 989 P.2d 739, 748 (Ariz. 1999) ("Gila River III"),

14  where the Court held that "[a] reserved right to groundwater may only be found where other

15  waters are inadequate to accomplish the purpose of a reservation."  The Court is unaware,

16  however, of any federal precedent that would require adherence to Gila River III, permitting

17  reserved groundwater rights only where surface waters are inadequate to provide for the

18  needs of the Reservation.[8]

19    Plaintiffs concede that other water sources not hydraulically isolated from the Lummi

20  Aquifer would need to be considered by the Court.[9]  However, no scientific evidence points

21  _____

22    [8] The Court ruled previously that "as a matter of law . . . the reserved water rights
doctrine extends to [Case Area] groundwater even if groundwater is not connected to surface

23  water," finding that federal reserved water rights law would not differentiate between surface
and groundwater in identifying reserved waters.  See Order, docket no. 304, at 8; see also Felix

24  S. Cohen, Handbook of Federal Indian Law, at 585-86 (1982) ("Rights [to reserved water]
should attach to all water sources – groundwater basins, streams, lakes, and springs . . .").

25    [9] In prior litigation involving many of the same parties, United States v. Bel Bay

26  Community & Water Ass'n, Civ. No. 303-71C2 (W.D. Wash. 1978), there was testimony from
an engineering geologist submitted by Ecology that other groundwater aquifers and the

1   to a hydraulic connection between the Lummi Aquifer and adjacent surface or ground waters;

2   as such, Plaintiffs argue the Court should not consider other sources.  Plaintiffs further note

3   that Indian reserved water rights cases have never required the adjudication of rights in

4   multiple sources.  See, e.g., Winters, 207 U.S. at 576;  Walton II, 647 F.2d at 42; United

5   States v. Anderson, 736 F.2d 1358, 1362 (1984).  Defendant Ecology distinguishes this case

6   from others because

7           this case is not an adjudication of all rights to the use of the Peninsula
        aquifer.  Rather, this case is an attempt by the Lummi to exclude any use

8           of the aquifer by non-Lummis.

9   Ecology Brief, docket no. 726, at 14.  This distinction, however, is without a difference.

10   This case is an adjudication of rights in a water source, and the senior user is entitled to their

11   rights without deference to the rights of junior users.  Defendants fail to explain why other

12   sources available to the Lummi must be considered, where the Lummi seek to assert their

13   senior right with its 1855 priority date, solely in the Case Area.

14        The Homeowner/Water Association Defendants argue that the Court must consider

15   adjacent water sources and potential uses by Lummi because the Case Area groundwater

16   represents a tiny fraction of available water.  Defendants argue that if the Fort Belknap

17   Reservation in Winters had been located on the shores of a large lake, the Supreme Court

18   would have considered those sources in evaluating whether to curtail non-Indian withdrawals

19   from the Milk River.  See Homeowner/Water Association Brief, docket no. 723, at 20-21.

20   This argument fails, however, because Winters involved other water sources that the

21   Supreme Court specifically did not consider when evaluating withdrawals from the Milk

22   River.  Winters, 207 U.S. at 576 ("there are springs and streams on the reservation flowing

23   about 2,900 inches of water . . .").

24   _____

25   Nooksack River are "separate from the aquifer underlying the Lummi Peninsula and have little,
if any, hydrological connection to it."  See Freimund Decl., docket no. 282, Ex. E (Third

26   Affidavit of Duane Wegner, ¶ 4).  The Bel Bay litigation was settled prior to trial and the issues
presented in the current litigation were not resolved.

1    Defendants also suggest that Walton II supports their position.  In evaluating the rights

2    of the various claimants to No Name Creek, the Walton II Court refused to find a reserved

3    water right for allotment 526.  Walton II, 647 F.2d at 49.  Instead, the Court found that

4    supply was available from Omak Creek.  Id.  However, at oral argument, counsel for Lummi

5    drew the Court's attention to the key difference between allotment 526 in the Walton

6    litigation and the Lummi Peninsula, illustrated by the map of allotments included in the

7    Walton I appendix.  See Walton I, 460 F. Supp. at 1336.  Allotment 526 is not traversed by

8    No Name Creek, but is physically traversed by Omak Creek.  See id.  As such, the Court did

9    not award water rights for allotment 526.  The Court's holding in Walton II does not support

