1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   UNITED STATES, in its own right and on
     behalf of the Lummi Indian Nation

11                    Plaintiff,

12   LUMMI INDIAN NATION

13                    Plaintiff-Intervenor,

14   v.

15   STATE OF WASHINGTON,
     DEPARTMENT OF ECOLOGY, et al.,

16

17                    Defendants.

No. C01-0047Z

ORDER CONDITIONALLY
APPROVING SETTLEMENT
AGREEMENT

18       THIS MATTER comes before the Court on a Joint Motion to Approve Settlement,

19   docket no. 1056, by plaintiff United States, plaintiff-intervenor Lummi Indian Nation, and

20   defendants Washington State Department of Ecology ("Ecology"), Whatcom County, the

21   Georgia Manor Water Association, the Harnden Island View Water Association, and the

22   Sunset Water Association (collectively, the "Water Associations"), and various property

23   owners represented by Eugene Knapp of Barron Smith Daugert PLLC.  On June 26, 2007,

24   the Court heard oral argument from the moving parties, as well as from the objecting parties.

25   The Court directed the moving parties to address certain issues and took the matter under

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 1

1   advisement.  The Joint Motion to Approve Settlement was subsequently renoted to

2   September 14, 2007, and the parties were directed to submit supplemental materials by that

3   date.  Having now reviewed all papers filed in support of and in opposition to the pending

4   motion, the Court hereby conditionally approves the Settlement Agreement as outlined in the

5   attachments to the Joint Motion to Approve Settlement, docket nos. 1056-4 through 1056-12,

6   the Notice of Corrections and attachments thereto, docket no. 1199, and the Corrected Pages

7   of the Settlement Agreement, docket no. 1243-2.

8   **Background**

9          This action was initiated in January 2001 by the United States on behalf of the Lummi

10  Nation.  The United States sought a declaration that the Treaty of Point Elliott implicitly

11  reserved to the Lummi Nation rights to surface water on and groundwater under the Lummi

12  and Sandy Point Peninsulas that are prior and paramount to the rights of other users of such

13  water.  The original complaint named as defendants various water associations and property

14  owners, as well as Ecology.  The Lummi Nation subsequently intervened, and Whatcom

15  County was later added as a defendant.  During the ensuing six years of litigation, some

16  defendants sold their parcels and were substituted or dismissed, while others, including the

17  Gooseberry Point Community and Water Association, separately settled with the United

18  States and the Lummi Nation.  After protracted negotiations, Ecology, Whatcom County, the

19  Water Associations, and substantially all of the remaining property owners have reached

20  agreement with the United States and the Lummi Nation, pursuant to which water is

21  allocated based on scientific principles and under which future disputes can be efficiently

22  resolved.  An assessment of this proposed settlement requires knowledge about the geology

23  and history of the area at issue.

24         In 1855, the Treaty of Point Elliott established the Lummi Indian Reservation.  The

25  Reservation consists of two peninsulas.  The larger peninsula, the Lummi Peninsula, extends

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 2

into Bellingham Bay, and the smaller peninsula, the Sandy Point Peninsula, extends into Lummi Bay.  Both Bellingham Bay and Lummi Bay are saltwater bodies.  The portion of the Lummi Reservation involved in this litigation (the "Case Area") is located on the Lummi Peninsula.  The impetus for this lawsuit was the belief that the available groundwater on the Lummi Peninsula cannot meet the future needs of every landowner within the Case Area.

Differing views have been articulated concerning the manner in which groundwater on the Lummi Peninsula is recharged.  The hydrogeologists at Aspect Consulting, LLC have concluded that precipitation falling on the Lummi Peninsula provides the only significant source of groundwater recharge.  They posit that, if the amount of groundwater withdrawn from the aquifer exceeds safe levels, saltwater could intrude and irreversibly contaminate the water supply.  Others have theorized that the Lummi aquifer has some continuity with groundwater outside the Case Area and might be recharged by the Nooksack River or other sources of potable water.  After devoting substantial resources to studying the issue, the moving parties have adopted a conservative approach, relying upon the annual safe yield calculations performed by Aspect Consulting, LLC.  Using a theoretical maximum safe yield of 1,000 acre-feet per year ("afy"),[1] the moving parties have agreed upon an actual safe yield of 900 afy.  The moving parties have indicated that they view this value for actual safe yield as a compromise,[2] based on their assessment that, in light of the evidence, the Court could reach the same conclusion at trial.