10    Defendants' position that the Court must consider additional sources outside the Case Area.

11    Lastly, Ecology argues that consideration of other water sources, including the

12    Nooksack River, maximizes the Lummi Nation's practicably irrigable acreage.  Ecology's

13    experts considered available water sources in evaluating the practicably irrigable acreage for

14    the Lummi Reservation.  See Young Decl., docket no. 728, at 27 (Table 1 – Exhibit A,

15    Attachment 18).[10]  Defendants' argument here has merit.  Consideration of all available

16    sources maximizes the determination of the Lummi's reserved water right for agriculture.

17    Id.; see also Young Decl., docket no. 727, at 41 (Taylor Dep. at 69-70).  Dr. Mesghinna, the

18    Plaintiffs' expert on groundwater and reserved rights, stated in his deposition that for

19    purposes of practicably irrigable acreage, it is customary to include all sources of water.

20    Young Decl., docket no. 728, at 24 (Mesghinna Dep. at 79).  Clearly, the Court must

21    consider all available sources when evaluating the practicably irrigable acreage within the

22    Case Area.  As Defendant Ecology suggests:

23

24    _____

25    [10] The feasability report prepared by Ecology's experts concludes that the maximum
number of acres that can be served by surface water and groundwater is 453, with an "applied
irrigation requirement" of 744 acre-feet.  Conversely, the maximum number of acres that can

26    be served by groundwater alone is 211, with an "applied irrigation requirement" of 346 acre-
feet.  Young Decl., docket no. 728, at 27 (Table 1 – Exhibit A, Attachment 18).

1
2
> even if the Court excludes evidence of other water sources for some purposes, it should not exclude that evidence for the purpose of showing Ecology's PIA calculations.

3   Ecology Brief, docket no. 726, at 18.

4   Evidence of other surface and groundwater sources available to the Lummi will

5   not be considered as part of these proceedings, except as those sources relate to the

6   calculation of the Lummi's PIA reserved water right.  PIA is necessarily based on

7   engineering calculations for service, which are dependent (at least in part) on source

8   location.  It would be error to exclude consideration of a particular source when

9   determining PIA, where consideration of that source would have the effect of

10  maximizing the Lummi's PIA reserved water right.

11  **7.      Water Uses beyond the Lummi Peninsula Case Area.**

12  The parties agree that the implied reservation of water for the Lummi Peninsula

13  aquifer should be quantified based only on Case Area usage, and should not include uses

14  beyond the Lummi Peninsula.  See U.S. Brief, docket no. 732, at 23; Lummi Brief, docket

15  no. 718, at 11; Ecology Brief, docket no. 726, at 18-20; see also Homeowner/Water

16  Association Brief, docket no. 723, at 23.  The Court agrees.

17  **8.      Lummi's Use of Reserved Water.**

18  Once the water rights of the Lummi have been quantified, the water may be used for

19  any purpose, including domestic, commercial, and industrial purposes.  See Arizona v.

20  California, 439 U.S. 419, 422 (1979); see also Walton II, 647 F.2d at 49 ("permitting the

21  Indians to determine how to use reserved water is consistent with the general purpose for the

22  creation of an Indian reservation providing a homeland for the survival and growth of the

23  Indians and their way of life.").  As a matter of law the Lummi may use their Treaty-reserved

24  water for any purpose.

25  ///

26  ///

ORDER   -24-

1  **9.      Transfer of Water Rights.**

2      **A.      What are the attributes of treaty reserved water rights for consumptive
               uses?  Are these rights held communally or by individual Lummi member
3              assignees and their successors?**

4      **B.      When land was assigned on the Reservation, was a water right also
               conveyed with the land? If so, what is the nature of the water right
5              conveyed to the assignee?**

6          Federal Indian reserved water rights are impliedly reserved with the creation of an

7   Indian reservation.  <u>Winters</u>, 207 U.S. at 577.  Federal Indian reserved rights, or "<u>Winters</u>

8   rights," are presently perfected, vested rights.  The rights vest on the day the reservation is

9   created whether the Indians put the water to use or not.  <u>Arizona I</u>, 373 U.S. at 600.  Water is

10  reserved only for the primary purposes of the reservation, not for secondary purposes.  <u>New</u>

11  <u>Mexico</u>, 438 U.S. at 702; <u>Adair</u>, 723 F.2d at 1409.