Assuming an actual safe yield of 900 afy, the moving parties propose to allocate, via the Settlement Agreement, a certain amount of groundwater to each of the constituencies involved, without regard to the seniority or vesting of water rights.  Thus, the Settlement

---

[1] One acre-foot per year equals approximately 892.8 gallons per day.

[2] The actual safe yield of the aquifer cannot be computed with certainty, and it will depend on a variety of factors, including the manner in which water is withdrawn.

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 3

1   Agreement substantially departs from the methods under federal and state law for

2   determining the priority of water rights.  In previous orders, the Court has ruled that the

3   Lummi Reservation is "Indian Country" within the meaning of 18 U.S.C. § 1151, and that

4   water rights consistent with the primary purpose of the reservation were implicitly

5   transferred by the treaty creating the reservation.  *See* Amended Order at 9, 14-15 (docket no.

6   794); Order at 8 (docket no. 304); *see also* *Winters v. United States*, 207 U.S. 564 (1908).

7   Such water rights, described as *Winters* rights, have not yet been quantified by the Court;

8   however, the Court has identified the water reserved to the Lummi Nation as the amount

9   associated with the "practicably irrigable acreage" in combination with a domestic supply.

10  Amended Order at 18-19 (docket no. 794).  The Court has also observed that, when an

11  Indian allottee transfers property to a non-Indian, the successor must act with diligence to

12  perfect the *Winters* rights and then must maintain the water rights through continuous use.

13  Amended Order at 27-28 (docket no. 794); *see also* *Colville Confederated Tribes v. Walton*,

14  647 F.2d 42 (9th Cir. 1981).  In other words, the non-Indian successor must "use it or lose

15  it."  *United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984).

16      The Settlement Agreement's water allocation system obviates the need to quantify the

17  water rights of the Lummi Nation or to determine whether various non-Indian successors

18  perfected and maintained their *Winters/Walton* rights.  For this and other reasons, the moving

19  parties are requesting that the Court vacate its prior orders concerning the applicable federal

20  and state law.  Before deciding whether to do so, the Court must first evaluate whether the

21  Settlement Agreement satisfies the criteria set forth in its order concerning the process for

22  approving settlement.  In its earlier order, the Court indicated that the following conditions

23  needed to be established by a preponderance of the evidence:

24          (a)     The Settlement is fair, adequate, and reasonable, considering all of the
                    circumstances surrounding the settlement;
25

26

1        (b)     The water rights or other legally protected interest claimed by the
2                   objector(s) were:

3                 (i)     not established by the objector; or

4                 (ii)     if established, the objector's water rights or other legally protected

5                       interest would not be materially injured by the terms of the Settlement and proposed Judgment and Order; or the objector is bound by the Settlement terms by virtue of the objector's relationship to a party that has agreed to the terms of the Settlement.

6              and;

7        (c)     The interests of all the parties would justify the Court's vacatur of the Court's

8                 Orders under all the circumstances.

9   Order at 5 (docket no. 1068); *see also United States v. Oregon*, 913 F.2d 576 (9th Cir. 1990).

10  As discussed in further detail below, the Court has thoroughly reviewed the Settlement

11  Agreement, as well as the objections thereto, and concludes that the Settlement Agreement

12  should be approved.