12         The parties dispute whether individual Indians "owned" a proportionate share of tribal

13  waters, or merely had the opportunity to "participate" in the tribal waters.  The Court finds,

14  as a matter of law, pursuant to <u>Adair</u> and <u>Preston</u>, that each individual Lummi Indian owned

15  a proportionate share of the agricultural and domestic tribal waters which became

16  appurtenant to their land at the time of allotment.  <u>See United States v. Adair</u>, 478 F. Supp.

17  336, 348 (D. Or. 1979) (citing <u>United States v. Preston</u>, 352 F.2d 352, 358 (9th Cir. 1965)).

18  Thereafter, each individual Lummi allottee was entitled to "sell his right to reserved water."

19  <u>Walton II</u>, 647 F.2d at 50.  Such appurtenant water rights, and the ability of each Indian

20  allottee to transfer his right to reserved water, is inconsistent with Plaintiff Lummi's assertion

21  that these rights were held communally.  Rather, the rights were appurtenant to allotted

22  lands, and were freely transferrable by individual Indian allottees.

23         **Agricultural.**  An Indian living on a tribal reservation owns a proportionate share of

24  the tribal waters "the minute the reservation is created, and his rights become appurtenant to

25  his land the minute he acquires his allotment."  <u>Adair</u>, 478 F. Supp. at 348 (citing <u>Preston</u>,

26  352 F.2d at 358).  The extent of an Indian allottee's right is based on the number of irrigable

1   acres he owns.  If the allottee owns ten percent of the irrigable acreage in the watershed, he

2   is entitled to ten percent of the water reserved for irrigation (i.e., a "ratable share").  Walton

3   II, 647 F.2d at 51.  Water rights for purposes of irrigation are affected by the allotment of

4   reservation lands and the passage of title out of Indian hands.  See Walton III, 752 F.2d at

5   400.  The Ninth Circuit has repeatedly held that "[a]n Indian allottee may sell his right to

6   reserved water."  See, e.g., Walton II, 647 F.2d at 50.

7        **Domestic.**  Plaintiffs attempt to distinguish the transferability of domestic reserved

8   rights.  See Lummi Brief, docket no. 718, at 30-31.  Plaintiffs argue that the Lummi's water

9   needs for its members do not diminish with the sale of allotted lands, and that the "sale of

10  land has no automatic or direct effect on the need for water."  Id. at 31.  Plaintiffs concede,

11  however, that non-Lummi owners who satisfy the Walton diligent use standard are entitled to

12  a share of the Lummi's reserved right, sufficient to support their domestic use.  Id. at 31.

13       Walton II and Walton III compel a finding that the Winters doctrine of water rights

14  applies to reserved water for domestic purposes, transferred with the sale of land to a non-

15  Indian.[11]  Where allotted Indian lands will not have an agricultural component because they

16  are not practicably irrigable, the only reserved water right will be domestic.  That right must

17  be transferrable by the Indian allottee in order to prevent the termination or diminution of the

18  Indian allottee's rights.  The Ninth Circuit reviewed this rule in Walton II, and its discussion

19  compels the result here:

20            The general rule is that termination or diminution of Indian rights requires
             express legislation or a clear inference of Congressional intent gleaned
21            from the surrounding circumstances and legislative history.  Upon careful

22

_____

23       [11] Claims to federal reserved Winters rights by a non-Indian successor to an Indian
    allottee have been referred to as "Walton claims," and the parties in this litigation have referred
24  to Winters rights transferred to non-Indians as "Walton rights."  See, e.g., In re General
    Adjudication of All Rights to Use Water in Big Horn River System, 48 P.3d 1040, 1042 (Wyo.
25  2002) ("Big Horn VI") ("The appellants own lands within the Big Horn River System and claim
    federal reserved water rights as a result of their acquiring properties from Indian allottees.  These
26  claims are known as 'Walton' claims based on the federal court cases which first identified
    them.").

consideration, we conclude this principle supports the proposition that an Indian allottee may sell his right to reserved water.