13  **Discussion**

14       **A.**     **The Settlement Agreement**

15       The Settlement Agreement addresses three primary issues:  (i) division of water;

16  (ii) management of the aquifer; and (iii) dispute resolution.  Under the Settlement

17  Agreement, Ecology is granted exclusive regulatory authority over 120 afy of groundwater in

18  the Case Area; an additional 95 afy is committed to non-Lummi water users under other

19  settlements and service arrangements.  The Lummi Nation may authorize withdrawal of all

20  groundwater in the Case Area not subject to allocation by Ecology or otherwise committed to

21  non-Lummi water users,[3] provided that chloride levels remain within an acceptable range,[4]

22  
_____

23  [3] The moving parties are directed to revise section III.B.1 of the Settlement Agreement to reflect that

24  the water reserved therein to the Lummi Nation does not include the amounts governed by separate settlement agreements and service arrangements.

25  [4] The presence of chloride within a well is an indication of saltwater intrusion, and the Settlement Agreement states as a goal maintaining less than 100 milligrams of chloride per liter of water.

26  

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 5

1   and the Lummi Nation may use such water for any purpose permitted under federal or tribal

2   law.  The moving parties indicate that the apportionment of water between Ecology and the

3   Lummi Nation is roughly equivalent to the current ratio of non-Lummi to Lummi property

4   ownership.  The moving parties agree that, of the 6,286 acres of land located within the Case

5   Area, approximately 1,245 acres, or almost 20%, is owned in fee by non-Lummi defendants.[5]

6   In comparison, under the Settlement Agreement, Ecology may allocate to non-Lummi users

7   up to 24% of the actual safe yield of the aquifer (215 of 900 afy).

8          Ecology's allotment is divided as follows:  20 afy to the Georgia Manor Water

9   Association, 35 afy to the Sunset Water Association, 4.29 afy to the Harnden Island View

10  Water Association, 7.0 afy to the well associated with state certificate G1-23833C, and

11  0.39 afy (or 350 gallons per day) to each person owning or served by an existing well.  In

12  this manner, the Settlement Agreement provides water for every existing home in the Case

13  Area.  Moreover, the moving parties envision that approximately 50 new homes can acquire

14  water from the Water Associations and another 60 homes will be able to draw water from

15  new wells.  These 110 currently undeveloped parcels would not have water rights but for the

16  Settlement Agreement because, under federal and state law, water rights depend on actual

17  use.  RCW 90.03.010; _Walton_, 647 F.2d at 51.

18         The Settlement Agreement explicitly addresses the effect of transferring property from

19  non-Lummi to Lummi ownership or vice versa.  When a parcel is deeded by a non-Lummi

20  owner to the Lummi Nation or one of its enrolled members, unless the parcel is receiving

21  water from a Water Association, regulation of the water for that parcel transfers to the

22

23  ───────────────

24  [5] These computations were performed by Ann Newton Stark, who is employed by the Lummi Nation
    as a professionally certified Geographic Information Systems Coordinator.  _See_ Stark Decl. (docket
    no. 1056-3).  Pro se defendant Chuck McCord challenges these acreage calculations.  Mr. McCord, a
25  local realtor, believes that "more like 40%" of the Case Area is owned by non-tribal members.
    McCord Response (docket no. 1102).  Mr. McCord, however, provides no evidentiary support for
26  his claim, and he fails to identify any error in Ms. Stark's calculations.

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 6

1   Lummi Nation and is withdrawn from Ecology's reserves.  Likewise, if an owner with a

2   perfected right to water from Ecology's allocation enters into an agreement to receive water

3   from the Lummi Nation, Ecology's reserves will be reduced by the quantity of water

4   authorized for such parcel of land.  On the other hand, if a non-Lummi acquires title from the

5   Lummi Nation, one of its members, or an Indian for whom the United States owns the land

6   in trust, then water rights for the parcel shall be determined by applicable law.  The Court

7   interprets this provision of the Settlement Agreement to incorporate the "use it or lose it"

8   doctrines of federal and state law.