647 F.2d at 50 (internal citations omitted).  The Court finds that as a matter of law <u>Walton II</u> applies to domestic reserved water rights, as well as agricultural reserved water rights.  An Indian allottee may sell his right to domestic or agricultural reserved water.  <u>Id.</u>

### C.   Did a water right transfer to a non-Lummi member merely by the conveyance of land?  If so, what is the nature of that right?

The purpose of a <u>Winters</u> reserved water right is to make reservation land livable and valuable.  <u>Walton II</u>, 647 F.2d at 49-50.  An Indian allottee <u>must</u> be able to transfer the right to federal reserved water when allotted land is sold in order to fulfill the purpose of a <u>Winters</u> right.  <u>Id.</u>  When held by a non-Indian such rights are subject to loss through non-use.  The Court in <u>Walton II</u> described the transfer and possibility of loss as follows:

> [T]he Indian allottee does not lose by non-use the right to a share of reserved water. This characteristic is not applicable to the right acquired by a non-Indian purchaser. The non-Indian successor acquires a right to water being appropriated by the Indian allottee at the time title passes. The non-Indian also acquires a right, with a date-of-reservation priority date, to water that he or she appropriates with reasonable diligence after the passage of title. If the full measure of the Indian's reserved water right is not acquired by this means and maintained by continued use, it is lost to the non-Indian successor.

<u>Walton II</u>, 647 F.2d at 51.  A non-Indian successor to a <u>Winters</u> right must exercise diligence to perfect his or her inchoate right to the Indian allottee's water right.  <u>Walton III</u>, 752 F.2d at 402.  Once perfected, the water right must be maintained by continuous use or it is lost.  <u>Id.</u>  This rule is referred to in the Ninth Circuit as "use it or lose it."  <u>Anderson</u>, 736 F.2d at 1362. The non-Indian successor's share of reserved water is limited to the amount appropriated "with reasonable diligence after the passage of title" from the original Indian allottees (or their heirs), and "maintained by continued use" by each subsequent successor.  <u>Id.</u> (citing <u>Walton II</u>, 647 F.2d at 51).

Consistent with <u>Walton II</u>, the Ninth Circuit affirmed the "use it or lose it" rule in <u>Anderson</u>:

ORDER   -27-

The second restriction may be simply expressed as: use it or lose it. Pursuant to this restriction, a non-Indian successor acquires a right to that quantity of water being utilized at the time title passes, plus that amount of water which the successor puts to beneficial use with reasonable diligence following the transfer of title. Where "the full measure of the Indian's reserved water right is not acquired by this means and maintained through continued use, it is lost to the non-Indian successor." Consequently, on reacquisition the Tribe reacquires only those rights which have not been lost through nonuse and those rights will have an original, date-of-the-reservation priority.

736 F.2d at 1362. A "non-Indian successor acquires a [perfected] right to water being appropriated by the Indian allottee *at the time title passes*," Walton II, 647 F.2d at 51 (emphasis added), and an inchoate right to the reserved water rights of the allottee that are not being appropriated by the Indian allottee at the time title passes. Walton III, 752 F.2d at 402.

> ### D.   What facts are required for a finding that a non-Lummi member has exercised due diligence?

Issues pertaining to federal reserved rights are controlled by federal law. E.g., Adair, 723 F.2d at 1401, n.3. However, the Ninth Circuit has looked to state law when determining whether a non-Indian successor to tribal lands has exercised due diligence in perfecting an inchoate right to reserved waters within a reasonable time. See Walton III, 752 F.2d at 402-04 (citing In re Waters of Doan Creek, 125 Wash. 14, 25 (1923) (limiting water right to acres put into irrigation within first years of appropriation)). Walton III allowed Walton to irrigate the 30 acres put into irrigation by his predecessors, but found that a delay of 23 years was not appropriation within a reasonable time, for the remaining acreage. Id.