9       The Settlement Agreement also provides a safety net in the event of saltwater

10  intrusion.  The owner of a well with chloride above the trigger level[6] may cease operating the

11  well and connect to the Lummi Tribal Water District system by providing notice and paying

12  the standard connection fee and a pro rata share of any additional infrastructure.  The

13  Settlement Agreement expressly provides that connection to the Lummi Tribal Water District

14  system does not confer tribal jurisdiction for any purpose over the connecting owner.

15      In addition to allocating groundwater, accounting for the transfer of rights, and

16  anticipating well failures, the Settlement Agreement outlines various obligations for

17  managing and preserving the health of the aquifer.  As a result, the Settlement Agreement

18  will have binding effect on all parties to this litigation:

19      (1)   **No Unauthorized Wells.**  New wells may not be drilled without prior express

20            written permission as set forth in the Settlement Agreement.  Unauthorized

21            wells shall be decommissioned.

22      (2)   **Registering and Metering.**  All wells in the Case Area shall be registered and

23            metered.

24  _____

25  [6] The trigger level is defined as 140 milligrams of chloride per liter of water, or 40 milligrams of
    chloride per liter of water above the base level for a small well, whichever is higher.  The trigger level
26  may not exceed 250 milligrams of chloride per liter of water.

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 7

1      (3)    **Monitoring.** For each well, an annual report shall be made concerning meter
2      readings of cumulative water use through September 30 of each year, chloride
3      levels taken as of August of each year, and problems and/or changes in well
4      and/or meter operations.

5      (4)    **No Overuse.** Users may not withdraw water in excess of the annual limit
6      specified for the property. Violators will be subject to various enforcement
7      mechanisms.

8      (5)    **No Unsafe Operation.** No domestic service well may operate at a chloride
9      level greater than 250 milligrams per liter.

10      Finally, the Settlement Agreement establishes a framework for dispute resolution. A

11 Water Master shall be appointed by the Court. The Water Master will have authority to

12 issue injunctions, collect fees, establish penalties and levy fines, file and enforce liens,

13 resolve disputes and enforce decisions, regulate wells or take other emergency measures to

14 protect the aquifer in the event of inaction by Ecology or the Lummi Nation, and hear

15 appeals from decisions of the United States, the Lummi Nation, or Ecology concerning

16 permission or denial thereof to construct a well or withdraw groundwater. Pursuant to the

17 Settlement Agreement, the Lummi Nation will pay 50% of the Water Master's budgeted

18 costs, each household receiving water from the allocation regulated by Ecology shall pay a

19 flat fee in the neighborhood of $100, and Ecology will pay the remainder. A decision of the

20 Water Master may be appealed to this Court within thirty days by payment of the filing fee

21 for a new civil action. The Settlement Agreement provides that such appeal will be based on

22 the written record established before the Water Master, but it does not indicate how such

23 record will be maintained or transmitted to this Court, and it does not articulate the standard

24 of review to be applied by this Court. As a result, the Court has included, within the

25 attached Draft Order and Judgment, language addressing these issues.

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 8

**B.** **Objections to the Settlement Agreement**

Various property owners, acting pro se, are objecting to the Settlement Agreement on a number of grounds.  These pro se defendants comprise a tiny fraction (about 1%) of the property owners in the Case Area.  Their objections can be divided into the following four categories:  (i) disagreement with the Court's prior legal conclusions; (ii) disputes with the factual premises underlying the Settlement Agreement; (iii) fears and concerns about the impact of the Settlement Agreement; and (iv) complaints falling outside the scope of this litigation.  The Court has carefully considered all of the objections and does not find any of them sufficient to warrant abandoning years of collaborative effort in crafting a workable solution to the difficult issues involved.  As an initial matter, the Court observes that none of the pro se property owners claims that water rights vested under federal or state law are negatively impacted by the Settlement Agreement.  To the extent that the pro se defendants are currently using water on their respective parcels, they are eligible to share in Ecology's allocation of groundwater.  Moreover, the Court notes that none of the pro se property owners claims that his or her water rights would be increased at trial over what is afforded under the Settlement Agreement.  To the contrary, the Court is persuaded that the risks of trial for the pro se defendants far outweigh the risks of trial for the opposing parties, namely the United States and the Lummi Nation, both of which are advocating for the resolution outlined in the Settlement Agreement.