The parties generally agree that under Walton III the Court may look to Washington law for guidance in determining whether a non-Lummi has exercised due diligence to perfect a Winters right transferred with the sale of allotted lands. E.g. Lummi Brief, docket no. 718, at 32 ("Washington law provides guidance for a determination of reasonable diligence and suggests that a successor must put water to use within fifteen years of the parcel leaving Indian ownership."); see also Walton III, 752 F.2d at 400 (holding the Court "may look to

1    state law for guidance" where federal law is not fully developed).  Plaintiff United States

2    suggests that under the prior appropriation system in Washington, rights are relinquished if

3    not used for a period of five years.  See Wash. Rev. Code § 90.14.130.  Plaintiff Lummi and

4    Defendant Ecology both cite Ecology v. Abbott, 103 Wash. 2d 686, 696 (1985), where the

5    Washington Supreme Court held that fifteen years was adequate notice of a change in the

6    law that required that a permit to appropriate water be sought under the state's 1917 water

7    code.  The Lummi suggest that the Court adopt a maximum period of 15 years for diligent

8    use.  See Lummi Brief, docket no. 718, at 33.  Ecology suggests that individual

9    circumstances may excuse non-use of a perfected water right and avoid relinquishment, but

10   joins Lummi in suggesting a presumptive period of 15 years.

11        Washington law provides guidance for evaluating whether Winters rights were put to

12   use with reasonable diligence by non-Indian successors.  As urged by the parties, 15 years is

13   a reasonable time for water rights to be put to use by a non-Lummi.  See Abbott, 103 Wash.

14   2d 696.  Individual circumstances may excuse the non-use of a Winters right, based on the

15   facts proven at trial.  However, a presumptive period of 15 years will be applied to the

16   Winters rights transferred to non-Lummi successors.

17        **E.    Did a water right transfer with the land to a non-Lummi member if the right was not perfected within a reasonable time?**

18   A non-Indian successor to an Indian allottee acquires an inchoate right to reserved

19   waters at the time title passes.  Walton II, 647 F.2d at 51.  The Ninth Circuit has described

20   the transfer of rights as follows:

21

22        The non-Indian successor acquires a right to water being appropriated
             by the Indian allottee at the time title passes. The non-Indian also
23        acquires a right, with a date-of-reservation priority date, to water that he
             or she appropriates with reasonable diligence after the passage of title. If
             the full measure of the Indian's reserved water right is not acquired by
24        this means and maintained by continued use, it is lost to the non-Indian
             successor.

25

26

ORDER   -29-

<u>Walton II</u>, 647 F.2d at 51; <u>see</u> <u>also</u> <u>Walton III</u>, 752 F.2d at 401-02.  The parties dispute whether any right passed with the land to a non-Lummi member, if the <u>Winters</u> right was not perfected by the non-Lummi within a reasonable time.  The Court finds that as a matter of law an inchoate right transferred to a non-Lummi successor-in-interest, even if that inchoate right was not perfected within a reasonable time.  <u>Walton II</u>, 647 F.2d at 51.

**F.    If a "Winters" right transferred to a non-Indian is not perfected, what happens to the unused water?**

**G.    If a "Winters" right transferred to a non-Indian was perfected but subsequently lost due to non-use, what happens to the lost water?**

**H.    When the Lummi Nation acquires land within the Reservation that has been in non-Indian ownership, what impact does this have on the water rights of the Nation and its members?**

If an inchoate right to federal reserved water is not perfected within a reasonable time, the right is lost to the non-Indian successor in interest.  <u>Walton II</u>, 647 F.2d at 51.  Similarly, if a perfected right is not maintained by continuous use, the right is lost to the land purchaser. <u>See</u> <u>Anderson</u>, 736 F.2d at 1362 ("use it or lose it").

The Ninth Circuit has applied the <u>Walton</u> test for lost federal reserved water rights in the context of reacquired Tribal lands.  That analysis is applicable to the water rights at issue in this case.

> The Ninth Circuit has restricted its rule concerning the transfer of reserved [water] rights appurtenant to allotted lands.  The first restriction is that "the non-Indian successor's right to water is 'limited by the number of irrigable acres [of former reservation lands that] he owns.'"  <u>Adair</u> at 1417 (citing <u>Walton</u>, 647 F.2d at 51).  The second restriction may be simply expressed as: use it or lose it.  <u>Walton</u>, 647 F.2d at 51.  Pursuant to this restriction, a non-Indian successor acquires a right to that quantity of water being utilized at the time title passes, plus that amount of water which the successor puts to beneficial use with reasonable diligence following the transfer of title.  Where "the full measure of the Indian's reserved water right is not acquired by this means and maintained through continued use, it is lost to the non-Indian successor."  <u>Id</u>.  ***Consequently, on reacquisition the Tribe reacquires only those rights which have not been lost through nonuse and those rights will have an original, date-of-the-reservation priority.***