**1.** **Prior Legal Conclusions**

Within the first category of objections, a number of pro se defendants argue that the Lummi Reservation is not "Indian Country."  The Court has already rejected this contention and would not reconsider its earlier ruling if this matter were to proceed to trial.  In addition, whether the Lummi Reservation is "Indian Country" is not a relevant inquiry under the Settlement Agreement; the moving parties have agreed to the allocations set forth therein

1   without regard to priority of water rights.  Therefore, this argument provides no basis for

2   believing that the pro se defendants would improve their position at trial or for rejecting the

3   Settlement Agreement.

4                               **2.        Factual Premises**

5          Within the second category of objections, various pro se defendants assert that the

6   hydrogeologic analysis underlying the Settlement Agreement is flawed.  They allege that the

7   Lummi aquifer is not recharged solely by rainwater, but rather by groundwater sources north

8   of the Lummi Peninsula, offering as support reports authored by Glenn A. Bezona, now

9   deceased, Don J. Easterbrook, Professor Emeritus of Geology at Western Washington

10  University, and Willard D. Purnell, licensed hydrogeologist with W.D. Purnell & Associates,

11  Inc.  Although the reports raise questions concerning the source of recharge for groundwater

12  under the Lummi Peninsula, none of the reports provides an estimate of the actual annual

13  safe yield for the Lummi aquifer.  In contrast, the experts retained by the United States and

14  the Lummi Nation, as well as the expert hired by Ecology, have opined that the actual safe

15  yield is in the neighborhood of 900 afy.  *See* Exh. 3 to Knapp Decl. (docket no. 1056-2)

16  ("The theoretical safe yield of the main aquifer system on the Lummi Peninsula was

17  computed using a numerical model to be approximately 1,000 acre-feet per year.  The

18  practicable safe yield will be less than the thoeretical safe yield, due to practical limitations

19  on well locations."); Nazy Dep. at 34, Exh. 1 to Knapp Decl. (docket no. 1056-2)

20  ("Groundwater recharge is 1,607 to 2,917 acre-feet per year.  Available groundwater, 26

21  percent of recharge, would be 402 to 729 acre-feet per year.").

22         In evaluating the fairness, adequacy, and reasonableness of the Settlement Agreement,

23  the Court need not decide whether the source of recharge for the Lummi aquifer is

24  precipitation or hydrologically connected groundwater or both.  The Court need only be

25  satisfied that the Settlement Agreement represents a reasonable factual determination.  *See*

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 10

1   *Oregon*, 913 F.2d at 581.  In light of the evidence concerning actual safe yield, the Court is

2   persuaded that the moving parties have based their allocations of groundwater on reasonable

3   expectations concerning the findings that would likely be made at trial.

4          Another objection falling within the second category and raised by many of the pro se

5   defendants is that the daily household water allotment provided by the Settlement Agreement

6   (350 gallons per day) is too low.  Marlene and Richard Dawson, and Ken and Ann Dawson,

7   are among the pro se defendants who have asserted a higher actual daily use.  They estimate

8   needing 400 gallons of water per day.  The Dawsons, however, have not articulated how the

9   Settlement Agreement would impair their use.  The Dawsons obtain water from the Sunset

10  Water Association; they hold no independent water right because they have never used water

11  from any source other than the Sunset Water Association.  The Settlement Agreement does

12  not impose any limit on water use by members of the Sunset Water Association; rather, the

13  Settlement Agreement simply requires that the Sunset Water Association use the figure of

14  300 gallons per day per connection when evaluating the number of parcels it can serve with

15  its 35-afy allocation.  The Settlement Agreement does not prevent the Sunset Water