ORDER  -30-

Anderson, 736 F.2d at 1362 (emphasis added).  Anderson clearly held that Winters rights are lost to the tribe on reacquisition, where they have not been maintained by the non-Indian successor.  Plaintiffs urge the Court to find a different result for unperfected Winters rights, lost to the non-Indian successor by failure to perfect within a reasonable time.  Walton III characterized the loss of unused ratable share:

> We held also [in Walton II] that a ratable share of this water reserved for irrigation passed to Indian allottees.  This ratable share could in turn be conveyed to a non-Indian purchaser.  However, the non-Indian purchaser's share is subject to loss if not put to use.

752 F.2d at 400.  The "use it or lose it" rule in the Ninth Circuit does not distinguish between unperfected Winters rights and rights perfected at transfer, which are lost through nonuse.  Plaintiffs argue that Anderson draws this distinction with its emphasis on Winters rights "appurtenant to allotted lands."  736 F.2d at 1362.  The Lummi argue that the rule in Anderson does not apply to lost unperfected rights, because that "water becomes appurtenant to land only when it is put to actual beneficial use on that land."  See Lummi Brief, docket no. 718, at 35.

However, an Indian allottee's share of tribal waters "become appurtenant to his land the minute he acquires his allotment."  Adair, 478 F. Supp. at 348 (quoting Preston, 352 F.2d at 358); accord Walton II, 647 F.2d at 48 ("sufficient appurtenant water was reserved to permit irrigation of all practicably irrigable acreage on the reservation.").  Thus, when the Tribe reacquires land on the reservation from a non-Lummi, it reacquires only those rights which have not been lost through nonuse, whether perfected or unperfected at the time of the original transfer to the non-Lummi successor.  Anderson, 736 F.2d at 1362.

///

///

///

///

ORDER   -31-

**10.    Burden of Proof.**

    **A.    Who bears the burden of proof as to what "Winters" rights, transferred to a non-Indian, were perfected?**

    **B.    Who bears the burden of proof as to what "Winters" rights, transferred to a non-Indian, were perfected but then lost, due to non-use?**

The rights of non-Indian purchasers have been addressed in this circuit, but the courts have not squarely addressed burden of proof. <u>Walton II</u> remanded to the district court the question of Walton's share of reserved waters, directing the court to proceed as follows:

> The district court's holding that Walton has no right to share in water reserved when the Colville reservation was created is reversed. *On remand, it will need to determine the number of irrigable acres Walton owns, and the amount of water he appropriated with reasonable diligence in order to determine the extent of his right to share in reserved water.*

<u>Walton II</u>, 647 F.2d at 51 (emphasis added).  The Court did not state whether the burden of proof was on defendants Walton, or on the plaintiff Tribes.  In <u>Walton III</u>, 752 F.2d 397, which followed, the Court similarly did not address the burden of proof.

Defendants argue that "[t]he party alleging the existence of a water right has the burden of proof and must prove it unequivocally."  <u>United States v. Ahtanum Irrigation Dist.</u>, 124 F. Supp. 818, 827 (E.D. Wash. 1953) (citing Wiel, <u>Water Rights in the Western States</u> § 636 (3d ed. 1911)).  Plaintiffs urge the Court to rely on two state court opinions, which allow <u>Winters</u> rights, transferred to a non-Indian, with a Treaty priority date "for the [practicably irrigable acreage] [the non-Indian successors-in-interest] *can show* were irrigated by their Indian predecessors or put under irrigation within a reasonable time thereafter."  <u>See</u> <u>Big Horn I</u>, 753 P.2d at 113-14 (emphasis added); <u>see</u> <u>also</u> <u>Big Horn VI</u>, 48 P.3d at 1042 ("Walton claimants *must demonstrate* their lands were irrigated by their Indian allottee predecessors or the first non-Indian successors irrigated the lands within a reasonable time after they were conveyed.") (emphasis added).