16  Association from relying on higher figures when evaluating how many parcels it can serve,

17  and it does not affect the amount of water that the Dawsons may draw from the Sunset Water

18  Association.

19         Also asserting a desire for more than 350 gallons of water per day are several

20  individual- or shared-well users.  The pro se well users provide very little support for their

21  claim that their actual water consumption exceeds 0.39 afy.  None of the wells at issue are

22  metered, and none of the well users have tracked their actual consumption by counting toilet

23  flushes, showers, dishwasher loads, laundry cycles, and the like.  Some of the well users

24  have testified that they based their estimated water needs on the "Tampa Water Use

25  Calculator," which is available via the Internet.  According, however, to Andrew Dunn, a

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 11

1   licensed hydrogeologist employed at Ecology's Northwest Regional Office, the Tampa

2   Water Use Calculator is not a scientific tool, is not applicable to conditions in the Case Area,

3   and contains some flawed assumptions.  Dunn. Decl. at ¶ 5 (docket no. 1130).  The

4   Calculator assumes year-round irrigation, which is not required in northwest Washington,

5   and substantially overestimates the amount of water used by standard washing machines.  *Id.*

6   (Energy Star qualified washers use 25 gallons per load, while the Calculator assumes 55

7   gallons per load).

8        Again, in deciding whether to approve the Settlement Agreement, the Court need not

9   resolve factual disputes.  The Court's task is not to determine how much water an average

10  household requires per day or year; rather, the Court's review is limited to assessing whether

11  the figure used in the Settlement Agreement is reasonable.  In contrast to the lack of data

12  supplied by the pro se well users, the moving parties have submitted evidence relevant to the

13  Case Area lending factual support for the allocation specified in the Settlement Agreement,

14  namely 350 gallons of water per day per household.  *See* Smith Decl. at ¶ 2 (docket no.

15  1131) (according to the records of the Georgia Manor Water Association, for the years 1995

16  through 2006, the average daily water usage per home served by the Association has been

17  less than 300 gallons per day); Heintz Decl. at ¶ 2 (docket no. 1132) (according to the Sunset

18  Water Association, for the years 2001 through 2006, the highest average household usage

19  was less than 300 gallons per day).  Moreover, a report submitted by one of the pro se

20  defendants gives further credence to the usage amount upon which the moving parties have

21  settled.  *See* Bellingham Water Meter Pilot Project Report, Exh. 1 to Walker Response

22  (docket no. 1162) (indicating that the average daily water consumption per household during

23  the period from April 2000 through January 2002 was 229 gallons per day for metered users

24  and 213 gallons per day for flat-rate users, and that the highest average household usage was

25  289 gallons of water per day, which was during the dryer summer months).  Thus, based on

26

1  the record before the Court, the Court is satisfied that the Settlement Agreement is premised

2  on reasonable determinations concerning the amount of water that can be safely withdrawn

3  annually from the aquifer and the amount of water that an average household requires on a

4  daily or yearly basis.

5              **3.    Fears and Concerns**

6           The third category of objections includes a number of misgivings based on

7  longstanding animosity toward the Lummi Nation.  Concerns have been raised about non-

8  Lummi property owners being subject to tribal jurisdiction and about non-Lummi property

9  owners being subject to discrimination.  The Settlement Agreement, however, expressly

10  addresses these fears.  The Settlement Agreement provides that "[c]onnection to the Lummi

11  tribal water system under the terms of this Agreement shall not be considered a consent to

12  tribal jurisdiction for any purpose" and that "no distinction in rates and charges [for water

13  from the tribal system] shall be made on the basis of race, color, creed, religion, or tribal

14  membership of the owner of the property served."  Settlement Agreement at § X.E.2.c on

15  p. 44 (docket no. 1056-3).  Moreover, to the extent that non-Lummi property owners receive

16  water from Ecology's allocation, they will be subject under the Settlement Agreement to

17  regulation by Ecology, not the Lummi Nation.[7]