The rule from <u>Ahtanum</u> is consistent with the <u>Walton</u> cases only to the extent that a claimant must prove his rights.  124 F. Supp. at 827.  The Court rejects the standard of proof

announced by <u>Ahtanum</u>, when it stated that "the party alleging the existence of a water right

. . . must prove it *unequivocally*." <u>Id.</u> (emphasis added).  This language articulates a standard

of proof that is inconsistent with <u>Walton III</u>:

> There may be periods about which the evidence concerning the acreage
> actually irrigated is sketchy or conflicting.  However, *absolute certainty is*
> *an impossibility* when we are dealing with witnesses' attempts to remember
> events of 30 to 40 years ago.

<u>Walton III</u>, 752 F.3d at 403 (emphasis added).  Evidence of the events in this case will be

"sketchy or conflicting," as well.  This case will deal with witnesses' attempts to recall

events of more than 40 years ago.

Walton III impliedly rejects the "must prove it unequivocally" standard of <u>Ahtanum</u>,

and this Court explicitly declines to follow <u>Ahtanum</u>.  The Court is obligated to reconcile the

evidence, even when "sketchy or conflicting," and the appropriate means for evaluating the

evidence in this case is by a preponderance of the evidence.  The Court finds that the party

alleging the existence of a water right has the burden of proof and must prove it by a

preponderance of the evidence.

**C.      Who bears the burden of proof as to what water rights are held by the
         Lummi Nation and its members?**

For the reasons discussed in the previous section, the United States and the Lummi

Nation have the burden of proving what federal Indian reserved water rights are held by the

Lummi Nation and its members.

**D.      Does federal law or other law apply to the burden of proof?**

Federal law applies with regard to burden of proof.  <u>See</u>, <u>e.g.</u>, <u>Walton III</u>, 752 F.2d at

400 ("[Tribal] reserved water rights are federal water rights and are not dependent upon state

law or state procedures.").

///

///

///

ORDER   -33-

# IV. CONCLUSION

For the reasons set forth in this Amended Order, the Court rules as follows:

1.      The Lummi Reservation does not lack Reservation status.  The Lummi Reservation is "Indian Country."

2.      The Lummi Reservation is not temporary.

3.      Reservation purpose is established at the time the reservation is created.  The Treaty of Point Elliott did not include a broad "homeland" purpose.  The primary purpose of the Lummi Reservation is limited to agriculture and domestic purposes.  This Action will be limited to the "narrow course charted by the Lummi Nation's Complaint," see Order, docket no. 93, at 4, and will only address the purposes of the Lummi Reservation in relation to the groundwater under the Lummi Peninsula.  Fishing rights are not at issue in the present case because the Lummi Nation concedes that fishing necessarily takes place in surface water, not groundwater.  See Lummi Nation Motion, docket no. 780, at 5.  Similarly, the United States does not ask this Court to evaluate "fish needs" in connection with the capacity of the Case Area aquifer.  See United States' Response, docket no. 751, at 3.

4.      Agricultural and domestic water rights will be quantified at trial.

5.      The Court will not quantify water rights for those areas outside the Case Area.

6.      The Court will exclude evidence of water sources outside the Case Area, except as those sources relate to a determination of the practicably irrigable acreage within the Case Area.

7.      The Court will only consider the implied reservation of water within the Case Area.

8.      Once quantified, the Tribe may use its implied reservation of water for any purpose.

9.   Treaty reserved water rights were transferrable to non-Indian successors-in-interest. The Court will look to state law in evaluating due diligence as it relates to perfection of a water right. Under Washington law, a non-Lummi exercises due diligence if water is put to use within 15 years. <u>Winters</u> rights lost under the "use it or lose it" rule are lost to the tribe, whether perfected or inchoate at the time of loss.

10.   The party alleging the existence of a water right has the burden of proof and must prove it by a preponderance of the evidence. Federal law applies with regard to the burden of proof.

IT IS SO ORDERED.

DATED this 23rd day of June, 2005.

Thomas S. Zilly
United States District Judge

ORDER   -35-

Map 1.

# Lummi Reservation Base Map

⋀ Hydrology
⋀ Transportation
⋀ Shoreline

Product of Lummi Nation Geographic Information Services, 1996.

ORDER  -36-



Lummi Peninsula Case Area Boundary

Case Area Boundary
Source: AESI

USGS Quads:

Lummi Bay (1994)
Ferndale (1994)
Lummi Island (1994)
Eliza Island (1995)

NORTHWEST ECONOMIC ASSOCIATES

June 2001

ORDER   -37-