18           The pro se defendants also complain that the Settlement Agreement is weighted too

19  heavily in favor of the Lummi Nation, which is permitted to use its water for any purpose,

20  including casinos and hotels.  The perception of unfairness, however, appears to relate more

21  to past interactions with the Lummi Nation and dissatisfaction with the course of

22  _____

23  [7] Even if, however, the Settlement Agreement had provided for complete control by the Lummi
   Nation, the threat to the Lummi aquifer might justify regulation by the tribe over non-members living

24  on the Lummi Reservation.  *See* *Montana v. United States*, 450 U.S. 544, 566 (1981) ("A tribe may
   also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands

25  within its reservation when that conduct threatens or has some direct effect on the political integrity,
   the economic security, or the health or welfare of the tribe.").

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 13

negotiations in this case than to any substantive deficiency in the Settlement Agreement. When viewed through a less tainted lens, the Settlement Agreement exhibits a balance rarely seen in litigation concerning a precious and potentially scarce commodity; it preserves the resource rights of the Lummi Nation, while guaranteeing existing users a sufficient amount of water for their needs and making water available for a limited number of future users. The pro se objectors fail to explain how their concerns would be in any way better addressed by trial in this matter.

### 4.    Outside Scope of Litigation

Pro se defendant Fred Larsen owns vacant land in the Harnden Island View area and claims membership in the Harnden Island View Water Association pursuant to language in the deed for his property.  As written, the Settlement Agreement grants the Harnden Island View Water Association 4.29 afy, which is sufficient for the existing 11 members of the Association.  Mr. Larsen seeks an allocation of 10.53 afy to allow for development of an additional 27 parcels.  The Harnden Island View Water Association, however, does not have a state water right permit or certificate, and its water rights are based entirely on past beneficial use.  The previous use of water by existing Association members does not create rights of future use by Mr. Larsen or other owners of vacant lots.  Mr. Larsen raises a dispute that is strictly between the Association and any aggrieved undeveloped property owners, and it is beyond the scope of this litigation.

Likewise, Gloria and C. Dean Hanson's complaints about thwarted attempts to obtain water from the Gooseberry Point Water Association or the Lummi Nation are beyond the scope of this litigation.  The fact remains that the Hansons cannot now establish a water right based on past use, and the Settlement Agreement provides them the best chance of securing water for their undeveloped land.  Under the Settlement Agreement, an owner of vacant property within the Case Area may apply for a permit to draw groundwater from Ecology's

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 14

allocation.  The task of determining which applications for future use have adequate merit is best left to those designated by the Settlement Agreement.  The Court would have no involvement in such matters if this case proceeded to trial because potential future users would have no water rights under federal or state law.

Finally, pro se defendant Chuck McCord suggests that the Settlement Agreement should provide a tribal member purchasing property from a non-tribal member the option of leaving the associated water in Ecology's allocation, rather than diverting it to the Lummi Nation, as a means of facilitating future transfers to non-Lummi individuals.  Although Mr. McCord's idea is intriguing, the Court simply does not have the authority to force the parties to agree to such resolution.  The Court is satisfied that the Settlement Agreement does not in any way preclude transfers from tribal members to non-tribal members.  Whether such transfers would convey any water rights and whether Ecology or the Lummi Nation would regulate such rights, if any, is not a justiciable controversy currently before the Court.

### C.   Evaluation of the Settlement Agreement

As articulated in a prior order, before approving this type of settlement, the Court must be persuaded that the Settlement Agreement is "fundamentally fair, adequate, and reasonable." *Oregon*, 913 F.2d at 580.  The inquiry required of the Court is "nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Id.* at 581.  Because this case affects the public interest, however, the Court has a "heightened responsibility" to protect those who did not participate in negotiating the compromise or who object to it. *See id.*  Nevertheless, to approve the compromise, the Court need not be convinced that the Settlement Agreement is in the public's "best" interest if it is otherwise reasonable. *Id.*  Having these principles, as well as the criteria set forth in its earlier order, in mind, the Court is prepared to approve the Settlement Agreement upon receipt of the final version as described in more detail below.

1    First, the Court concludes that the Settlement Agreement is fundamentally fair,

2  adequate, and reasonable.  It is the product of extensive and creative negotiations, and it

3  equitably apportions the available groundwater on the Lummi Peninsula.  Approximately

4  20% of the land within the Case Area is owned by non-Lummi defendants, and the

5  Settlement Agreement allocates 24% of the actual safe yield from the aquifer to those

6  defendants.  Moreover, the Settlement Agreement allows for a reasonable amount of

7  additional construction, securing for a number of non-Lummi defendants water rights that

8  they would not otherwise have.

9    Second, the Court is persuaded that those objecting to the Settlement Agreement have

10 failed to establish either (i) a water right superior to, or even equivalent to, that of the

11 Lummi Nation, or (ii) a water right materially injured by the Settlement Agreement.  The

12 Settlement Agreement provides 350 gallons of water per day per household served by a well;

13 it places no limits on individual usage for households served by a Water Association.  Any

14 claim that the amount of water allocated under the Settlement Agreement does not meet an

15 average property owner's needs is unsupported by the record and amounts to nothing more

16 than speculation.

17   Finally, the Court is convinced that vacatur of its Amended Order dated June 23,

18 2005, docket no. 794, and its precursor Order dated May 20, 2005, docket no. 779, would be

19 in the interests of all parties under the circumstances.  The Court's previous orders set forth

20 the framework for determining water rights within the Case Area consistent with federal and

21 state law.  The Settlement Agreement, however, abandons the federal and state priority

22 systems for allocation of water rights.  Under the Settlement Agreement, the United States

23 and the Lummi Nation have agreed not to assert seniority over other existing water users and

24 have assumed the risks associated with future water shortages.  The Settlement Agreement

25 also departs from federal law as outlined in the Court's previous orders by dividing water

26

1   based on the aquifer's actual safe yield rather than the practicably irrigable acreage

2   combined with an allocation for domestic use.  The moving parties contend, and the Court

3   agrees that, if this action is terminated without vacating the previous orders, those orders will

4   stand at odds with the Settlement Agreement and the parties will have no right to appeal from

5   them.  For these reasons, the Court consents to vacate the orders identified above, and it will

6   do so in an order and judgment entered after the parties submit the final Settlement

7   Agreement.  *See* *Blair v. Shanahan*, 919 F. Supp. 1361 (N.D. Cal. 1996) (vacating a

8   declaratory judgment to permit the State of California to intervene and be heard on the

9   merits, which could no longer be reviewed on appeal because the declaratory judgment had

10  been rendered moot by the settlement between the original parties).

11  **Conclusion**

12        The Settlement Agreement proposed by the moving parties satisfies the standard for

13  judicial approval of such decrees, and the Court believes that it is in the public's best

14  interest.  It reflects difficult decisions and substantial compromise, and it offers a

15  comprehensive and workable solution for all water users in the Case Area.  The moving

16  parties are directed to file the final Settlement Agreement, along with all attachments, within

17  ten (10) days of this Order.  The final Settlement Agreement shall contain the revisions

18  described in footnote 3 of this Order.  Upon review of the final Settlement Agreement, the

19  Court will enter an Order and Judgment substantially in the form shown in the draft attached

20  hereto as Exhibit A.  Any objections to the form of Order and Judgment shall be filed by and

21  noted for November 16, 2007.  The Clerk is directed to RENOTE the Joint Motion to

22  Approve Settlement, docket no. 1056, to November 16, 2007.  The Clerk is further directed

23  to send a copy of this Order to all counsel of record and all pro se parties.

24

25

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 17

1    IT IS SO ORDERED.

2    DATED this 2nd day of November, 2007.

3

4                                        _____
                                         Thomas S. Zilly
5                                        United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER CONDITIONALLY APPROVING
SETTLEMENT AGREEMENT - 18